UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LENNAR MARE ISLAND, LLC, | No.  2:12-cv-02182-KJM-KJN |
| Plaintiff, | |
| v. | ORDER |
| STEADFAST INSURANCE COMPANY, | |
| Defendant. | |
| AND RELATED COUNTERCLAIMS | |

Lennar Mare Island, LLC (LMI), CH2M Hill Constructors, Inc. (CCI), and Steadfast Insurance Company dispute their obligations in the clean-up of Mare Island, a former U.S. Navy base.  Several motions are pending: LMI's motions for partial summary judgment as to the definition of "Government Authority" and "Known Pollution Condition"; Steadfast's motions for leave to amend its counterclaim and for relief from the magistrate judge's discovery order; and CCI's motion to disqualify Steadfast's counsel.  On February 27, 2015, the court held a hearing on CCI's motion to disqualify, as this motion must be decided before the others.  Ryan Werner appeared for Plaintiff Lennar Mare Island, LLC.  Deborah Ballati and Amanda Hairston appeared for CCI.  Merri Baldwin, Ethan Miller, and Brandon Rainey appeared for Steadfast

1

1    Insurance Company.  After considering the parties' briefing and arguments presented at the

2    hearing, the court GRANTS the motion to disqualify.

3    I.        BACKGROUND

4              A.        General Background

5                        The United States Navy operated a base at Mare Island in Vallejo, California from

6    1852 until 1996.  Joint Stmt. Discovery Dispute 2, ECF No. 63.  After a century of use, the land

7    had become contaminated.  *Id.*  After closing the base, the Navy conveyed the land to the City of

8    Vallejo, and Vallejo in turn conveyed a portion of the base to LMI.  *Id.*  With the land came

9    obligations to investigate and clean up pollution.  *Id.* at 2–3.  LMI entered a contract with CCI in

10   which CCI agreed, first, for a fixed price, to investigate and clean up certain known

11   contamination in LMI's parcel of land, and second, to perform other clean-up tasks for additional

12   compensation.  *Id.* at 3.  The contract price included money the Navy had provided to purchase

13   three environmental insurance policies issued by Steadfast.  *Id.*  Two of these insurance policies

14   are the subject of this lawsuit: (1) the Remediation Stop Loss or RSL Policy, now expired, which

15   provided coverage to CCI should the cost of its cleanup of "Known Pollution Conditions" exceed

16   a specific amount; and (2) the Environmental Liability Insurance or ELI Policy, which provides

17   coverage to LMI for the cost of remediating pollution other than the Known Pollution Conditions,

18   along with coverage for certain other conditions.  *Id.*

19                       In this action, LMI alleges Steadfast has caused it several million dollars in

20   damages by refusing to pay for claims under the ELI policy or by delaying payments.  *Id.* at 5;

21   First Am. Compl. ¶¶ 16–17, 25–26, 30–31, ECF No. 22.  It also seeks declaratory relief that

22   Steadfast must pay certain submitted claims.  First Am. Compl. ¶ 34.  Steadfast removed the case

23   to federal court in August 2012.  Not. Removal 1–2, ECF No. 1.  A few days after removal,

24   Steadfast answered LMI's complaint and asserted a counterclaim against both LMI and CCI,

25   seeking declaratory relief in Steadfast's favor.  Answer, ECF No. 4; Counterclaim, ECF No. 5.

26   At this time, Steadfast was represented by attorneys with the firm of Sinott, Puebla, Campagne &

27   Curet, APLC.  Counterclaim 1, 5, ECF No. 5.  In August 2014, several attorneys from Hogan

28

1   Lovells US LLP associated as additional counsel for Steadfast.  Notices of Appearance, ECF Nos.

2   126–129.

3           In December 2014 and January 2015, the parties filed a flurry of motions.  On

4   December 19, 2014, LMI moved for partial summary judgment of the definition of

5   "Governmental Authority."  Mot. Summ. J., ECF No. 160.  On the same day, Steadfast moved to

6   amend its counterclaim.[1]  Mot. Am. Counterclaim, ECF No. 161.  On January 16, 2015, Steadfast

7   moved for partial relief from the magistrate judge's discovery order.  ECF No. 176.  On the same

8   day, CCI moved to disqualify Hogan Lovells.  ECF No. 180.  Finally, on January 30, 2015, LMI

9   moved for partial summary judgment of the definition of "Known Pollution Condition."  ECF No.

10  187.  As noted, the court held a hearing on February 27, 2015, but heard arguments only on the

11  motion to disqualify.  After the hearing, the court allowed Steadfast to submit a sur-reply to

12  address additional evidence offered for the first time in CCI's reply brief on disqualification.  *See*

13  Ballati Reply Decl., ECF No. 220; Wright Reply Decl., ECF No. 223; Brierly Decl., ECF No.

14  224; McCoy Reply Decl., ECF No. 225; Minute Order, ECF No. 242.  Steadfast filed its sur-reply

15  on March 18, 2015.  ECF No. 251.

16          B.      Hogan Lovells's Relationship to the Parties

17          In November 2005, Hogan Lovells's predecessor firm, Hogan & Hartson LLP,

18  began representing CCI's parent corporation, CH2M HILL Companies, Ltd. (CH2M).  Dover

19  Decl. ¶ 3, ECF No. 199.  Over the next several years, Hogan Lovells represented CH2M in

20  several capacities.  Thomas McCoy, CH2M's general counsel since September 2014, submitted a

21  declaration describing the matters in which Hogan Lovells provided legal advice to CH2M and its

22  subsidiaries:

23          [S]ensitive corporate governance and board fiduciary issues; capital
            markets strategy to raise capital as well as divestitures to improve
24          the company's balance sheet; amendments to the company charter
            and an associated Securities and Exchange Commission Proxy
25          Solicitation and Special Shareholder meeting; transfer pricing
            issues; Securities and Exchange Commission compliance issues;
26

        _____

27      [1] Lennar's first motion for summary judgment and Steadfast's motion to amend were
        originally noticed for hearings in January 2015, but were reset on the court's motion to coincide
28      with the other three.  *See* Minute Orders, ECF Nos. 165, 185.

                                                    3

> Foreign Corrupt Practices Act compliance; a significant United Kingdom pension plan regulatory matter; and . . . an internal investigation into project accounting based on a whistleblower complaint.

McCoy Decl. ¶¶ 2, 5, ECF No. 182.  Mr. McCoy attached to his declaration a copy of an October 2014 presentation from Hogan Lovells about the firm's representation of CH2M.  *See id.* Ex. A, ECF No. 182-1.  The presentation, although mostly redacted, describes Hogan Lovells's assistance "with the purchase of the then Lockheed Hanford company," "the acquisition of Halcrow in 2011," and "on a variety of regulatory matters (government contracts, export control, FCPA, sanctions, nuclear regulatory) in both the U.S. and E.U. as well as on corporate matters in both the U.S. and U.K."  *Id.* Ex. A, at 2.  Hogan Lovells has provided legal advice to Michael Szomjassy, the CH2M board member responsible for the Mare Island project, who negotiated with the other participants in that project.  Wright Decl. ¶ 10, ECF No. 181.  CH2M's general counsel, board of directors, and senior management consider Hogan Lovells to be CH2M's "top strategic law firm."  McCoy Decl. ¶ 8.  Mr. McCoy's declaration reports CH2M "is wholly dependent on Hogan Lovells for nearly all of the most important corporate and regulatory issues currently facing the company."  *Id.*  Hogan Lovells billed CH2M approximately $1 million for its work in 2014.  *Id.* ¶ 9.  Most of its work for CH2M has been in Colorado and Washington, D.C. Dover Decl. ¶ 2.

    In this case, in July 2014, after an unsuccessful settlement conference, Steadfast's counsel at the time, David Campagne, told Steadfast his firm did not have the resources to continue as lead counsel.  Campagne Decl. ¶¶ 3–4, ECF No. 198; Duggan Decl. ¶ 3, ECF No. 200.  Steadfast began seeking new counsel and was referred to Ethan Miller.  Duggan Decl. ¶ 3.  Mr. Miller had represented Steadfast previously in a similar matter and had since joined Hogan Lovells, a firm with resources Steadfast considered sufficient for this case.  *Id.*  Steadfast believes its decision to hire Hogan Lovells was correct, particularly thanks to Mr. Miller's familiarity with Steadfast's employees and attorneys, many of whom it believes will be deposed here.  *Id.* ¶ 4.  Thomas Duggan, the Steadfast team manager for environmental claims, considers this litigation "one of the largest matters Steadfast Environmental Claims has faced in many years."  *Id.* ¶¶ 1–2.

1    He believes that should he lose the assistance of Hogan Lovells and Mr. Miller, "Steadfast will be

2    significantly hampered in its ability to meet the serious allegations in this case." *Id.* ¶ 5

3            Steadfast contacted Mr. Miller about this case in July 2014. Miller Decl. ¶ 4, ECF

4    No. 20. Hogan Lovells checked for conflicts of interest and discovered it represented CH2M,

5    although at the time the firm was not providing legal services directly to CCI. *Id.*; Dover Decl.

6    ¶ 6. Hogan Lovells's only engagement directly with CCI occurred in 2008, when CCI was a joint

7    client with another CH2M affiliate, CH2 Savannah River Company. Dover Decl. ¶ 6. In that

8    matter, a mediation effort, Hogan Lovells advised CCI in a fee dispute after CCI had remediated a

9    former government site. *Id.*; Wright Decl. ¶ 9. The matter did not involve any insurance or

10   coverage disputes. Dover Decl. ¶ 6; Dover Sur-Reply Decl. ¶ 5, ECF No. 251-3.

11           Agnes Dover, the Hogan Lovells partner who works most with CH2M, learned

12   Steadfast had contacted Mr. Miller and then called Kirby Wright, CH2M's lead on litigation

13   matters. Dover Decl. ¶¶ 7–8. She believed Hogan Lovells's representation of Steadfast would

14   create no conflict of interest thanks to a prospective waiver of conflicts in CH2M's original

15   engagement letter, but wanted Mr. Wright to know about it. *Id.* ¶ 8. Mr. Wright remembers he

16   said CH2M was a company that tended to honor its agreements and would review the engagement

17   letter. Wright Decl. ¶ 3; Dover Sur-Reply Decl. ¶ 6. Ms. Dover recalls Mr. Wright reassured her

18   CH2M would not move to disqualify Hogan Lovells. Dover Decl. ¶ 8. Ms. Dover asked Mr.

19   Wright what he would do in her shoes, and he said he would do what was in the law firm's best

20   interest. Wright Decl. ¶ 4. Ms. Dover interpreted this to mean Hogan Lovells should proceed

21   with the Steadfast litigation, Dover Decl. ¶ 8; Mr. Wright avers he did not intend to give consent,

22   Wright Decl. ¶ 4. After their conversation, Ms. Dover sent Mr. Wright an email to confirm

23   Hogan Lovells would continue to represent both Steadfast and CH2M, and to affirm her belief no

24   further consent was needed. Dover Decl. ¶ 9; *id.* Ex. B, ECF No. 199-2. She reassured him no

25   Hogan Lovells lawyer who represented CH2M would also work on the Steadfast case. *Id.* Ex. B.

26   She did not hear from Mr. Wright again, and interpreted his silence as consent. *See* Dover Sur-

27   Reply Decl. ¶ 7 ("Based on my conversation with Mr. Wright . . . and the fact that neither he nor

28   anyone else in the company objected to our relying on the advance waiver, I had a good faith

1    belief that [CH2M] intended to honor the advance waiver.").  Hogan Lovells has not requested,

2    and CH2M and CCI have not provided, any further consent, written or otherwise.  Mr. McCoy

3    states that CH2M and CCI have not and will not consent to Hogan Lovells's representation of

4    Steadfast here.  McCoy Decl. ¶ 12.

5         On August 20 and 21, 2014, Ethan Miller, David Skaar, Benjamin Diggs, and Neil

6    O'Hanlon of Hogan Lovells associated as additional counsel for Steadfast.  Notices of

7    Appearance, ECF Nos. 126–129.  Blaise Curet, Jane Baker, Stephen Wong, and William

8    Campagne of Sinnott, Puebla, Campagne & Curet continue to represent Steadfast as co-counsel.

9    Since August, Hogan Lovells has billed Steadfast several thousand hours for the work of ten

10   attorneys, three paralegals, and other support professionals.  Miller Decl. ¶¶ 6, 15.  Hogan Lovells

11   attorneys have reviewed and produced documents, responded to discovery requests, conducted

12   interviews on the East Coast and in Southern California, visited the Mare Island site, negotiated

13   deposition schedules, prepared for depositions, strategized with Steadfast, and prepared and filed

14   the currently pending motions.  *Id.* ¶¶ 7–14.

15        On December 17, 2014, Mr. Miller contacted Deborah Ballati, CCI's counsel, to

16   request CCI stipulate to Steadfast's filing of a first amended counterclaim.  Ballati Decl. ¶ 2, ECF

17   No. 183.  Ms. Ballati did not agree to the stipulation and explained her understanding that the

18   court's scheduling order did not allow any further pleadings without a showing of good cause.  *Id.*

19   ¶ 3.  On December 19, 2014, Steadfast filed a motion to amend its counterclaim.  Mot. Am. 14,

20   ECF No. 161.  The proposed counterclaim included several new claims, including for

21   misrepresentation and accounting irregularities.  Proposed Am. Counterclaim ¶¶ 70–110, ECF

22   No. 164-1. A few weeks later, on January 13, 2015, Mr. McCoy, CH2M's general counsel,

23   contacted Ms. Dover about Hogan Lovells's role in this case.  McCoy Decl. ¶ 10.  He said that

24   the firm's representation of Steadfast was a "serious concern," and worried Hogan Lovells

25   attorneys might seek to depose CH2M's senior executives.  Dover Decl. ¶ 14.  A day after Mr.

26   McCoy spoke with Ms. Dover, CCI's counsel contacted Hogan Lovells to confirm it intended to

27   file a motion to disqualify.  Ballati Decl. ¶ 4.  After filing its motion, CCI has refused to allow

28

1  Hogan Lovells to depose CCI witnesses.  Miller Decl. ¶ 21.  Hogan Lovells has continued to

2  make Steadfast witnesses available for deposition.  *Id.* ¶ 22.

3  II.     DISCUSSION

4          A.      Conflicts of Interest in General

5                  This District has adopted the Rules of Professional Conduct of the State Bar of

6  California, and any applicable state court decisions, as its own standards of professional conduct.

7  E.D. Cal. L.R. 180(e).  The District's local rules require both familiarity and compliance with

8  California's Rules.  *Id.*  California Rule of Professional Conduct 3-310 provides, in relevant part,

9                          A member [of the State Bar of California] shall not, without the
                           informed written consent of each client:
10

11                         (1) Accept representation of more than one client in a matter in
                           which the interests of the clients potentially conflict; or

12                         (2) Accept or continue representation of more than one client in a
                           matter in which the interests of the clients actually conflict; or
13

14                         (3) Represent a client in a matter and at the same time in a separate
                           matter accept as a client a person or entity whose interest in the first
15                         matter is adverse to the client in the first matter.

16                         . . .

17                         A member shall not, without the informed written consent of the
                           client or former client, accept employment adverse to the client or
18                         former client where, by reason of the representation of the client or
                           former client, the member has obtained confidential information
19                         material to the employment.

20  Cal. R. Prof'l Conduct 3-310(C), (E).

21                  If an attorney or firm takes on a representation in violation of these rules, a client

22  may move for disqualification.  *See* E.D. Cal. L.R. 110 ("Failure of counsel . . . to comply with

23  these Rules . . . may be grounds for imposition . . . of any and all sanctions authorized by statute

24  or Rule or within the inherent power of the Court."); *Visa U.S.A., Inc. v. First Data Corp.*, 241 F.

25  Supp. 2d 1100, 1103 (N.D. Cal. 2003) ("The right to disqualify counsel is within the discretion of

26  the trial court as an exercise of its inherent powers.") (citing *United States v. Wunsch*, 84 F.3d

27  1110, 1114 (9th Cir. 1996)).  "The district court is permitted to resolve disputed factual issues in

28  deciding a motion for disqualification and must make findings supported by substantial

1   evidence." *Id.* (citing *Dept. of Corporations v. SpeeDee Oil Change Syst.*, 20 Cal. 4th 1135, 1143

2   (1999)).  When faced with ethical disputes, courts may also look to ethics opinions from

3   California and other jurisdictions.  *Cargill Inc. v. Budine*, No. 07-349, 2007 WL 1813762, at *7 &

4   n.3 (E.D. Cal. June 22, 2007) (citing Cal. R. Prof'l Conduct 1-100(A)).

5              Disqualification is a blunt tool meant to encourage wide berth of ethical grey

6   areas, its ruthlessness warranted only after a clear showing of conflict.  On the one hand,

7   "[b]ecause disqualification is a drastic measure, it is generally disfavored and should only be

8   imposed when absolutely necessary."  *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 814

9   (N.D. Cal. 2004).  *See also Gregori v. Bank of Am.*, 207 Cal. App. 3d 291, 300–01 (1989)

10  ("[M]otions to disqualify counsel often pose the very threat to the integrity of the judicial process

11  that they purport to prevent."); *Visa*, 241 F. Supp. 2d at 1104 ("[S]uch requests 'should be

12  subjected to particularly strict judicial scrutiny.'" (quoting *Optyl Eyewear Fashion Int'l Corp. v.

13  Style Cos.*, 760 F.2d 1045, 1050 (9th Cir. 1985)).  On the other hand, particularly when a party

14  alleges a conflict between two of a firm's current clients, "the paramount concern must be the

15  preservation of public trust both in the scrupulous administration of justice and in the integrity of

16  the bar.  Consequently, the recognizably important right to choose one's counsel must yield to the

17  ethical considerations that embody the moral principles of our judicial process."  *State Farm Mut.

18  Auto. Ins. Co. v. Fed. Ins. Co.*, 72 Cal. App. 4th 1422, 1428 (1999).  "As a practical matter, an

19  attorney must be able to determine beforehand whether particular conduct is permissible;

20  otherwise, an attorney would be uncertain whether the rules had been violated until . . . he or she

21  is disqualified.  Unclear rules risk blunting an advocate's zealous representation of a client."

22  *Snider v. Superior Court*, 113 Cal. App. 4th 1187, 1197–98 (2003) (quoting *Nalian Truck Lines,

23  Inc. v. Nakano Warehouse & Transportation Corp.*, 6 Cal. App. 4th 1256, 1261 (1992))

24  (alterations in *Snider*).

25             The court therefore must "'weigh the combined effect of a party's right to counsel

26  of choice, an attorney's interest in representing a client, the financial burden on a client of

27  replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding

28  against the fundamental principle that the fair resolution of disputes within our adversary system

1   requires vigorous representation of parties by independent counsel unencumbered by conflicts of

2   interest.'" *In re Lee G.*, 1 Cal. App. 4th 17, 26 (1991) (quoting *William H. Raley Co. v. Superior*

3   *Court*, 149 Cal. App. 3d 1042, 1048 (1983)).  Disqualification is not a punishment for ethical

4   transgressions, but a protection of the integrity of the judicial process.  *See Cargill*, 2007 WL

5   1813762, at *7.  The decision is one of discretion.  *See Wunsch*, 84 F.3d at 1114.

6       1.  Successive and Concurrent Conflicts

7      California law distinguishes two types of conflict.  A successive conflict of interest

8   arises when the interests of a current client conflict with those of a former client.  *See Oaks Mgmt.*

9   *Corp. v. Superior Court*, 145 Cal. App. 4th 453, 463 (2006).  A concurrent conflict places the

10  interests of two current clients at odds.  *See id.*  If the conflict is successive, the "'chief fiduciary

11  value jeopardized is that of client *confidentiality*.'"  *Robert Bosch Healthcare Sys., Inc. v.*

12  *Cardiocom, LLC*, No. 14-1575, 2014 WL 2703807, at *3 (N.D. Cal. June 13, 2014) (quoting *Flatt*

13  *v. Superior Court*, 9 Cal. 4th 275, 283 (1994)) (emphasis in *Flatt*).  If the conflict is concurrent,

14  "'[t]he primary value at stake . . . is the attorney's duty—and the client's legitimate expectation—

15  of *loyalty*, rather than confidentiality.'"  *Id.* (quoting *Flatt*, 9 Cal. 4th at 284) (emphasis in *Flatt*).

16  Nevertheless, the duty of confidentiality and loyalty apply in both concurrent and successive

17  cases.  *Id.* (citing *Damron v. Herzog*, 67 F.3d 211, 214 (9th Cir. 1995) and *City & Cty. of S.F. v.*

18  *Cobra Solns., Inc.*, 38 Cal. 4th 839, 846 (2006)).

19     Different standards govern the analysis of concurrent and successive conflicts.  If

20  the conflict is successive, the court determines whether the representations are substantially

21  related.  *Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.*, 36 Cal. App. 4th 1832, 1839 (1995).  If

22  the representations are substantially related, an attorney's access to adverse confidential

23  information is presumed and he or she must be disqualified.  *Kirk v. First Am. Title Ins. Co.*, 183

24  Cal. App. 4th 776, 796 (2010).  Whether two representations are substantially related depends on

25  the factual situation, legal questions, and the attorney's involvement in the two cases.  *Morrison*

26  *Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 69 Cal. App. 4th 223, 234 (1999).  "[T]he court

27  should examine the time spent by the attorney on the earlier cases, the type of work performed,

28  and the attorney's possible exposure to formulation of policy or strategy."  *Id.*  Information from

1   the first representation must be material to the second.  *Id.* (citing Cal. R. Prof'l Conduct 3-

2   310(E)).

3           The rule against concurrent conflicts is less forgiving.  An attorney will be

4   automatically disqualified from simultaneously representing two clients with adverse interests

5   without both clients' informed, written consent, even if the two matters have nothing in common.

6   *Flatt*, 9 Cal. 4th at 284; *see also W. Sugar Coop. v. Archer-Daniels-Midland Co.*, No. 11-3473,

7   2015 WL 690306, at *4 (C.D. Cal. Feb. 13, 2015) (collecting authority on this point).  "It is

8   immaterial whether the lawyer possesses confidential information that could be misused to the

9   prejudice of either client."  *Cal. W. Nurseries, Inc. v. Superior Court*, 129 Cal. App. 4th 1170,

10   1175 (2005) (citations and internal quotation marks omitted).  As the California Supreme Court

11   explains:

12           A client who learns that his or her lawyer is also representing a
             litigation adversary, even with respect to a matter *wholly unrelated*
13           to the one for which counsel was retained, cannot long be expected
             to sustain the level of confidence and trust in counsel that is one of
14           the foundations of the professional relationship.  All legal
             technicalities aside, few if any clients would be willing to suffer the
15           prospect of their attorney continuing to represent them under such
             circumstances.
16

17   *Flatt*, 9 Cal. 4th at 285 (emphasis in original).  "Ethical walls" or "screens," which may prevent a

18   conflict of interest from arising in a successive representation, "do nothing to mitigate conflict

19   arising from concurrent adverse client relationships, since the purpose of the prohibition against

20   such relationships is to preserve the attorney's duty of loyalty, not confidentiality, to his client."

21   *Concat*, 350 F. Supp. 2d at 822.

22           2.      Conflicts in this Case; Defenses

23           Here, Hogan Lovells's representation of Steadfast, CH2M, and CCI may give rise

24   to both concurrent and successive conflicts of interest.  If Hogan Lovells now represents both

25   Steadfast and CCI, its conflict is concurrent, and disqualification is the *per se*, automatic result.

26   Steadfast argues CH2M, CCI's corporate parent, is Hogan Lovells's current client, not CCI, so if

27   a conflict exists, it is successive, not concurrent.  Whether or not CCI is a current Hogan Lovells

28   client, Steadfast concedes that CCI is a former client by virtue of the Savannah River matter

10

1  described above, Opp'n Mot. Disqualify 14, and disqualification may be necessary if that

2  representation was substantially related to this case.

3         Steadfast presents two additional defenses.  First, it argues the advance waiver in

4  Hogan Lovells's engagement letter applies to this conflict, whether concurrent or successive, and

5  embodies CH2M's and CCI's consent.  Second, it argues that CCI's delay in bringing the motion

6  shows the motion was tactically motivated and should be denied

7        B.    Corporate Separation

8            1.    Professional Rules

9         The California Rules of Professional Conduct draw a distinction between

10  representation of an organization and its constituents.  *See* Cal. R. Prof'l Conduct 3-600(A) ("In

11  representing an organization, a member shall conform his or her representation to the concept that

12  the client is the organization itself . . . .").  The California State Bar interpreted this rule in a

13  formal ethical opinion in 1989.  *See* State Bar of Cal. Standing Comm. On Prof'l Responsibility

14  and Conduct, Formal Opinion No. 1989-113.  In that opinion the Bar addressed whether it was

15  "ethically permissible for an attorney to undertake a representation adverse to a wholly-owned

16  subsidiary of an existing corporate client."  It answered in the affirmative, but conditioned the

17  answer on two exceptions.  First, "[w]hen a corporation is the alter ego of another entity or has a

18  sufficient unity of interests, they should be treated as the same entity for conflict purposes."  *Id.*

19  Second, an attorney may have obtained confidential information from a subsidiary, and the

20  attorney could be precluded from an adverse representation if the confidential information is

21  relevant.  *Id.*

22         The American Bar Association (ABA) has also addressed the question.  ABA

23  Standing Comm. On Ethics and Prof'l Responsibility, Formal Ethics Opinion 95-390.  It has

24  concluded representation of a corporate parent would not necessarily preclude adverse

25  representation of its subsidiary.  *Id.*  But the ABA cautioned "the circumstances of a particular

26  representation may be such that the corporate client has a reasonable expectation that [its]

27  affiliates will be treated as clients, either generally or for purposes of avoidance of conflicts, and

28  the lawyer is aware of the expectation."  *Id.*  Therefore "the better course" is for the lawyer to

obtain the parent corporation's consent.  *Id.*  The ABA Committee described several factual

circumstances that could give rise to a conflict of interest.  A duty of loyalty may arise after a

lawyer's work for a parent that was designed to benefit all its subsidiaries, for example on a stock

offering or other financing.  *Id.*  If a subsidiary's in-house counsel reports to the parent's general

counsel, and that general counsel is represented by the lawyer, the corporate parent and subsidiary

may expect to be treated together as one client.  *Id.*  A lawyer may also obtain confidential

information from the parent relevant to a dispute with the subsidiary and thereby represent both.

*Id.*  Or a parent and subsidiary could be so closely connected as to share an identity for purposes

of the representation.  *Id.*  The ABA quoted *Teradyne, Inc. v. Hewlett-Packard Co.*, a case

interpreting California law:

> In determining whether there is a sufficient unity of interests to
> require an attorney to disregard separate corporate entities for
> conflict purposes, the attorney should evaluate whether corporate
> formalities are observed, the extent to which each entity has distinct
> and independent managements and boards of directors and whether,
> for legal purposes, one entity could be considered the alter ego of
> the other.

*Id.* (quoting No. 91-0344, 1991 WL 239940, at *4 (N.D. Cal. June 6, 1991)).  In the ABA's

opinion, the parent's ownership of the subsidiary would not alone equate the two for conflict

purposes, but if they share management and a legal department, they may be one client.

### 2.    Case Law

California courts have weighed in, although only infrequently.  The most

prominent case is *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 69 Cal. App. 4th

223 (1999).  The *Morrison Knudsen* court described a test for the parent and subsidiary's "unity

of interests" and clarified the law does not require the two entities be alter egos.  *Id.* at 248–52.

The *Morrison Knudsen* test is pragmatic, designed to probe whether "the attorney's relationship

with the corporate family . . . may give the attorney a significant practical advantage in a case

against an affiliate."  *Id.* at 253.  Since *Morrison Knudsen* was decided, a three-factor inquiry has

crystallized.  First, a firm may represent the subsidiary if it receives confidential information from

the parent substantially related to the claim against the subsidiary, a fact which alone may require

disqualification.  *Id.* at 245.  This factor is essentially a more specific application of the

1   substantial relationship test, drawn from cases such as *Flatt, supra*; *see, e.g.*, *Bosch*, 2014 WL

2   2703807, at *7.  Second, the parent and subsidiary may share a unity of interests if the parent

3   controls the subsidiary's legal affairs or if the parent and subsidiary share a legal department.

4   *Morrison Knudsen*, 69 Cal. App. 4th at 246; *see also Teradyne*, 1991 WL 239940, at *5 ("[The

5   parent's] control and supervision of the legal affairs of [its subsidiary], and specifically its direct

6   role in the retention and supervision of the work of [its] outside counsel, represents a significant

7   identity of legal interest between [subsidiary and parent].").  Third, the parent and subsidiary may

8   have a unity of interests if they share operations and management.  *Morrison Knudsen*, 69 Cal.

9   App. 4th at 246–47.  The *Morrison Knudsen* court held the trial court had not erred by applying

10  California State Bar Opinion 1989-113, ABA Formal Opinion 95-390, and related case law and

11  affirmed the decision to disqualify counsel.  69 Cal. App. 4th at 252 (citing *Teradyne*, 1991 WL

12  239940, at *4, and *Baxter Diagnostics v. AVL Scientific Corp.*, 798 F. Supp. 612 (C.D. Cal.

13  1992)).  The court acknowledged the factually intensive nature of a motion to disqualify and

14  believed the unity-of-interests test would evolve to "take more definite and useful shape" over

15  time.  *Id.*

16          Although *Morrison Knudsen* is the most thorough development of the unity-of-

17  interests test, it was decided in the context of a successive representation.  *See* 69 Cal. App. 4th at

18  230–31.[2]  In light of this fact, the Northern District court concluded its application was not

19  ───────────────

20          [2] At hearing, Steadfast's counsel argued *Morrison Knudsen* was decided in the context of
    a concurrent representation.  That court's order, however, speaks for itself:

21          [T]he trial court found that Morrison [the parent] was *not* Hancock's [the law
            firm's] client when Hancock acted as monitoring counsel.  [¶]  This finding was
22          supported by substantial evidence.  The evidence shows that Morrison's
            underwriters, not Morrison, retained Hancock to monitor the other attorneys
23          Morrison hired to defend against insured claims.  Hancock was paid for its services
            by the underwriters, not Morrison, and reported to the underwriters rather than
24          Morrison.  The underwriters' interests were actually or potentially adverse to those
            of Morrison in at least some of the matters in which Hancock became involved.
25          Under the circumstances, the court reasonably concluded that Hancock did not
            presently represent Morrison.  Thus, the per se disqualification rule does not apply.
26

27  69 Cal. App. 4th at 230–31 (emphasis in original).  The Northern District court adopted this same
    interpretation of *Morrison Knudsen* in *Certain Underwriters at Lloyd's London v. Argonaut*
28  *Insurance Co.*, 264 F. Supp. 2d 914, 922 (N.D. Cal. 2003) ("[T]he 'unity of interest' analysis in

dispositive in an alleged concurrent conflict. *See Certain Underwriters at Lloyd's London v. Argonaut Ins. Co. (Argonaut)*, 264 F. Supp. 2d 914, 922 (N.D. Cal. 2003).  Because concurrent conflicts of interest pose inherent threats to an attorney's loyalty first and foremost, disclosure of confidential information and a resulting "practical litigation advantage" are of secondary concern. *Id.* at 922.  Therefore, if a subsidiary alleges a concurrent conflict, its interest is sufficiently unified with its parent's if the representation "reasonably diminishes the level of confidence and trust in counsel." *Id.* at 922 (internal quotation marks omitted).  The *Argonaut* court went on to describe how the facts of the case before it satisfied this test: "(1) the relatively direct financial relationship between [parent and subsidiary] as a result of the [insurance] pooling agreement and (2) [their] common management, including supervision over the legal affairs of both entities at issue in the two suits in which [the law firm] is involved—mandate the conclusion that the two should be treated as one entity . . . ." *Id.* at 924.

The reasoning of *Argonaut* is persuasive.  Mechanical application of the *Morrison Knudsen* test here, where CCI alleges a concurrent conflict, would unjustifiably import the substantial relationship analysis from the successive representation context.  The court's focus would incorrectly shift from the client's reasonable expectations of loyalty to the possible strategic advantage gained from exchanges of confidential information.  The duties of confidentiality and loyalty assuredly must apply in both concurrent and successive representations; an obvious practical advantage gained by misappropriation of confidential information would surely weigh in favor of disqualification in a concurrent representation.  But the lack of practical strategic advantages cannot be dispositive in an alleged concurrent conflict. *See id.* at 922–24.

The *Morrison Knudsen* court's expectation that the unity-of-interests test would "develop on a case-by-case basis," 69 Cal. App. 4th at 253, and its citation to *William H. Raley*

---

*Morrison Knudsen* was undertaken in the context of the conflict of interest claim based on the successive representation model—the focus was on the acquisition of confidential information from the parent which could be used against the subsidiary.").  Here, unlike in *Morrison Knudsen*, Hogan Lovells currently represents both CH2M and Steadfast.

14

*Co.*, 149 Cal. App. 3d at 1048, support this conclusion.  In *Raley*, the court held that a conflict of interest could arise with a non-client not only when an attorney acquires confidential information, but also when a "relationship with a person or entity creates an expectation that the attorney owes a duty of fidelity."  149 Cal. App. 3d at 1047 (citations and internal quotation marks omitted).  This logic squares with that of the ABA Committee.  *See supra* Formal Opinion 95-390 ("[T]he circumstances of a particular representation may be such that the corporate client has a reasonable expectation that the affiliates will be treated as clients, either generally or for purposes of avoidance of conflicts, and the lawyer is aware of the expectation.").

       3.  Unity of Interests Analyzed

    Here, the record discloses that "CCI does not have a separate legal team.  [CH2M] controls all of the legal affairs of CCI."  McCoy Reply Decl. ¶ 7, ECF No. 225; *see also* McCoy Decl. ¶ 9, ECF No. 182 ("I consider Hogan to be strategic counsel to [CH2M] and CCI and I have communicated this clearly to partners at Hogan.  In 2014, Hogan attorneys in seven different offices billed over $1 million for work performed for the benefit of CH and its subsidiaries."); Wright Decl. ¶¶ 2, 9 (the same Hogan Lovells partner has represented both CH2M and CCI).  CH2M's accounting practices and controls are uniform across all its projects.  McCoy Reply Decl. ¶ 3.  Hogan Lovells partners have had access to uniform, company-wide accounting data and assisted CH2M in investigations that required "a deep and thorough understanding of how the company accomplishes percentage of completion accounting in all its projects."  *Id.* ¶ 2.  Hogan Lovells has provided legal advice to a member of the CH2M board, Mr. Szomjassy, who is responsible for the Mare Island project.  Wright Decl. ¶ 10.  Hogan Lovells has represented CH2M and CCI in a past adversarial setting similar to this one, in which Hogan Lovells and CCI mediated a fee dispute for remedial work on a former government site.  Dover Decl. ¶ 6; Wright Decl. ¶ 9.  Hogan Lovells has represented CH2M in matters involving the entire corporate family's compliance with the Foreign Corrupt Practices Act (FCPA), and CH2M's FCPA compliance program does not differ by constituent entity.  *See generally* Brierly Decl., ECF No. 224 (describing Hogan Lovells's FCPA engagement and CH2M's compliance program).  Hogan Lovells's representation of CH2M exposes it to the parent corporation's board of directors and

1    executive officers.  CH2M has entrusted Hogan Lovells attorneys with a wide variety of

2    confidences: the board members' fiduciary duties, the company's capital market strategies, its

3    balance sheet and financial position, FCPA compliance, its regulatory disclosures, and

4    information about a whistleblower complaint and resulting company internal investigation.

5    McCoy Decl. ¶ 5.

6            On the other hand, some facts weigh in Steadfast's favor.  Overall, Hogan

7    Lovells's work for CH2M is largely unrelated in purpose to the Steadfast litigation, has generally

8    taken place in Colorado and Washington, D.C., and the firm has ensured no lawyer individually

9    represents both Steadfast and CCI or CH2M.[3]  *See, e.g.*, Sur-Reply 6–10.  This case does not

10   involve the types of direct parent-subsidiary insurance connections that proved dispositive in

11   *Argonaut*, 264 F. Supp. 2d at 914.  And although Hogan Lovells has represented Mr. Szomjassy,

12   CH2M's board member responsible for the Mare Island project, it appears unlikely he will testify

13   here.  *See* Miller Decl. ¶ 19.

14           On balance, the facts weigh in favor of the conclusion that CCI and CH2M are a

15   unified client.  Hogan Lovells has advised CH2M on strategic decisions in matters that impact the

16   entire corporate family, CH2M and CCI share the same legal department, and the company

17   considers Hogan Lovells to be both its and its subsidiaries' top strategic firm.

18           4.      Client Identification

19           Hogan Lovells protests it never agreed to represent CH2M's subsidiaries.

20   CH2M's in-house counsel signed a representation agreement on its behalf in 2005.  Dover Decl.

21   Ex. A, at 1, ECF No. 199-1.  The agreement included the following sentence under the heading

22   "Client Identification":

23           [3] CCI has submitted evidence that some Hogan Lovells lawyers associated as counsel in
     this case have been included in CH2M's internal system for tracking its attorneys' billing.  *See*
24   Wright Reply Decl. ¶ 9, ECF No. 223.  In its sur-reply and the declarations attached, Hogan
     Lovells explains that this internal system lists any lawyer who has ever worked for CH2M in any
25   capacity, and even includes lawyers who are no longer associated with Hogan Lovells or are
     deceased.  *See* Sur-Reply 9–10; Scott Decl. ¶¶ 4–5, ECF No. 251-1.  The firm vows it has erected
26   an effective "ethical wall" between any of its attorneys representing Steadfast and the others
     representing CH2M, and the court sees no reason to discount these assertions.  *See* Sur-Reply 9;
27   Dover Sur-Reply Decl. ¶ 3, ECF No. 251-3; Miller Sur-Reply Decl. ¶¶ 4–5, ECF No. 251-4.

28

> You agree that the person or entity identified as engaging us in the Transmittal Letter is our client for the specific matters on which we are engaged, and that we shall not be deemed to represent any of its parents, subsidiaries, or other affiliates unless we expressly agree in writing to do so.

*Id.* Ex. A, at 5.  The transmittal letter refers to the client as "CH2M HILL Companies, Ltd."  *Id.* Ex. A, at 1.  This language appears to rely on an ethical opinion of the New York City Bar Association, which has concluded that a "law firm and client may choose to define their relationship by agreeing to an advance conflict waiver or by delineating in the engagement letter, or other agreement, those affiliates that the law firm is undertaking to represent."  *See* Ass'n of the Bar of the City of N.Y. on Prof'l and J. Ethics, Formal Opinion 2007-3.

Despite the parties' agreement, however, the behavior of Hogan Lovells, CH2M, and CCI since 2005 implies that all three understood Hogan Lovells was more than just CH2M's law firm.  Hogan Lovells's relationship with CH2M may have started with the parent company alone, but its later representation of CCI and at least one other subsidiary, CH2 Savannah River Company, shows the expansion of their attorney-client relationship.  Beginning in or about 2008, Hogan Lovells took on assignments that unquestionably involved the entire CH2M corporate family, including the Savannah River matter, company-wide accounting practices, and company-wide FCPA compliance.  Although these other matters may or may not be substantially related to the Mare Island dispute and may or may not give Steadfast a practical advantage here, Hogan Lovells's decision to tackle them shows its and CH2M's expectation that Hogan Lovells owed the corporate family a "duty of fidelity."  *Raley*, 149 Cal. App. 3d at 1047.  At no point as their relationship evolved did Hogan Lovells seek a modification of its original agreement with CH2M.  Against this backdrop, Hogan Lovells's ethical wall does not cure an alleged concurrent conflict.  *See, e.g.*, *Concat*, 350 F. Supp. 2d at 821–22; *Henriksen v. Great Am. Sav. & Loan*, 11 Cal. App. 4th 109, 115 (1992).

Because the court concludes CCI and CH2M are both current Hogan Lovells clients, it does not reach the question of Hogan Lovells's disqualification based on its relationship with CCI as a former client.

1        C.    Waiver

2              "When evaluating whether a law firm may concurrently represent two clients, even

3    on unrelated matters, it is presumed that the duty of loyalty has been breached and counsel is

4    automatically disqualified."  *Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1104

5    (N.D. Cal. 2003).  Hogan Lovells's concurrent representation of CCI and Steadfast is *prima facie*

6    cause for its disqualification.  This presumption may be rebutted by evidence of full disclosure to

7    both clients and their agreement in writing to waive the conflict.  *Id.*  Clients may even waive

8    future conflicts.  *See, e.g.*, *Zador Corp. v. Kwan*, 31 Cal. App. 4th 1285, 1301 (1995).  If such an

9    advanced waiver does not sufficiently inform a client of a later-developing conflict, however, a

10   second waiver may be required.  *Visa*, 241 F. Supp. 2d at 1106.

11             Here, CH2M's and Hogan Lovells's[4] 2005 engagement agreement includes several

12   provisions in a section titled "Conflicts and Confidential Information":

13              Hogan & Hartson is a large law firm with multiple offices around
              the world.  Because of the firm's size and geographic scope, as well
14            as the breadth and diversity of our practice, other present or future
              clients of the firm inevitably will have contacts with you.
15            Accordingly, to prevent any future misunderstanding and to
              preserve the firm's ability to represent you and our other clients, we
16            confirm the following understanding about certain conflicts of
              interest issues:
17
              a) Unless we have your specific agreement that we may do so, we
18            will not represent another client in a matter which is substantially
              related to a matter in which we represent you and in which the other
19            client is adverse to you.  We understand the term "matter" to refer
              to transactions, negotiations, proceedings or other representations
20            involving specific parties.

21            b) In the absence of a conflict as described in subparagraph (a)
              above, you acknowledge that we will be free to represent any other
22            client either generally or in any matter in which you may have an
              interest.
23
              c) The effect of subparagraph (b) above is that we may represent
24            another client on any issue or matter in which you might have an
              interest, including, but not limited to: . . . (iii) Litigation matters
25            brought by or against you as long as such matters are not the same
              as or substantially related to matters in which we are, or have been,
26            representing you.

27   _____

28        [4] At the time, Hogan Lovells was still Hogan & Hartson.

                                            18

d) We do not view this advance consent to permit unauthorized disclosure or use of any client confidences. Under applicable Rules of Professional Conduct, we are obligated to and shall preserve the confidentiality of any confidential information you provide to us. . . .

f) The fact we may have your documents and/or information, which may be relevant to another matter in which we are representing another client, will not prevent us from representing that other client in that matter without any further consent from you. In such a case, however, we will put in place screening or other arrangements to ensure that the confidentiality of your documents and/or information is maintained. . . .

(g) Our professional obligations require us to perform a conflicts check and not to commence work on a matter if we find conflicts of interest that would preclude us from doing so. Our professional obligations to you and to our other clients will require us to run a new conflicts check if there is any change in the parties to the matter or any material change in its nature. We must also run a new conflicts check before undertaking any new matters for you.

Dover Decl. Ex. A, at 4–5.

California Rule 3-310(C) allows waiver of concurrent conflicts of interest by "informed written consent." The Rule defines "informed written consent" as a client's "written agreement to the representation following written disclosure." Cal. R. Prof'l Conduct 3-310(A). "Disclosure" is defined in turn to mean "informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client." *Id*. In *Visa*, the Northern District court developed a list of factors that may show whether an advance waiver was sufficiently informed, including the waiver's specificity, breadth, applicability to all future conflicts, discussions between the client and attorneys, the relationship between the conflicting representations, the client's sophistication, and in general, the interests of justice. 241 F. Supp. 2d at 1106; *see also Concat*, 350 F. Supp. 2d at 820. In *Visa*, after applying these factors, the court concluded that the advance waiver in question was informed and effective.[5] 241 F. Supp. 2d at 1107–10. The court emphasized that the waiver in that case

---

[5] Unlike the waiver here, in *Visa* the firm had disclosed the nature of a potential conflict and the likely persons involved:

Our engagement by you is also understood as entailing your consent to our representation of our other present or future clients in "transactions," *including litigation* in which we have not been engaged to represent you and in which you

1    disclosed the adverse client's identity and as fully as possible without disclosing confidences

2    described the nature of the potential conflict.  *Id.* at 1107.  The court underscored the client's

3    actual knowledge of the conflict and the client's size and sophistication, as a Fortune 500

4    company with over $6 billion in annual revenues.  *Id.* at 1110.  The court distinguished cases in

5    which attorneys downplayed or concealed conflicts.  *Id.* at 1108 (citing *Image Technical Servs.,*

6    *Inc. v. Eastman Kodak Co.*, 820 F. Supp. 1212, 1216 (N.D. Cal. 1993) and *Fla. Ins. Gty. Assoc. v.*

7    *Carey Canada, Inc.*, 749 F.Supp. 255, 257 (S.D. Fla. 1990)).

8            Faced with an advance waiver similar to the waiver here,[6] the court in *Concat*

9    reached the opposite conclusion.  350 F. Supp. 2d at 820–21.  It found the waiver in question

10           have other counsel, and in which one of our other clients would be adverse to you
             in matters unrelated to those that we are handling for you. In this regard, *we*

11           *discussed [Heller's] past and on-going representation of Visa U.S.A. and Visa*
             *International* . . . in matters which are not currently adverse to First Data.

12           Moreover, as we discussed, we are not aware of any current adversity between
             Visa and First Data. Given the nature of our relationship with Visa, however, *we*

13           *discussed the need for the firm to preserve its ability to represent Visa on matters*
             *which may arise in the future including matters adverse to First Data*, provided

14           that we would only undertake such representation of Visa under circumstances in
             which we do not possess confidential information of yours relating to the

15           transaction . . . .

16    *Visa*, 241 F. Supp. at 1107 (emphases and alterations in original).

17           [6] In *Concat*, the waiver provided,

18           Morgan, Lewis & Bockius is a large law firm, and we represent many other

19           companies and individuals.  It is possible that some of our present or future clients
             will have disputes or other dealings with you during the time that we represent

20           you.  Accordingly, as a condition of our undertaking of this matter for you, you
             agree that Morgan, Lewis & Bockius may continue to represent, or may undertake

21           in the future to represent, existing or new clients in any matter, including
             litigation, that is not substantially related to our work for you, even if the interests

22           of such clients in those other matters are directly adverse to you.  Further, you
             agree in light of its general consent to such unrelated conflicting representations,

23           Morgan, Lewis & Bockius will not be required to notify you of each such
             representation as it arises.  We agree, however, that your prospective consent to

24           conflicting representations contained in the preceding sentence shall not apply in
             any instance where, as the result of our representation of you, we have obtained

25           confidential information of a non-public nature that, if known to another client of
             ours, could be used to your material disadvantage in a matter in which we

26           represent, or in the future are asked to undertake representation of, that client.

27

28    350 F. Supp. 2d at 801–02.

20

1    nonspecific and overbroad both in its scope and subject matter and noted the record lacked

2    evidence of the law firm's discussion of the waiver with its client. *Id.* at 820. Considering the

3    fact that the law firm did not seek to represent an adverse client in a substantially related matter

4    and that the client was a sophisticated user of legal services, the court nonetheless concluded the

5    waiver was not fully informed. *Id.* The court also expressed its disapproval of the law firm's

6    decision not to immediately inform its clients when it became aware of its concurrent obligations.

7    *Id.* at 821. The court distinguished *Visa* by noting the law firm in that case had disclosed the

8    nature of the conflict and specified which parties may become adverse. *Id.*

9         Recently, the Central District has rejected an open-ended waiver, also similar to

10   the one in this case.[7] *See Western Sugar*, 2015 WL 690306, at *5. It applied the factors listed in

11   *Visa* and *Concat* and concluded the waiver was too open-ended, non-specific, and lacked

12   identification of potentially adverse clients, the types of conflicts, or the types of possible future

13   representations. *Id.* It distinguished the *Visa* waiver, which identified a specific adverse client,

14   "disclosed as fully as possible the nature of any potential conflict that could arise between the

15   parties," and "specifically contemplated the firm's representation of Visa against First Data in

16   litigation matters." *Id.* (also citing *Zador*, 31 Cal. App. 4th at 1302, for the proposition that a

17   waiver may be enforceable if it names the prospective adverse client). The court in *Western*

18   *Sugar* quoted a declaration submitted by the client's general counsel, who stated his attorneys had

19   not discussed the prospective waiver and explained his understanding that a further disclosure and

20   request for a waiver was necessary. *Id.*

21        The *Western Sugar* court rejected citations to the ABA Model Rules and the

22   argument that decisions emphasizing client sophistication were analogous. *Id.* The *Western*

23   _____

[7] In *Western Sugar*, the waiver agreement provided as follows:

24   It is possible that some of our current or future clients will have disputes with you

25   during the time we are representing you. We therefore also ask each of our clients
     to agree that we may continue to represent or may undertake in the future to

26   represent existing or new clients in any matter that is not substantially related to
     our work for you, even if the interest of such clients in those unrelated matters are

27   directly adverse to yours. . . .

28   2015 WL 690306, at *5.

1     *Sugar* court appears to have referred to a 2005 formal ethics opinion in which the ABA

2     determined that a prospective or advance waiver is effective if "the client reasonably understands

3     the material risks that the waiver entails."  *See* Am. Bar Ass'n Standing Comm. On Ethics and

4     Prof'l Responsibility, Formal Ethics Opinion 05-436 (2005).  Therefore, in the ABA's opinion, a

5     waiver will more likely be effective if it comprehensively explains the types of conflicts that

6     might arise and any adverse consequences of giving consent.  *Id.*  Generally, in the ABA's

7     opinion, an open-ended general consent is ineffective, but is more likely to be effective if (1) the

8     client is an experienced user of legal services; (2) is independently represented by other counsel;

9     (3) is reasonably informed of the risk of a conflict; and (4) consent is limited only to unrelated

10     future conflicts.  *Id.*  Comment 22 to Rule 1.7 of the ABA Model Rules of Professional Conduct

11     provides similarly.  The Northern District of Texas recently applied ABA Formal Opinion 05-436

12     and Model Rule 1.7 to conclude that an advance waiver similar to the waiver here and in *Concat*

13     was informed and effective.[8]  *Galderma Labs., L.P. v. Activis Mid Atl. LLC*, 927 F. Supp. 2d 390,

14     402 (N.D. Tex. 2013).  It cited *Visa* and *Concat*, but disagreed with their reasoning, concluding

15     the national standard had evolved to embrace a broader conception of "informed consent."  *Id.* at

16     404.

17           This court declines to adopt the broader interpretation given informed consent by

18     the court in *Galderma Labs*.  California courts may look outside the state for guidance on ethical

19

20            [8] The waiver in *Galderma Labs* provided, in pertinent part,

21        We understand and agree that this is not an exclusive agreement, and you are free
to retain any other counsel of your choosing. We recognize that we shall be

22        disqualified from representing any other client with interest materially and
directly adverse to yours (i) in any matter which is substantially related to our

23        representation of you and (ii) with respect to any matter where there is a
reasonable probability that confidential information you furnished to us could be

24        used to your disadvantage. You understand and agree that, with those exceptions,
we are free to represent other clients, including clients whose interests may

25        conflict with ours in litigation, business transactions, or other legal matters. You
agree that our representing you in this matter will not prevent or disqualify us

26        from representing clients adverse to you in other matters and that you consent in
advance to our undertaking such adverse representations.

27

28     927 F. Supp. 2d at 393.

1   questions, but out-of-state authority is persuasive only absent "a conflicting state public policy."

2   *City and Cnty. Of S.F.*, 38 Cal. 4th at 852.  California has adopted neither ABA Model Rule 1.7

3   nor its comments.  Its policy, as correctly distilled by the *Visa* and *Concat* courts, encompasses a

4   broader range of concerns that goes beyond the client's sophistication or the absence of a direct

5   and substantially related conflict.  *See W. Sugar*, 2015 WL 690306, at *6 (reaching the same

6   conclusion).

7          Turning to the matter at hand, several factors weigh against enforcement of the

8   prospective waiver.  It is broad, general, and indefinite.  It leaves Hogan Lovells "free to

9   represent any other client either generally or in any matter in which [CH2M] may have an

10  interest."  Dover Decl. Ex. A, at 4.  Its scope is essentially unlimited, making its provisions

11  applicable to everything from "mergers and acquisitions" to "patents, copyrights, trademarks,

12  trade secrets or other intellectual property," "administrative proceedings," "advocacy with respect

13  to legislative issues," and litigation.  *Id.*  Given the broad language of the waiver, Hogan Lovells

14  did not pursue an exemplary approach.  As Hogan Lovells's relationship with CH2M expanded,

15  rather than avoiding a misunderstanding as to prospective conflicts by revisiting the waiver, the

16  firm waited until a potential conflict arose, then asserted affirmatively in a phone call and e-mail

17  to Mr. Wright that the engagement letter tied CH2M's hands.  The court declines to accept

18  Steadfast's argument at hearing, that CCI bore the burden of showing it had withheld consent.

19         Some factors do weigh in favor of the waiver's effectiveness.  The waiver does not

20  apply to a matter "which is substantially related to a matter in which [Hogan Lovells] represent[s]

21  [CH2M] and in which the other client is adverse to you."  *Id.*  Moreover, CH2M is a large

22  corporation with international operations and was represented by its own in-house counsel at the

23  time it entered the agreement.  In total, however, these countervailing concerns do not render the

24  waiver effective.  It is simply too broad and too stale to cover the current conflict.

25         Steadfast contends that rejection of its position would render the waiver agreement

26  meaningless, upset a standard national practice, and leave hanging over it a sword of Damocles,

27  "ready to drop at any moment" at its client's whim.  *See* Opp'n Mot. Disqualify 15–16, 18, ECF

28  No. 196.  Broad advance waivers are a logical outgrowth of large law firms and the spiderwebs of

affiliates, subsidiaries, and parents they represent.  The court recognizes that without effective

waivers, "[l]arge firms would never be able to take on small, specialized matters for a client

unless the firms could reasonably protect against . . . abuse." *Galderma*, 927 F. Supp. 2d at 395.

But the waiver in *Visa* serves as a model on which firms can rely.  *See supra* note 5 and

accompanying text.  Pronouncing the waiver here enforceable and blessing Hogan Lovells's

conduct would promote broad, static agreements over timely and forthright discussions of

conflicts and their effects, a result contrary to California ethical rules and policy.

This case is an example of a situation in which "the original waiver insufficiently

disclosed the nature of a subsequent conflict." *Concat*, 350 F. Supp. 2d at 820.  At the time

CH2M and Hogan Lovells began their relationship, they agreed to limit the engagement to the

parent corporation.  This choice is unsurprising in light of the subject of that first representation,

an acquisition; however, as Hogan Lovells took on increasingly diverse assignments, its role and

relationship with CH2M changed.  It represented CH2M in corporate governance matters.  It

assisted with internal investigations of the firm's accounting practices.  It advised the company in

matters of the Foreign Corrupt Practices Act.  It directly represented CH2M's subsidiaries in the

Savannah River fee dispute without updating its engagement letter, despite its original intent not

to represent a subsidiary absent express written agreement.  *See* Dover Decl. Ex. A, at 5.

Although CH2M did not bring up the engagement letter or the waiver at the time, it was not

obliged to.  When Steadfast sought Hogan Lovells's expertise in this case, the firm asserted

CH2M had no choice but to accept Hogan Lovells's taking on the Steadfast matter.  The price of

hiring a large and capable firm should not be powerlessness in the face of unanticipated future

adverse representations, especially when, as here, the attorney-client relationship is dynamic over

time.  Were the court to uphold Hogan Lovells's position, it is its clients that would be threatened

by the Damoclean sword.

The decision to disqualify is a matter of discretion.  The court recognizes it is a

drastic solution subject to the nuances of fact and circumstance in a given case.  But the totality of

circumstances here require Hogan Lovells's disqualification.  Hogan Lovells realized it faced a

conflict but determined it would take on representation of Steadfast, then told CH2M of its

1    decision asserting it was covered by the broad advance waiver from nine years ago; it then

2    inferred CH2M's acceptance from its silence.  In this way, Hogan Lovells effectively forced

3    CH2M's general counsel into "an impossible position of having to brief the directors on litigation

4    [Hogan Lovells] intended to prosecute against [CH2M] in meetings where I would need [Hogan

5    Lovells] to advise the board on strategic matters."  McCoy Reply Decl. ¶ 11, ECF No. 225.  He

6    concluded Hogan Lovells "could not represent [CH2M] in its most serious matters involving the

7    executive team and its Board of Directors, while attacking the integrity of the company in another

8    matter representing a client adverse to the company."  *Id.*  CH2M cannot have fairly anticipated

9    this turn of events at the time it signed the original engagement letter.  *See Raley*, 149 Cal. App.

10   3d at 1049 ("[A client] should not be asked to confront [its law firm] in both the courtroom and

11   the board room.").

12          D.      Delay and Prejudice

13          The court is mindful that in the context of a successive representation, a client who

14   wishes to disqualify opposing counsel may not wait for just the right moment.  *See, e.g.*,

15   *Openwave Sys. Inc. v. Myriad France S.A.S.*, No. 10-02805, 2011 WL 1225978, at *6–7 (N.D.

16   Cal. Mar. 31, 2011).  If a party opposing a motion to disqualify can produce *prima facie* evidence

17   of unreasonable delay and prejudice, the burden shifts to the party seeking disqualification to

18   justify its delay.  *In re Complex Asbestos Litig.*, 232 Cal. App. 3d 572, 599 (1991).  "[T]he

19   ensuing prejudice must be extreme."  *W. Cont'l Operating Co. v. Natural Gas Corp.*, 212 Cal.

20   App. 3d 752, 764 (1989).  The exception is indeed narrow; a California Court of Appeal has

21   upheld an order disqualifying counsel brought on the "eve of a trial" because the opposing party

22   did not show prejudice.  *See In re Complex Asbestos Litig.*, 232 Cal. App. 3d at 599 ("The only

23   prejudice cited . . . is that [the] clients lost the services of knowledgeable counsel of their choice,

24   and were forced to retain new counsel.  This is not the type of prejudice contemplated by our

25   decision in [*Western Continental Operating Co.*].  Rather, the [disqualified] firm has simply

26   identified those client interests implicated by any disqualification motion.").

27          As noted, *Openwave* involved a case of successive representation.  It appears that

28   only one court, and no California state court, has adopted this delay and prejudice test in the

                                                    25

1   context of a concurrent representation. *See Bosch*, 2014 WL 2703807, at *4 & n.2. That court

2   also recognized California authority contrary to its position. *See id.* The parties are not aware of

3   any state court decision applying the test to an alleged concurrent representation. California case

4   law suggests delay and prejudice may even be irrelevant in cases of concurrent conflicts. *See*

5   *State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.*, 72 Cal. App. 4th 1422, 1433 (1999) ("In

6   successive representation situations, there exists a narrow exception to the rules requiring

7   disqualification based on delay."). The exception for delay and prejudice derives from the

8   doctrine of implied waiver of conflicts, a doctrine that does not apply to concurrent

9   representations. *See id.* But because motions to disqualify are often tactically motivated and

10  should be viewed with skepticism, this court finds it is reasonable to take delay and suspicious

11  timing into consideration, stopping short of applying the test dispositively. *See TransPerfect*

12  *Global, Inc. v. MotionPoint Corp.*, 2012 U.S. Dist. LEXIS 85649, at *38 (N.D. Cal. June 20,

13  2012).

14          Here, Hogan Lovells attorneys associated as additional counsel for Steadfast on

15  August 20 and 21, 2014, and CCI filed its motion on January 16, 2015, a delay of about five

16  months. CCI contends its motion was not delayed because it was filed only weeks after it learned

17  Steadfast intended to file an amended counterclaim. In CCI's view, the counterclaim so seriously

18  altered the litigation that Hogan Lovells's presence became intolerably adversarial. Steadfast

19  argues this reasoning is a smokescreen, because CCI has long asserted claims of bad faith and

20  misconduct. While a delay of four months has been found long enough to deny a motion for

21  disqualification in other federal decisions, *see, e.g.*, *Openwave*, 2011 WL 1225978, at *7,

22  California courts require that delay and prejudice be "extreme" and reach beyond "those client

23  interests implicated by any disqualification motion," *In re Complex Asbestos Litig.*, 232 Cal. App.

24  3d at 599.

25          Steadfast argues CCI's motion is meant to delay and specifically to stifle an

26  amendment to Steadfast's counterclaim. *See, e.g.*, Sur-reply 3–6. The timing of CCI's motion is

27  more plausibly viewed as CCI's reaction to the motion to amend, the proverbial last straw. Two

28  considerations weigh in CCI's favor. First, Mr. McCoy, CH2M's general counsel, joined the

1  company in September 2014, McCoy Decl. ¶ 2, and can reasonably have been expected to have

2  been coming up to speed with the company's legal affairs over several months.  Second, CCI's

3  arguments do not depend on the denial of Steadfast's motion to amend.  CCI's briefing argues

4  that, from its perspective, Steadfast went on the offensive by seeking to amend its counterclaim,

5  and this has made Hogan Lovells's continuing representation intolerable.  Rather than trying to

6  pull the rug from under Steadfast's feet, CCI can be seen as jumping to clear a rug it believes

7  Steadfast has yanked from under its feet.  Even were CCI's motion a tactical move, it has proved

8  to be poor tactics: Steadfast has now completely briefed all the pending motions and the court is

9  prepared to decide them in due course.

10        Neither will Steadfast suffer any prejudice beyond that normally associated with a

11  motion to disqualify.  The question here is not whether CCI impliedly waived the conflict by

12  responding to discovery requests in late 2014.  *Cf., e.g.*, *Trust Corp. of Mont. v. Piper Aircraft*

13  *Corp.*, 701 F.2d 85, 87 (9th Cir. 1983) (applying federal law to conclude "[i]t is well settled that a

14  *former* client who is entitled to object to an attorney representing an opposing party on the ground

15  of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have

16  *waived* that right." (emphasis added)).  It is whether CCI's delay and any resulting prejudice are

17  so extreme as to justify toleration of a concurrent conflict of interest.  A period of five months and

18  the associated time and money spent on discovery do not make for extreme prejudice and delay.

19  The court is able to adjust discovery deadlines to mitigate any prejudice to Steadfast's discovery

20  efforts, and Steadfast will have the benefit of continuous representation of the Sinnott Puebla firm

21  to assist with transition to new counsel.

22  /////

23  /////

24  /////

25  /////

26  /////

27  /////

28  /////

27

III.    CONCLUSION

CCI's motion to disqualify Hogan Lovells is GRANTED.  This resolves ECF No. 180.  All pending dates and deadlines are VACATED.  A status conference is SET for April 30, 2015, at 2:30 p.m. in Courtroom 3.  The parties shall file a joint status report proposing a new schedule for the balance of the case no later than seven days before the status conference.

IT IS SO ORDERED.

DATED:  April 7, 2015.

_____
UNITED STATES DISTRICT JUDGE

28