1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LENNAR MARE ISLAND, LLC,              No.  2:12-cv-02182-KJM-KJN

12              Plaintiff,

13        v.                              ORDER

14   STEADFAST INSURANCE COMPANY,

15              Defendant.

16   _____

17   AND RELATED COUNTERCLAIMS.

18

19          In this case, Lennar Mare Island, LLC (LMI), CH2M Hill Constructors, Inc.

20   (CCI), and Steadfast Insurance Company dispute their obligations with respect to the clean-up of

21   Mare Island, a former U.S. Navy shipyard.  This order addresses LMI's and CCI's motions to

22   dismiss Steadfast's Amended Counterclaim under Federal Rules of Civil Procedure 12(b)(6) and

23   12(b)(7).  The matter was submitted without a hearing.  For the following reasons, the motions

24   are granted in part.

25   I.      BACKGROUND

26          First, to avoid confusion, a preliminary note on the parties' identities:  LMI is the

27   plaintiff in this action, and Steadfast is the defendant.  *See* Am. Compl. ¶¶ 1–2, ECF No. 22.

28   Steadfast asserts counterclaims against LMI and CCI.  *See* Am. Countercl. ¶¶ 2–3, ECF

                                        1

1   No. 164-1.[1]  CCI also asserts counterclaims against Steadfast, but not LMI.  *See* CCI Answer &

2   Countercl., ECF No. 12.  The matter is before the court on LMI's and CCI's motions to dismiss

3   Steadfast's amended counterclaim.  LMI Mot., ECF No. 293; CCI Mot., ECF No. 297.

4       A.    Steadfast's Allegations

5           Because LMI and CCI bring motions under Federal Rule of Civil Procedure

6   12(b)(6), the court assumes the allegations of Steadfast's amended counterclaim are true.  *See*

7   *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  On its own motion, the court takes judicial

8   notice of the parties' previous stipulated description of this case's general background.  *See* Joint

9   Stmt. Disc. Dispute (JS), ECF No. 63; *W. Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 976

10  (9th Cir. 2012) (a court may consider proper subjects of judicial notice on a motion to dismiss);

11  *Do v. Am. Home Mortgage Servicing, Inc.*, No. 11-324, 2011 WL 5593935, at *1 n.1 (C.D. Cal.

12  Nov. 17, 2011) (citing *Kelly v. Johnston*, 111 F.2d 613, 615 (9th Cir. 1940)) (taking judicial

13  notice of the parties' previous stipulation on a motion under Rule 12(b)(6)).

14          The United States Navy operated a base at Mare Island in the City of Vallejo,

15  California for nearly 150 years.  JS at 2.  Over the years, Mare Island was contaminated.  In 1996,

16  the Navy closed the base, and in 2002, it conveyed the land to Vallejo.  *Id.*  The Navy, however,

17  was obligated to investigate and remediate pollution on Mare Island.  *Id.*  In 2001, the City, the

18  Navy, Steadfast, LMI and CCI entered several contracts.  *Id.* at 2–3.

19          First, the Navy and the City entered the Environmental Services Cooperative

20  Agreement, or ESCA.  *Id.* at 2.  In the ESCA, the Navy agreed to pay the City about $78 million

21  and the City agreed to remediate certain environmental problems on Mare Island.  *Id.*  But the

22  Navy agreed to retain responsibility for certain conditions, *i.e.*, the "Navy-Retained Conditions."

23  *Id.*  These Navy-Retained Conditions included a defined set of known conditions for which the

24  costs of clean-up exceed $114.3 million.  *Id.*  Second, in the Mare Island Remediation

25  Agreement, or MIRA, LMI agreed it would take on the City's obligations under the ESCA to

26  remediate pollution on Mare Island.  *Id.* at 2–3.  This agreement anticipated the City's later

27          [1] Steadfast's proposed amended counterclaim was deemed filed after the court granted its
28  motion for leave to amend.  *See* Order Aug. 17, 2015, ECF No. 290.

transfer of some of Mare Island to LMI. *Id.* at 2. Third, LMI and CCI entered into a Guaranteed Fixed Price Contract, or GFPC. *Id.* at 3; Am. Countercl. ¶ 9. In the GFPC, CCI agreed to remediate specific contamination problems on Mare Island in return for a fixed price. JS at 3; Am. Countercl. ¶ 9. CCI also agreed to remediate other pollution for additional compensation when LMI requested. JS at 3.

In conjunction with the GFPC, Steadfast, LMI and CCI negotiated a series of insurance policies. *Id.*; Am. Countercl. ¶ 10. These policies' premiums were paid for indirectly with Navy funds. JS at 3. Steadfast, LMI and CCI are all parties to these policies, but their rights and obligations differ or conflict. Am. Countercl. ¶ 10. Two of the policies are the subject of this lawsuit. Copies of both are attached as exhibits to the amended counterclaim. *See id.* Exs. A, B.

First, there is the Remedial Stop Loss Policy or RSL policy: Steadfast issued the RSL policy to CCI. *Id.* ¶ 11, Ex. A. The "Insuring Agreement" it describes is as follows: "To pay the Named Insured any Loss arising out of the Insured Project that exceeds the Self Insured Retention(s), provided the Loss is the result of a Claim first reported to the Company, in writing by the Named Insured, during the Policy Period." *Id.* Ex. A, at 35[2] (bold typeface omitted). CCI is the "Named Insured," *see id.* at 33, 39, and Steadfast is the "Company," *id.* at 33, 36. In simpler terms, the RSL policy covers clean-up costs in excess of about $57.5 million, but only for the clean-up of "Known Pollution Conditions." *Id.* ¶ 11. Steadfast's liability, the maximum it would pay under the policy, was an additional $57.5 million; that is, total costs would be about $115 million. *Id.* Steadfast's obligation to pay claims under this policy ended on March 30, 2011, when the policy expired. *Id.* ¶ 11, Ex. A, at 33, 39. The RSL policy also includes a "Scope of Work Endorsement" listing many "Known Pollution Conditions." *Id.* Ex. A, at 54–79.

Second, the Environmental Liability Insurance or ELI policy: Steadfast issued the ELI policy to both CCI and LMI. *Id.* ¶ 12, Ex. B. Among other things, the ELI policy "affords coverage for certain cleanup costs required by a 'Governmental Authority' as a result of a 'Pollution Event' that is not a 'Known Pollution Condition' and that is first discovered by an

---

[2] The pages cited here are those printed consecutively throughout the counterclaim in the bottom right corner of each page.

1    insured during the policy period." *Id.* ¶ 12.  The ELI policy is set to expire on March 30, 2021,

2    ten years after the RSL policy expired.  *Id.*

3         According to the amended counterclaim, when the RSL and ELI policies were

4    drafted and signed, LMI, CCI and Steadfast intended for the RSL policy to provide coverage for

5    known pollution conditions and the ELI policy to provide coverage for unknown pollution

6    conditions.  *Id.*  In particular, Steadfast alleges that whether a particular pollution condition or

7    event was "known" or "unknown" depends on a reference to two sources: first, the Scope of

8    Work Endorsement appended to the policies, and second, other various documents available to

9    CCI or LMI at the time.  *Id.*  These documents included "certain environmental reports"

10   exchanged between Steadfast, LMI and CCI before inception of the policies.  *Id.* ¶ 13.  These

11   "environmental reports and Technical Summaries were part of the applications for the RLS and

12   ELI Policies," and both policies' preambles make the applications "a part hereof."  *Id.*

13        Steadfast alleges LMI's and CCI's actions after 2001 matched this understanding.

14   *Id.* ¶ 15.  For example, LMI conceded in private discussions with CCI that "the underwriting

15   materials" should be considered when deciding whether a pollution condition was known or

16   unknown.  *Id.*  But after the policies were signed, LMI and CCI eventually adopted a different

17   interpretation of the policies in their communications with Steadfast.  *Id.*  To Steadfast, they

18   argued that if a pollution event is not listed in the tables and figures appended to the policies, then

19   it is unknown, regardless of anything to the contrary in the "Applications" or "underwriting

20   documents."  *Id.*  This has also been LMI's position in this action.  *See* Mot. Summ. J., ECF

21   No. 187.

22        "Fundamentally," Steadfast charges LMI and CCI with "a pattern of improper

23   conduct throughout their contractual relationship with Steadfast . . . ."  *Id.* ¶ 20.  First, LMI and

24   CCI "attempted to convert claims for known pollution conditions into claims for unknown

25   pollution conditions, and vice versa."  *Id.* ¶ 20(a).  Second, CCI did significantly more work than

26   necessary and billed Steadfast for that unnecessary work.  *Id.* ¶ 20(b).  Third, LMI and CCI

27   "charged Steadfast for substantially more environmental cleanup than was required by the

28   regulators and permissible under the policies."  *Id.* ¶ 20(c).  And fourth, LMI and CCI are guilty

4

of "[o]ther misrepresentations and failures to disclose information critical to the fair and proper disposition of claims under the Policies." *Id.* ¶ 20(d).

Steadfast claims LMI and CCI took these actions because the RSL policy expired earlier than the ELI policy; if claims could no longer be submitted under the RSL policy, then LMI and CCI attempted to submit them under the ELI policy, which has not expired. *Id.* ¶ 21(a). LMI also intended to use both the RSL and ELI policies to "finance its infrastructure development at the Mare Island project." *Id.* ¶ 21(b). In other words, LMI attempted to pass off its real estate development costs as pollution cleanup costs. *See id.* But, Steadfast says, the policies were never intended for this purpose. *Id.* In all, LMI and CCI sought to maximize their profits, regardless of the policy terms or the effects on Steadfast's own bottom line. *Id.* § 21(c).

After laying out this general theory, Steadfast's counterclaim describes several dozen instances of wrongdoing. *See id.* ¶¶ 23–69. It divides these allegations into several groups:

- "Submitting claims for 'known' pollution conditions (under the RSL Policy) as 'unknown' pollution conditions (under the ELI Policy), and vice-versa," *id.* ¶¶ 23–33;

- "Overstaffing, overworking and overbilling," *id.* ¶¶ 34–36;

- "Concealing fees in accounting records in order to prevent Steadfast from learning that the fees were improper," *id.* ¶¶ 37–42;

- "Performing and billing for unnecessary, non-required, non-approved, settled and non-covered work," *id.* ¶¶ 43–50;

- "Billing substantive remediation expenses as 'Limited Further Investigation,'" *id.* ¶¶ 51–52;

- Concealing other "material misrepresentations" and "critical information," *id.* ¶¶ 53–60;

- Otherwise failing to cooperate, *id.* ¶¶ 61–65; and

- Otherwise interfering with Steadfast's contractual rights, *id.* ¶¶ 66–69.

1    On the basis of these allegations, Steadfast advances ten claims against both LMI

2   and CCI: (1) accounting; (2) breach of contract; (3) negligence; (4) restitution; (5) unjust

3   enrichment; (6) intentional interference with contractual relations; (7) negligent

4   misrepresentation; (8) intentional misrepresentation; (9) reformation; and (10) declaratory relief.

5   *Id.* at 22–31.  It seeks relief in the form of an accounting, restitution, reformation of the policies,

6   cancellation of the ELI policy, compensatory damages, punitive damages, a declaration of its

7   rights under the contracts, and whatever other relief is proper.  *Id.* at 31.

8    B.    Relevant Procedural History

9    LMI filed its original complaint in state court, and the case was removed to this

10   court in August 2012.  ECF No. 1.  Steadfast filed an answer and its original counterclaim the

11   same month.  ECF Nos. 4, 5.  Since then, the parties have engaged in extensive litigation.[3]  Of

12   note here is Steadfast's December 2014 motion to file the amended counterclaim, ECF Nos. 161,

13   which the court granted on August 17, 2015, ECF No. 290.  In its motion to amend, Steadfast

14   explained it had long suspected LMI's and CCI's foul play, but only after CCI produced certain

15   files in Fall 2014 did Steadfast "uncover[ ] unequivocal support" for the claims it now advances.

16   Mot. Am. 9, ECF No. 162.  These newly discovered documents, it asserted, were "more than

17   sufficient to establish the facts alleged" in the amended counterclaim.  *Id.* at 2.  The court granted

18   Steadfast's motion, despite questioning its diligence, because in the months after the motion was

19   filed, the case's schedule had been significantly delayed for unrelated reasons.  *See* Order Aug.

20   17, 2015, at 12–13, ECF No. 290.

21    LMI and CCI filed the pending motions to dismiss on September 4, 2015.  CCI

22   joined LMI's motion in full.  ECF No. 298.  In opposition to these motions, Steadfast agreed to

23   withdraw its claim for negligence.  Opp'n LMI Mot. at 20; Opp'n CCI Mot. at 17.  The court

24

25

---

26    [3] *See* LMI Mot. Sever, ECF No. 41; LMI Mot. Summ. J., ECF No. 51; LMI Mot. Recons.,
ECF No. 96; LMI Mot. Summ. J., ECF No. 160; Steadfast Mot. Am. Countercl., ECF No. 161;
27   CCI Mot. Disqualify, ECF No. 180; LMI Mot. Summ. J., ECF No. 186; *see also* ECF Nos. 43,
56, 57, 58, 93, 94, 124, 176, 233, 234, 235, 236, 237, 238, 239, 247 (discovery motions).
28

construes this agreement as a stipulation to dismissal of the claim for negligence with prejudice, and grants the request.

LMI and CCI request relief under both Rules 12(b)(6) ("failure to state a claim upon which relief can be granted") and 12(b)(7) ("failure to join a party under Rule 19").  The court addresses first the motions under Rule 12(b)(7).

II.    RULE 12(b)(7) ANALYSIS

Rule 12(b)(7) allows a party to request dismissal for "failure to join a party under Rule 19."  Fed. R. Civ. P. 12(b)(7).[4]  "Federal Rule of Civil Procedure 19 imposes a three-step

---

[4] Rule 19 provides, in relevant part, as follows:

(a) Persons Required to Be Joined if Feasible.

    (1) Required Party.  A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

        (A) in that person's absence, the court cannot accord complete relief among existing parties; or

        (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

            (i) as a practical matter impair or impede the person's ability to protect the interest; or

            (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

    . . .

(b) When Joinder Is Not Feasible.  If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed.  The factors for the court to consider include:

    (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

    (2) the extent to which any prejudice could be lessened or avoided by:

        (A) protective provisions in the judgment;

        (B) shaping the relief; or

        (C) other measures;

    (3) whether a judgment rendered in the person's absence would be adequate; and [continued . . . ]

1   inquiry:" (1) "Is the absent party . . . required to be joined if feasible . . . under Rule 19(a)?"

2   (2) "If so, is it feasible to order that the absent party be joined?" (3) "If joinder is not feasible, can

3   the case proceed without the absent party, or is the absent party indispensable such that the action

4   must be dismissed?" *Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1179

5   (9th Cir. 2012) (footnote omitted).  In the third step, the court considers the demands of "equity

6   and good conscience." Fed. R. Civ. P. 19(b).

7               The inquiry is fact-specific and practical.  *N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d

8   466, 468 (9th Cir. 1986); *Camacho v. Major League Baseball*, 297 F.R.D. 457, 460–61 (S.D. Cal.

9   2013).  For this reason, it may be necessary to review evidence beyond the pleadings.  *Camacho*,

10  297 F.R.D. at 461 (quoting *McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir. 1960)).  LMI and

11  CCI, the moving parties, "'bear the burden in producing evidence in support of the motion.'" *Id.*

12  (quoting *Biagro W. Sales Inc. v. Helena Chem. Co.*, 160 F. Supp. 2d 1136, 1141 (E.D. Cal.

13  2001)).

14              Here, LMI and CCI argue the United States Navy is a necessary party to the

15  reformation claim and the request to cancel the ELI policy.  LMI Mot. at 16–19; CCI Mot. at

16  13–15.  They argue however that the Navy cannot be joined because the United States has not

17  waived its sovereign immunity, and equity and good conscience do not allow Steadfast to seek

18  reformation and cancellation in the Navy's absence.  LMI and CCI both move to dismiss the

19  reformation claim, LMI Mot. at 16–19, and CCI moves to strike Steadfast's requests for

20  reformation and cancellation, CCI Mot. at 15.  The court first considers whether the Navy is

21  necessary under Rule 19(a).

22          A.      Whether the Navy is a Necessary Party under Rule 19(a)

23              "A party may be necessary under Rule 19(a) in three different ways." *Salt River*,

24  672 F.3d at 1179.  "First, a person is necessary if, in his absence, the court cannot accord

25  complete relief among existing parties." *Id.* (citing Fed. R. Civ. P. 19(a)(1)(A)).  "Second, a

26  person is necessary if he has an interest in the action and resolving the action in his absence may

27  _____

    [ . . . continued] (4) whether the plaintiff would have an adequate remedy if the
28  action were dismissed for nonjoinder.

1    as a practical matter impair or impede his ability to protect that interest." *Id.* (citing Fed. R. Civ.

2    P. 19(a)(1)(B)(i)).  "Third, a person is necessary if he has an interest in the action and resolving

3    the action in his absence may leave an existing party subject to inconsistent obligations because

4    of that interest." *Id.* (citing Fed. R. Civ. P. 19(a)(1)(B)(ii)).  As a fourth consideration, however,

5    even when a party has an interest in the litigation, that party may not be necessary under Rule

6    19(a) if it is "adequately represented" by a present party.  *Id.* at 1180–81.  The court considers

7    each possibility in turn.

8                    1.    Complete Relief

9            "Complete relief 'is concerned with consummate rather than partial or hollow

10   relief as to those already parties, and with precluding multiple lawsuits on the same cause of

11   action.'" *Alto v. Black*, 738 F.3d 1111, 1126 (9th Cir. 2013) (quoting *Disabled Rights Action*

12   *Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 879 (9th Cir. 2004)).  "To be 'complete,' relief

13   must be 'meaningful relief *as between the parties*.'" *Id.* (quoting *Disabled Rights*, 375 F.3d at

14   879 (emphasis in *Alto*)).

15           Here, LMI and CCI argue "resolving Steadfast's reformation claim without the

16   Navy would mean LMI could not obtain complete relief vis-a-vis Steadfast or CCI because the

17   very bases on which these parties entered into contracts and did business for some fifteen years

18   could be altered retrospectively."  LMI Mot. at 18.  The relationships between LMI, CCI, the

19   Navy and Steadfast are the subject of several lengthy written agreements, including the GFPC,

20   the ELI policy, the RSL policy, and the ESCA, among others.  The parties' obligations under

21   these agreements are interdependent; the agreements cite one another and define terms by

22   reference to one another.  *See, e.g.*, Am. Countercl. Ex. B, at 145 (referring to Navy-Retained

23   Conditions, a term defined in the ESCA); Werner Decl. Ex. 2A, at 6–7, ECF No. 296-2 (referring

24   to the RSL and ELI policies; defining terms by reference to the effect of those policies).  Since

25   the early stages of this case, the parties have represented that these contracts are part of a single

26   insurance scheme.  *See, e.g.*, Joint Statement 2–6, ECF No. 16.

27           That said, LMI and CCI have argued in only general and abstract terms that the

28   policies' entire structure would collapse if the Navy is not joined.  This does not suffice to satisfy

                                            9

1   the fact-specific standard of Rule 19.  For example, LMI has not shown that if the Navy remains

2   absent, LMI will be precluded from later seeking indemnification from the Navy.  *Cf., e.g.*,

3   *E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1081 (9th Cir. 2010).  Neither has it shown that

4   follow-on litigation with the Navy would render any relief granted here "hollow."  *Alto*, 738 F.3d

5   at 1126 (citing *Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 276 F.3d 1150,

6   1155–58 (9th Cir. 2002)).  Because LMI bears the burden to produce relevant evidence, but has

7   not, a dismissal under Rule 12(b)(7) cannot be based on a theory of the Navy's necessity under

8   Rule 19(a)(1)(A).

9                   2.     <u>The Navy's Interests</u>

10         Rule 19 does not protect every interest an absentee may have.  For example, "a

11  financial stake in the outcome of the litigation" does not give rise to Rule 19(a)(2) necessity.

12  *Disabled Rights*, 375 F.3d at 880, 883.  Only "legally cognizable interests," *id.* at 880, or "legally

13  protected interests" are within the Rule's scope, *id.* at 883 (citing *Makah Indian Tribe v. Verity*,

14  910 F.2d 555, 558 (9th Cir. 1990)).

15         LMI and CCI point out three interests the Navy may have in adjudication of the

16  amended counterclaim: (1) the Navy paid the policy premiums, and should Steadfast succeed, the

17  policies would be gutted, LMI Mot. at 16–17; (2) should Steadfast's reformation claim succeed,

18  the policies' overall structure would be undermined and the Navy's intent ignored, LMI Mot.

19  at 17; and (3) the Navy is a party to the contract Steadfast seeks to reform, and should Steadfast

20  succeed, the Navy is at risk of incurring greater liability, LMI Mot. at 17–18; CCI Mot. at 13–14.

21          The first and second arguments are similar.  In effect, LMI and CCI argue that if

22  the ELI policy is cancelled or reformed, Steadfast would have retroactively changed the terms of

23  the insurance scheme the Navy bought into.  In other words, the "very foundation on which the

24  Navy, the City of Vallejo, LMI, and CCI entered into their 2001 agreements" was that "all

25  cleanup costs were to be directly funded by the Navy's payment or insured with Navy-paid

26  premium dollars."  LMI Mot. at 17.  LMI does not support this assertion with citations to

27  evidence.  Nevertheless, assuming LMI had proven this fact, its argument describes only

28  prejudice in the abstract.  It leaves the court to surmise the implications of Steadfast's claims for

1   the Navy's interests and assumes without explanation that the Navy has an interest in ensuring it

2   (and not Steadfast, LMI, CCI, the City of Vallejo or anyone else) paid for pollution clean-up.

3          On the other hand, the Navy's interest in the insurance policy is far weightier.  The

4   Ninth Circuit has "repeatedly held that '[n]o procedural principle is more deeply imbedded in the

5   common law than that, in an action to set aside a lease or a contract, all parties who may be

6   affected by the determination of the action are indispensable.'"  *Peabody*, 610 F.3d at 1082

7   (quoting *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975)) (alteration in

8   *Peabody*).  *See also Dawavendewa*, 276 F.3d at 1157 ("[A] party to a contract is necessary, and if

9   not susceptible to joinder, indispensable to litigation seeking to decimate that contract."); *Clinton

10  v. Babbitt*, 180 F.3d 1081, 1088 (9th Cir. 1999) ("[A] district court cannot adjudicate an attack on

11  the terms of a negotiated agreement without jurisdiction over the parties to that agreement.").  But

12  the Ninth Circuit has read its own precedent narrowly on this point.  In a case that was not "an

13  action to set aside a contract, . . . an attack on the terms of a negotiated agreement, or litigation

14  seeking to decimate a contract," absentee signatories were not necessary.  *See Disabled Rights*,

15  375 F.3d at 881 (citations, quotation marks, and alterations omitted).

16         The "United States Department of Defense, Department of the Navy" is an

17  "additional insured" under the ELI policy, "to the extent of Claims arising out of the activities,

18  liabilities and obligations of the Navy at the Covered Location: Coverage A.1 only."  Am.

19  Countercl. Ex. B, at 183.  As an additional insured, the Navy has an interest in preventing

20  Steadfast from canceling the insurance policy.  *See Peabody*, 610 F.3d at 1082 (an action to "set

21  aside" a contract requires the signatories' presence).  Whether the Navy has an interest in

22  Steadfast's reformation claim, however, depends on whether and how the proposed reformation

23  would impact the Navy's contract rights.  The court therefore turns to the proposed reformation.

24         Steadfast seeks reformation of the definition of "Known Pollution Condition,"

25  through alteration of the ELI policy as follows:

26         Known Pollution Conditions means all conditions specifically
        described in the Policy application materials, including all
27      documents describing the environmental conditions at Mare Island
        (including Technical Summaries) and in the Scope of Work
28      Endorsement to the Remediation Stop Loss Policy No. ERC

5224884-00 ("Scope of Work Endorsement") and which require or may ultimately require any form of remedial investigation or action, including solely administrative action or establishment of Institutional Controls, by the Named Insured before a Governmental Authority will determine that no further remedial action is required.  Known Pollution Conditions constitute all of the conditions that are deemed known to the Insureds for the purposes of this Policy.  Known Pollution Conditions ~~are~~ include:

1.     those conditions specifically set forth in Tables 1-3 and Figures 1 through 89 and Fuel Oil Line Removal Project Figures 1 through 11 to the Scope of Work Endorsement, which statement of conditions is either (i) a designation of location, contamination, byproducts, breakdown products and source of such identified contamination at the time of policy inception, or (ii) a designation of location, contamination, byproducts, breakdown products and an expressly unidentified source of such identified contamination at the time of policy inception, and

2.     any contaminants generally accepted in the relevant scientific community at the time of policy inception as a byproduct or breakdown product of the contaminant(s) referred to in 1) above, whether listed on the Scope of Work Endorsement or not.  Listing of a byproduct or breakdown product on the Scope of Work Endorsement shall constitute agreement by the Insureds and the Company that such general acceptance exists with respect to that byproduct or breakdown product.

See Am. Countercl. ¶ 107(a), Ex. B, at 136.  Steadfast proposes equivalent modifications of the RSL Policy.  See id. ¶ 107(b), Ex A, at 37.[5]

---

[5] In opposition to LMI's pending motion for summary judgment, Steadfast has advanced an interpretation of "Known Pollution Conditions" that tracks this reformation claim.  See Opp'n Mot. Summ. J. 11, ECF No. 193 (arguing the parties understood they could "resort to environmental studies during the underwriting and during the claims adjusting process . . . to determine whether a pollution condition was 'known' or 'unknown.'"); id. at 3 ("[T]he issues in this case are not simply whether a condition is listed in a table, but rather whether the actual pollution . . . was known.").  Here, Steadfast argues this similarity shows the Navy must be joined to LMI's and CCI's requests for declaratory judgment if it must be joined to Steadfast's counterclaim.  See Opp'n LMI Mot. 15–16.  The court disagrees.  "[A]s a practical matter," proceeding without the Navy on LMI's and CCI's claims would not "impair" or "impede" any interest the Navy has in the ELI policy.  Fed. R. Civ. P. 19(a)(1)(B)(i).  The declaratory relief LMI and CCI seek is of Steadfast's obligations to make payments to LMI and CCI, not to the Navy; were LMI and CCI to succeed, the Navy's interests would not be adversely affected.  Moreover, CCI's counterclaim seeks relief under only the RSL policy, and the court is aware of no evidence showing the Navy is a party to the RSL policy.  See Answer & Countercl. ¶¶ 27–43, ECF No. 12.

1    LMI and CCI argue that should Steadfast succeed on this front, the ELI policy's

2  coverage will be reduced.  They argue the Navy would face greater liability.  *See* LMI Mot. at 17.

3  The court has reviewed the terms of the ELI policy and ESCA, and agrees that were the ELI and

4  RSL policy definition of "Known Pollution Condition" to expand, the ELI policy's coverage

5  would contract, and the Navy could arguably face greater liability.  *See* Werner Decl. Ex. 2A, at

6  3, ECF No. 296-2 ("The Navy shall remain responsible . . . for Navy-Retained Conditions . . . .");

7  *id.* at 4–5 (defining "Navy-Retained Conditions"); *id.* at 6 (defining "Known Conditions" and

8  "Unknown Conditions"); *id.* at 7 (defining "Insured Unknown Conditions").  Steadfast does not

9  dispute this general conclusion, and it has made similar statements in previous filings.  *See, e.g.*,

10  Joint Rep. 3, ECF No. 16 ("Under the ESCA, the City [of Vallejo] declined responsibility for

11  certain of the Navy's potential environmental liabilities, including, inter alia, natural resource

12  damages, certain unknown conditions, and known conditions once remediation costs for known

13  conditions exceeded $114.3 million (collectively, 'Navy Retained Conditions').").

14    If the court were to reform the ELI policy as Steadfast requests, the Navy's

15  liability could arguably increase.  The Navy's legally cognizable interests may therefore be

16  impaired or impeded by both reformation and cancellation of the ELI policy.  In sum, under Rule

17  19(a)(1)(B)(i), the Navy is a necessary party to Steadfast's counterclaim for reformation and

18  Steadfast's requests for cancellation and reformation.

19              3.      Inconsistent Obligations

20    LMI argues reformation would subject LMI to "cleanup obligations under the

21  ESCA that are inconsistent with its insurance coverage for cleanup costs under the ELI policy,

22  even though ELI policy coverage was consideration for the original deal."  LMI Mot. at 18.  This

23  possible conflict does not require the Navy's joinder.  LMI has not shown, for example, that

24  should Steadfast prevail, the reformed ELI policy would subject LMI to a contractual obligation

25  contrary to another duty LMI owes the Navy.  *Cf., e.g.*, *Peabody*, 610 F.3d at 1081.  LMI has not

26  shown it cannot defend its financial interests in the ELI policy in the Navy's absence.  The Navy

27  is not necessary under Rule 19(a)(1)(B)(ii).

28

13

4.      Adequate Representation

Although the Navy has an interest in the adjudication of Steadfast's counterclaim, it may not be necessary under Rule 19(a) if it is "adequately represented" here.  *Salt River*, 672 F.3d at 1180–81.  The parties do not address this possibility, but were the court to dismiss Steadfast's claims without doing so, the error may be reversible.  *See id.* 1180–82.

As the Ninth Circuit has explained, "If a legally protected interest exists, the court must further determine whether that interest will be impaired or impeded by the suit.  Impairment may be minimized if the absent party is adequately represented in the suit."  *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990).  The court considers three factors in determining whether a present party adequately represents the interests of an absent party:

> (1) "whether the interests of a present party to the suit are such that it will undoubtedly make all of the absent party's arguments"; (2) "whether the party is capable of and willing to make such arguments"; and (3) "whether the absent party would offer any necessary element to the proceedings that the present parties would neglect."

*Salt River*, 672 F.3d at 1180 (quoting *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992)).

The *Salt River* court's decision illustrates how these rules may be applied.  In that case, two non-tribal entities, the owner and operator of a power plant on Navajo Nation land, were defendants in an employment case brought in tribal courts.  *Id.* at 1177.  In a federal-court complaint against Navajo officials, the power plant sought to bar the application of tribal law in the employment case, arguing the tribe lacked authority to do so under its lease agreement with the power plant.  *Id.* at 1177–78.  The tribe was absent from the federal case, however, and tribal officers argued the case could not proceed without the tribe because the complaint challenged the lease agreement.  *Id.* at 1178.  The district court agreed and dismissed the federal case under Rule 19.  *Id.*

On appeal, the Ninth Circuit reversed, finding the tribal officials adequately represented the tribe.  *Id.* at 1180–81.  The officials' interests were "aligned" with the tribe's interests.  *Id.* at 1180.  No evidence suggested the officials would be unable to make every

1    reasonable argument the tribe itself would make.  *Id.*  And no evidence suggested the tribe would

2    "offer any necessary element to the action that the Navajo official defendants would neglect."  *Id.*

3    at 1180–81.  The Navajo Nation was therefore not a necessary party, and the case could go

4    forward without it.  *Id.* at 1182.

5              Here, LMI's and CCI's interests are similarly "aligned" with the Navy's.  All are

6    insureds under the ELI policy.  In defending Steadfast's counterclaim, LMI and CCI attempt to

7    rebuff an interpretation they claim would "gut" the ELI Policy for the same reasons the Navy

8    would: to preserve the structure of insurance for the Mare Island project as they see it and to

9    prevent coverage reductions.  The Navy arguably faces increased liability should Steadfast

10   succeed.  LMI faces the same danger.

11             The Navy's rights under the ELI policy may differ from LMI's and CCI's rights

12   generally, but their interests all align with respect to Steadfast's counterclaim.  First, Steadfast

13   seeks cancellation of the ELI policy for fraud.  LMI and CCI have the same if not a greater

14   interest in defending against this claim as does the Navy: not only could they lose coverage if

15   Steadfast prevails, but they would be branded fraudsters.  Second, Steadfast seeks reformation of

16   the definition of "Known Pollution Condition."  The Navy, LMI and CCI all face the risk of

17   reduced coverage were the ELI policy's terms to be reformed.  LMI's vigorous defense of the

18   counterclaim and its pending motion for summary judgment on the definition of "Known

19   Pollution Conditions" show both that its interests align with the Navy's and that it is capable of

20   defending those interests.

21             The court also concludes LMI and CCI are as capable of defending against the

22   counterclaim as the Navy would be.  LMI and CCI have not suggested the Navy has evidence

23   they do not or can make arguments they cannot, and the progression of the case to date also

24   suggests no such shortfall.  Neither has any party suggested the Navy's presence would contribute

25   any element necessary to this case.  The Navy is adequately represented in this case, and for this

26   reason it is not a necessary party under Rule 19(a).

27             The Navy's public or sovereign status does not lead to the opposite conclusion.  In

28   some cases, third party litigants may not adequately represent a public entity's sovereign interests.

1    *See, e.g.*, *W. Watersheds Project v. U.S. Forest Serv.*, No. 10-612, 2012 WL 262573, at *4

2    (D. Idaho Jan. 30, 2012); *In re Chocolate Confectionary Antitrust Litig.*, No. 08-1935, 2008 WL

3    4960194, at *1 (M.D. Pa. Nov. 18, 2008).[6]  But sovereign or public status alone is not antithetical

4    to adequate representation under Rule 19(a).  *See, e.g.*, *Salt River*, 672 F.3d at 1180–81

5    (individual tribal officials could represent the Navajo Nation).  And no sovereign interests are

6    implicated here.  *Cf. W. Watersheds*, 2012 WL 262573, at *4 (Wyoming's regulatory interests in

7    managing land use); *Chocolate Confectionary*, 2008 WL 4960194, at *1 ("the Canadian

8    government's sovereign interest in maintaining the integrity of its criminal investigations").

9               Because the court concludes the Navy is not a necessary party, it does not address

10   whether the Navy may feasibly be joined as a party.[7]

11        B.    Whether the Case May Proceed in the Navy's Absence under Rule 19(b)

12              Even if the Navy were necessary under Rule 19(a), the court could not grant the

13   motion to dismiss based on Rule 12(b)(7).  LMI and CCI have not carried their burden to show

14   that Steadfast's requests for reformation and cancellation cannot proceed "in equity and good

15   conscience."  Fed. R. Civ. P. 19(b).

16              Rule 19 lists several specific considerations the court should weigh when joinder

17   of a necessary party is not feasible:

18               (1) the extent to which a judgment rendered in the person's absence
19               might prejudice that person or the existing parties;

20               (2) the extent to which any prejudice could be lessened or avoided
     by:

21                   (A) protective provisions in the judgment;

22                   (B) shaping the relief; or

23                   (C) other measures;

24   _____

25       [6] These cases concerned motions to intervene.  Intervention as of right under Rule 24(a)
     and necessary joinder under Rule 19 are governed by analogous standards.  *Compare, e.g.*, *Salt*
26   *River*, 672 F.3d at 1179–80, *with, e.g.*, *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810,
     817–18, 822–23 (9th Cir. 2001).

27       [7] The court notes, however, that the United States' sovereign immunity would likely bar
28   the Navy's involuntary joinder.  *See, e.g.*, *Munoz v. Mabus*, 630 F.3d 856, 861 (9th Cir. 2010).

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).  The court's decision on this question is one of discretion.  *Salt River*, 672 F.3d at 1179.

First, LMI and CCI do not argue they or Steadfast will be prejudiced by the Navy's absence.  Neither does it appear they will be.  As to the Navy, as noted above, the course of this litigation shows LMI's and CCI's interests parallel the Navy's.  Their vigorous prosecution of this case will substantially reduce any risk of prejudice to the Navy.  Moreover, were evidence to be uncovered that showed the Navy faces prejudice, the court may revisit its decision, or the Navy could seek to provide amicus curiae briefing.  *See*, *e.g.*, *Bordallo v. Camacho*, 475 F.2d 712, 713 n.1 (9th Cir. 1973) (per curiam) (finding the United States was not an indispensable[8] party, citing an amicus curiae brief filed by the United States); *Altmann v. Republic of Austria*, 142 F. Supp. 2d 1187, 1212 (C.D. Cal. 2001) (an amicus curiae could advance an absentee's interests), *aff'd and remanded*, 317 F.3d 954 (9th Cir. 2002), *am. on denial of reh'g*, 327 F.3d 1246 (9th Cir. 2003), *and aff'd on other grounds*, 541 U.S. 677 (2004).

Second, if judgment in Steadfast's favor would prejudice the Navy, the court could shape that judgment to minimize prejudice.  For example, should Steadfast prevail on its reformation claim, the court may equitably refine the definition of "Known Pollution Condition" to fit the parties' total pre-contract expectations, including the Navy's, whatever the evidence may establish those expectations were.

Third, were Steadfast's counterclaim dismissed with prejudice, it would likely have no other avenue for relief.  *See* Fed. R. Civ. P. 19(b)(4).  Although the lack of an alternative forum is not dispositive, *see Makah*, 910 F.2d at 560, in this case, this factor weighs against dismissal.

---

[8] "Following stylistic amendments enacted in 2007, Federal Rule of Civil Procedure 19 no longer refers to 'indispensable' parties, but instead uses the term 'required party.'"  *Alto*, 738 F.3d at 1118 n.6.

1     Finally, when a person or agency is aware of an action but chooses not to claim an

2     interest, the district court does not err by finding joinder unnecessary.  *United States v. Bowen*,

3     172 F.3d 682, 689 (9th Cir. 1999).  Steadfast's position in this litigation has always been that the

4     definition of "Known Pollution Conditions" included more than the Tables and Figures in the

5     endorsements, even before its counterclaim was filed.  The Navy has remained silent despite its

6     awareness of this action's nature and pendency.  *See, e.g.*, Joint Status Rep. 3, ECF No. 110

7     (Steadfast reports (1) it sent the Navy requests for documents under the Freedom of Information

8     Act, (2) the Navy agreed to produce documents related to Mare Island; and (3) it later also served

9     the Navy with discovery subpoenas in this case); Minutes, ECF No. 121 (noting the Navy's

10    participation in settlement efforts in this case); Order Apr. 7, 2015, at 9, ECF No. 263 (ordering

11    LMI to produce "any written agreement or agreements it has entered into with the Navy that

12    establish that the Navy is assisting LMI in its payment of attorneys' fees in this litigation and that

13    the Navy is entitled to reimbursement for some or all of the attorneys' fees for which it is

14    paying").

15         The motions to dismiss and strike under Rules 12(b)(7) and 19 are denied.

16    III.    RULE 12(b)(6) ANALYSIS

17         The court now turns to the motions to dismiss for failure to state a claim.

18         A.    Legal Standard

19         "A defendant's counterclaims are held to the same pleading standard as a

20    plaintiff's complaint."  *First Serv. Networks, Inc. v. First Serv. Maint. Grp., Inc.*, No. 11-01897,

21    2012 WL 5878837, at *1 (D. Ariz. Nov. 21, 2012) (citing *Starr*, 652 F.3d at 1216).  A party may

22    move to dismiss a counterclaim for "failure to state a claim upon which relief can be granted."

23    Fed. R. Civ. P. 12(b)(6).  The motion may be granted only if the counterclaim lacks a "cognizable

24    legal theory" or if its factual allegations do not support a cognizable legal theory.  *Hartmann v.*

25    *Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013).  The court assumes the

26    counterclaim's factual allegations are true and draws reasonable inferences from them.  *Ashcroft*

27    *v. Iqbal*, 556 U.S. 662, 678 (2009).

28

18

1    　　　　A counterclaim need contain only a "short and plain statement of the claim

2    showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual

3    allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  But this rule demands more

4    than unadorned accusations; "sufficient factual matter" must make the claim at least plausible.

5    *Iqbal*, 556 U.S. at 678.  In the same vein, conclusory or formulaic recitations of elements do not

6    alone suffice.  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Evaluation under Rule 12(b)(6) is a

7    context-specific task drawing on "judicial experience and common sense."  *Id.* at 679.  And aside

8    from the counterclaim, district courts have discretion to examine documents incorporated by

9    reference, *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012); affirmative

10   defenses based on the complaint's allegations, *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir.

11   2013); and proper subjects of judicial notice, *W. Radio Servs.*, 678 F.3d at 976.

12   　　　　Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard on

13   fraud allegations: "In alleging fraud or mistake, a party must state with particularity the

14   circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a

15   person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  "Fraud can be averred by

16   specifically alleging fraud, or by alleging facts that necessarily constitute fraud (even if the word

17   'fraud' is not used)."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003).

18   Although state law governs the substantive adequacy of the pleading here, Rule 9(b) nonetheless

19   applies to any claims or allegations of fraud.  *Id.* at 1103.  If fraud is not an essential element of a

20   particular claim, "only those allegations . . . which aver fraud are subject to Rule 9(b)'s

21   heightened pleading standard."  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).

22   If an allegation does not meet the heightened pleading standard, it is disregarded.  *Id.*  Non-fraud

23   allegations need satisfy only the standard of Rule 8.  *Id.*

24   　　　　To meet the Rule 9(b) standard, a pleading must "'be specific enough to give

25   defendants notice of the particular misconduct . . . so that they can defend against the charge and

26   not just deny that they have done anything wrong.'"  *Sanford v. MemberWorks, Inc.*, 625 F.3d

27   550, 558 (9th Cir. 2010) (quoting *Kearns*, 567 F.3d at 1124) (alteration in original).  Normally

28   this standard requires allegations of "the time, place, and specific content of the false

1   representations as well as the identities of the parties to the misrepresentation." *Id.* (quoting

2   *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)) (quotation marks and

3   alterations omitted).

4   　　　　B.　　　Discussion

5   　　　　　　　LMI and CCI challenge the amended counterclaim as a whole, as insufficiently

6   specific under Rule 9(b).  Their motions also advance several claim-specific arguments for

7   dismissal, targeting the claims for breach of contract, negligence, intentional interference with

8   contractual relations, and reformation.  Each is a state law claim.  Therefore California

9   substantive law applies.  *See Bell Lavalin, Inc. v. Simcoe & Erie Gen. Ins. Co.*, 61 F.3d 742, 745

10  (9th Cir. 1995).  The court first addresses LMI's and CCI's claim-specific arguments, then turns

11  to Rule 9(b).

12  　　　　　　　1.　　　Breach of Contract

13  　　　　　　　California courts define a claim for breach of contract in four parts: "(1) the

14  existence of the contract, (2) plaintiff's performance or excuse for nonperformance,

15  (3) defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis W. Realty, LLC v.*

16  *Goldman*, 51 Cal. 4th 811, 821 (2011).  Here, the parties dispute only the third element: whether

17  Steadfast can allege LMI and CCI breached the ELI and RSL policies.

18  　　　　　　　The amended counterclaim lists four alleged breaches:

19  　　　　•　　　LMI and CCI wrongfully submitted claims for Known Pollution Conditions under

20  　　　　　　　the ELI policy and unknown conditions under the RSL policy—that is, claims

21  　　　　　　　were wrongfully submitted under the incorrect policy, Am. Countercl. ¶ 75;

22  　　　　•　　　LMI and CCI wrongfully submitted claims for costs not required by Governmental

23  　　　　　　　Authority, *id.* ¶ 76;

24  　　　　•　　　LMI and CCI submitted unreasonable claims, *id.* ¶ 75; and

25  　　　　•　　　LMI and CCI breached their covenant to cooperate, *id.* ¶ 77.

26  The court addresses each claim in turn.

27

28

1                a)      **Wrong Policy**

2         Steadfast alleges as follows:

3             Under the RSL Policy, CH2M[9] was to submit claims for Known
Pollution Events.  Under the ELI Policy, LMI was to submit claims

4             for Unknown Pollution Events.  Thus, CH2M and LMI agreed to
submit claims for Known Pollution Events only under the RSL

5             Policy and agreed to submit claims for Unknown Pollution Events
only under the ELI Policy.

6

7 Am. Countercl. ¶ 75.

8         No provision of the RSL or ELI policies forbids LMI or CCI from submitting

9 claims for unknown pollution events under the RSL policy or known events under the ELI policy.

10 First, the RSL policy provides coverage for "any Loss arising out of the Insured Project that

11 exceeds the Self Insured Retention(s), provided the loss is the result of a Claim first reported to

12 the Company, in writing by the Named Insured, during the Policy Period."  Am. Countercl.

13 Ex. A, at 35 (bold typeface omitted).  The "Insured Project" is "the project designated in Item 5 of

14 the Declarations as specifically described in and limited by the appended Scope of Work

15 endorsement."  *Id.* at 37.  Item 5 lists "Remediation of the Covered Location as described by the

16 Scope of Work Endorsement . . . to this policy."  *Id.* at 33.  The Scope of Work endorsement

17 provides, "The conditions and activities identified in Tables 1, 2, and 3 and listed below represent

18 the Scope of Work of the Insured Project and are Known Pollution Conditions or actions with

19 respect to such Known Pollution Conditions authorized under the Scope of Work as provided

20 below."  *Id.* at 54.  Therefore, Steadfast may deny a claim submitted under the RSL policy

21 because the claim is for an unknown condition, but submitting such a claim is not a breach of

22 contract.

23         Second, the ELI policy provides coverage for (1) "Cleanup Costs in excess of the

24 applicable Self Insured Retention required by Governmental Authority as a result of a Pollution

25 Event on, at or under a Covered Location that is not a Known Pollution Condition and that is first

26 discovered during the Policy Period"; and (2) "Cleanup Costs in excess of the applicable Self

27

28       [9] The amended counterclaim refers to CCI as "CH2M."  *See* Am. Countercl. ¶ 3.

1    Insured Retention where the Insured is legally obligated to pay as a result of a Claim first made

2    against the Insured during the Policy Period of Cleanup Costs caused by a Pollution Event on, at,

3    under or coming from a Covered Location that is not a Known Pollution Condition." *Id.* Ex. B,

4    at 131 (bold typeface omitted).  Therefore, Steadfast may deny a claim submitted under the ELI

5    policy because the claim is for a known condition, but submitting such a claim is not a breach of

6    contract.

7           The motion to dismiss is granted as to this claim with prejudice and without leave

8    to amend.  *See, e.g.*, *Cafasso*, 637 F.3d 1047, 1058 (9th Cir. 2011) (leave to amend need not be

9    granted if amendment would be an exercise in futility); *Steckman v. Hart Brewing, Inc.*, 143 F.3d

10   1293, 1295–96 (9th Cir. 1998) (the court does not assume the truth of allegations contradicted by

11   documents referred to in the complaint).

12                        b)      Work not Required by Governmental Authority

13          Steadfast alleges as follows:

14          [T]he RSL and ELI Policies allow CH2M and LMI only to submit
            claims for investigation or cleanup that is required by governmental
15          authority.  Instead, and in breach of this requirement, CH2M and
            LMI have submitted claims that do not arise out of governmental
16          authority and have in fact asked the government to require them to
            investigate and remediate the sites.
17

18   Am. Countercl. ¶ 76.  The court has carefully reviewed the RSL and ELI policies.  No provision

19   of either policy forbids LMI or CCI from submitting claims for costs not required by

20   governmental authority.  Rather, the terms quoted above show Steadfast may deny claims for

21   cleanup not required by government authority, but the policies impose no contractual duty to

22   refrain from submitting such a claim.  *See supra* pages 21–22.  This claim is dismissed with

23   prejudice and without leave to amend.

24                        c)      Unreasonable Claims

25          Steadfast alleges CCI and LMI "submitted claims that were not reasonable in

26   amount or kind, all in violation of the terms of the RSL and ELI Policies."  Am. Countercl. ¶ 75.

27   The RSL Policy provides, "Allowable Expenses of the Named Insured include the sum of

28   [specific items listed in the policy], to the extent they are reasonable and necessary to complete

1   the agreed Scope of Work." Am. Countercl. Ex. A, at 35 (bold typeface omitted). Similarly, the

2   ELI policy provides, "[I]tems which will comprise and which are Allowable Expenses of the First

3   Named Insured include the sums of [certain items], to the extent they are reasonable and

4   necessary to complete the agreed Covered Work." *Id.* Ex. B, at 132 (bold typeface omitted). No

5   provision prohibits LMI or CCI from submitting unreasonable claims; rather, the policies allow

6   Steadfast to deny unreasonable claims. As above, this claim is dismissed with prejudice and

7   without leave to amend.

8              d)     <u>Failure to Cooperate</u>

9          Steadfast alleges as follows:

> CH2M and LMI also covenanted to cooperate with Steadfast in the
> adjustment of claims under the RSL and ELI Policies. In breach of
> those covenants, CH2M and LMI have submitted claims they know
> to be improper, have refused to provide requested support for
> submitted claims, have concealed information from Steadfast, have
> misrepresented the facts of the claims submitted, have refused to
> allow Steadfast to hire proper consultants, and have otherwise
> withheld information from both Steadfast and each other.

15  Am. Countercl. ¶ 77. Under the ELI Policy, "The Insureds agree with the Company to assist and

16  cooperate in the fulfillment of the policy's terms, including the investigation, adjustment, defense

17  or settlement of Claim(s)." Am. Countercl. Ex. B, at 154.

18          Under longstanding California law, if an insured breaches a covenant to cooperate,

19  the insurer may enjoy a defense in an action under that policy. *See, e.g.*, *Billington v.*

20  *Interinsurance Exch. of S. Cal.*, 71 Cal. 2d 728, 742 (1969); *Campbell v. Allstate Ins. Co.*,

21  60 Cal. 2d 303, 305 (1963); *Truck Ins. Exchange v. Unigard Ins. Co.*, 79 Cal. App. 4th 966, 976

22  (2000). California courts appear to have assumed the breach of a cooperation clause creates a

23  defense only; disputes tend to center on the correct classification of the condition imposed:

24  subsequent or precedent. *See, e.g.*, *Billington*, 71 Cal. 2d at 742 ("It has been said that a

25  cooperation clause constitutes a condition subsequent or a condition precedent in an insurance

26  policy . . . ."); *O'Morrow v. Borad*, 27 Cal. 2d 794, 800 (1946) ("[R]egardless of the name given

27  to provisions of this kind [that is, condition subsequent or condition precedent], the insurer is

28  ordinarily released from its contract by the total and unjustifiable refusal of cooperation by the

1  insured . . . ."); *Valladao v. Fireman's Fund Indem. Co.*, 13 Cal. 2d 322, 337 (1939) ("[T]he

2  condition of the policy requiring cooperation by the assured is in the nature of a condition

3  precedent to liability on the company's part . . . .").

4           Some California federal court decisions are consistent with these state cases.  *See*

5  *Pac. Dental Servs., LLC v. Homeland Ins. Co. of N.Y.*, No. 13-749, 2013 WL 3776337, at *4

6  (C.D. Cal. July 17, 2013); *Allstate Ins. Co. v. Madan*, 889 F. Supp. 374, 379 (C.D. Cal. 1995)

7  (citing *West v. State Farm Fire & Cas. Co.*, 868 F.2d 348, 350 (9th Cir. 1989)).  In an

8  unpublished 2007 decision, the Ninth Circuit also understood California law to require an insurer

9  to present cooperation-clause breaches in its defense, and not in an affirmative contract claim.

10 *See Ins. Co. State of Pa. v. The Roman Catholic Archbishop of L.A.*, 227 F. App'x 643, 644 (9th

11 Cir. 2007) ("California courts have long characterized the insured's duty to cooperate as a

12 condition precedent to coverage, *not* as a basis on which to assert an independent cause of action.

13 For these reasons, we believe that the California Supreme Court would require plaintiffs to

14 present their theories as to how the [defendant] breached his duty to cooperate as a defense to

15 liability under the policies." (emphasis in original) (citing *Valladao*, 13 Cal. 2d at 337)).

16          In recent years, however, some federal district courts have held otherwise,

17 allowing insurers to pursue an affirmative contract claim under California law for breach of a

18 cooperation clause.  *See Travelers Indem. Co. of Connecticut v. Centex Homes*, No. 14-451, 2014

19 WL 2801050, at *3 (E.D. Cal. June 19, 2014); *Centex Homes v. Lexington Ins. Co.*, No. 13-719,

20 2014 WL 1225501, at *17 (N.D. Tex. Mar. 25, 2014); *Great Am. Ins. Co. v. Chang*, No. 10–833,

21 2012 WL 3660005, at *2 (N.D. Cal. Aug. 24, 2012); *Sierra Pac. Indus. v. Am. States Ins. Co.*,

22 883 F. Supp. 2d 967, 976–77 (E.D. Cal. 2012).  These courts reach this conclusion largely after

23 noting the absence of controlling authority to the contrary.  *See, e.g.*, *Travelers*, 2014 WL

24 2801050, at *3–4; *Sierra Pac.*, 883 F. Supp. 2d at 976–77.  The decision from another judge in

25 this district in the *Sierra Pacific* case also drew from *Kransco v. American Empire Surplus Lines*

26 *Insurance Co.*, in which the California Supreme Court noted the "duty of good faith and fair

27 dealing in an insurance policy is a two-way street, running from the insured to his insurer as well

28

1  as vice versa." 23 Cal. 4th 390, 402 (2000) (citation and quotation marks omitted). *See* 883 F.

2  Supp. 2d at 976–77.

3        The rule that requires the court to apply California law here famously stems from

4  *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), whose "twin aims" are "discouragement of

5  forum-shopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer*,

6  380 U.S. 460, 468 (1965). The U.S. Supreme Court has interpreted *Erie* to reject "a particular

7  way of looking at law":

8        Law was conceived as a "brooding omnipresence" of Reason, of
      which decisions were merely evidence and not themselves the

9        controlling formulations. Accordingly, federal courts deemed
      themselves free to ascertain what Reason, and therefore Law,

10        required wholly independent of authoritatively declared State law,
      even in cases where a legal right as the basis for relief was created

11        by State authority and could not be created by federal authority and
      the case got into a federal court merely because it was "between

12        Citizens of different States" . . . .

13  *Guar. Trust Co. of N.Y. v. York*, 326 U.S. 99, 102 (1945). In other words, "the court 'must apply

14  the law as it believes the California Supreme Court would apply it.'" *Kairy v. SuperShuttle Int'l*,

15  660 F.3d 1146, 1150 (9th Cir. 2011) (quoting *Gravquick A/S v. Trimble Navigation Int'l, Ltd.*,

16  323 F.3d 1219, 1222 (9th Cir. 2003)).

17        This court adopts the position of the court in *Insurance Company of the State of*

18  *Pennsylvania* as persuasively comprehending what the California Supreme Court's decision

19  would be. Steadfast must pursue its cooperation-clause theories as a defense, not an independent,

20  affirmative contract claim. The court reaches this conclusion on the basis of four considerations.

21  First, California courts have final authority to define and interpret California law. *See, e.g.*,

22  *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975); *Fid. Union Trust Co. v. Field*, 311 U.S. 169, 177

23  (1940). This court applies the law as defined by California courts; it does not assume a claim

24  may proceed in the absence of contrary authority. *See U.S. Fid. & Guar. Co. v. Lee Investments*

25  *LLC*, 641 F.3d 1126, 1134 (9th Cir. 2011) ("In assessing how the California Supreme Court

26  would resolve [a] question—absent controlling state authority—federal courts look to existing

27  state law without predicting potential changes in that law.").

28

1          Second, California courts have treated an insurer's defensive posture in this

2   situation as axiomatic.  In deciding decades of case law, no California court has even taken up the

3   question of an affirmative cooperation-clause claim, which suggests adopting Steadfast's position

4   would be a ground-breaking move better left to the state courts as a matter of comity.

5          Third, as a practical matter, allowing Steadfast to pursue an affirmative claim in

6   this court may encourage forum shopping.  To date no state court has recognized affirmative

7   claims for the breach of a cooperation clause.  For this reason, an insurer who believes its insured

8   has breached a cooperation clause may prefer federal court, whereas an insured who suspects

9   such a response from her insurer may prefer state court.

10         Finally, the California Supreme Court has emphasized differences between an

11   insurer's and an insured's position in a contract action.  *See, e.g.*, *Kransco*, 23 Cal. 4th at 402

12   (citing, *inter alia*, *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 684 (1988)).  Both insurers

13   and insureds owe one another a duty of good faith and fair dealing, but only an insured may

14   pursue tort remedies for breaches of this duty.  *Id.*  In addition, an insured's breach of a

15   cooperation clause does not excuse the insurer's duty of good faith and fair dealing; "the insurer's

16   duty is unconditional and *independent* of the insured's contractual obligations."  *Id.* (quoting

17   *Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 576–78 (1973)) (emphasis in *Kransco*).  This also

18   suggests the California Supreme Court would require an insurer to advance cooperation-clause

19   theories in a defensive rather than an offensive posture.

20         The motion is granted with prejudice and without leave to amend as to this claim.

21              e)        The Covenant of Good Faith and Fair Dealing

22         Steadfast does not allege a claim for breach of the covenant of good faith and fair

23   dealing in its amended counterclaim.  It does advance this theory in its opposition brief to LMI's

24   motion.  *See* Opp'n LMI Mot. at 13–14.  "In determining the propriety of a Rule 12(b)(6)

25   dismissal, a court may not look beyond the [pleadings] to a [party's] moving papers, such as a

26   memorandum in opposition to a . . . motion to dismiss."  *Schneider v. Cal. Dep't of Corr.*,

27   151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (emphasis omitted).  The court therefore construes

28   Steadfast's argument as a request for leave to amend.

California law recognizes the implied covenant of good faith and fair dealing in every contract. *Kransco*, 23 Cal. 4th at 400. Each party promises not to do "anything which will injure the right of the other to receive the benefits of the agreement." *Id.* "[T]he covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 36 (1995). It "applies equally to insurance policies, which are a category of contracts." *Kransco*, 23 Cal. 4th at 400. An insured's breach of the covenant of good faith and fair dealing is separately actionable as a contract claim. *Id.* at 408.

Here, it appears the counterclaim could be amended to state a claim for LMI's and CCI's breach of the covenant of good faith and fair dealing. Steadfast alleges LMI and CCI attempted to shift claims from one policy to another, to conjure government authority, and to submit inflated claims in bad faith. Steadfast is therefore granted leave to amend to allege a claim for breach of the implied covenant of good faith and fair dealing.

### 2.   Intentional Interference with Contractual Relations

California law recognizes a tort claim for intentional interference with existing contractual rights. *Woods v. Fox Broad. Sub., Inc.*, 129 Cal. App. 4th 344, 350 (2005). The claim may proceed if the plaintiff adequately alleges (1) it has or had a contractual relationship with a third party; (2) the defendant knew about that contract; (3) the defendant intended to disrupt performance of the contract; (4) the defendant engaged in conduct preventing performance of the contract; and (5) the defendant caused damage by doing so. *United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014), *cert. denied*, ___ U.S. ___, 135 S. Ct. 980 (2015) (citing *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990)).

In an action for intentional interference with contractual relations, the plaintiff and defendant may not both be parties to the contract in question. *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994). Otherwise a plaintiff could improperly recast contract claims as tort claims. *See id.* at 514–17. In *Applied Equipment*, the California Supreme Court expressed this rule in broad terms:

> One contracting party owes no general tort duty to another not to interfere with performance of the contract; its duty is simply to perform the contract according to its terms. The tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance.

*Id.* at 514.  This rule is commonly known as the "not-a-stranger" principle.  *See, e.g.*, *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1126 (9th Cir. 2014).

The *Applied Equipment* court's language has "spawned much controversy" in both California state and federal courts.  *Id.*  Many courts have held, relying on *Applied Equipment*, that California law recognizes "no tort duty not to interfere falling on non-contracting parties who do have a legitimate interest in the scope or course of the contract's performance, concluding . . . that such third-parties are not strangers to the relationship."  *Id.* (citing *Exxon Corp. v. Super. Ct.*, 51 Cal. App. 4th 1672, 1688 (1997); *Kasparian v. Cnty. of L.A.*, 38 Cal. App. 4th 242, 262 (1995); *Mintz v. Blue Cross of Cal.*, 172 Cal. App. 4th 1594, 1603 (2009)).

In a few recent decisions, California appellate courts have "limited [*Applied Equipment*] to its specific holding that only parties to a contract are excluded from asserting an intentional interference claim."  *Id.* at 1026–27.  For example, in *Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp.*, the Court of Appeal allowed a motorcycle dealer to sue its distributor for interfering in a contract between the dealer and a prospective buyer.  221 Cal. App. 4th 867, 883 (2013).  In *Woods v. Fox Broadcasting Sub., Inc.*, the Court of Appeal also interpreted *Applied Equipment* narrowly and held that a person with an ownership interest in a corporation may be liable for interfering with the corporation's contractual obligations despite that ownership interest.  129 Cal. App. 4th 344, 353 (2005).  Moreover, the Ninth Circuit recently decided that the rule of *Applied Equipment* could be applied only to parties to the same contract.  *United Nat'l Maint.*, 766 F.3d at 1007–08.  The law remains in flux.  *Fresno Motors*, 771 F.3d at 1127.

Whatever the exact contours of the not-a-stranger rule may be, no court, federal or state, has interpreted California law to allow a claim for intentional interference with contractual relations to proceed between parties to the same agreement.  State and federal courts in  other

1   states, however, have found such claims may be viable when the contract is multilateral or the

2   parties' rights are divisible.  *See, e.g.*, *Sufrin v. Hosier*, 128 F.3d 594, 598 (7th Cir. 1997)

3   (interpreting Illinois law; noting "the temptation to tortious interference might seem especially

4   great" where the parties in a multilateral contract "have contractual claims against the same

5   obligor"); *UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, 927 N.Y.S.2d 59, 66 (N.Y. App. Div.

6   2011) ("While some courts have held that a party to a multilateral agreement can be found liable

7   for tortious interference with the agreement, that has generally been where the alleged tortfeasor

8   has rights and duties that are separate from those of the breaching party." (citing *Rosecliff, Inc. v.

9   C3, Inc.*, No. 94-9104, 1995 WL 276156, at *3 (S.D.N.Y. May 10, 1995), and *Aljassim v. S.S. S.

10  Star*, 323 F. Supp. 918, 925 (S.D.N.Y. 1971))); *see also Fillmore E. BS Fin. Subsidiary LLC v.

11  Capmark Bank*, 552 F. App'x 13, 18 (2d Cir. 2014) (not precedential).

12           Here, Steadfast alleges, "Although Steadfast, CH2M and LMI are parties to the

13  same contracts, their rights and obligations thereunder are not co-terminus and, in fact, conflict in

14  many regards."  Am. Countercl. ¶ 93.  "In other words," Steadfast alleges, "the contours of

15  Steadfast's coverage obligations under the RSL and ELI Policies are not congruently owed to

16  CH2M and LMI."  *Id.*  Steadfast acknowledges that no California cases have adopted an

17  exception to the not-a-stranger rule along the lines of the out-of-state cases cited above.  Opp'n

18  LMI Mot. at 18; Opp'n CCI Mot. at 15.  It requests this court extend California law to allow an

19  exception here.  *Id.*  The court declines to do so.  Steadfast may pursue contract remedies in this

20  action.

21           The motion is therefore granted with prejudice and without leave to amend with

22  respect to this claim.

23           3.      <u>Reformation</u>

24                   a)      <u>In General</u>

25           Under California Civil Code section 3399, a party to a written agreement may

26  request reformation of that agreement:

27           When, through fraud or a mutual mistake of the parties, or a
             mistake of one party, which the other at the time knew or suspected,
28           a written contract does not truly express the intention of the parties,

29

1    it may be revised on the application of a party aggrieved, so as to
2    express that intention, so far as it can be done without prejudice to
     rights acquired by third persons, in good faith and for value.

3    Cal. Civ. Code § 3399.  "'[T]he purpose of the remedy is to make the written contract truly

4    express the intention of the parties.'"  *Century Sur. Co. v. Weir Bros. Const. Corp.*, No. 14-0687,

5    2015 WL 1608874, at *9 (S.D. Cal. Apr. 9, 2015) (quoting *Shupe v. Nelson*, 254 Cal. App. 2d

6    693, 700 (1967)).

7           Here, as noted above, Steadfast alleges, "At the time the RSL and ELI Policies

8    were drafted and agreed to by LMI, CH2M and Steadfast, the parties intended that a prerequisite

9    for coverage under the ELI Policy was that the Pollution Event was not known to CH2M or LMI

10   at policy inception."  Am. Countercl. ¶ 12.  The parties meant to define "known" conditions and

11   events to include both those listed in the "tables appended to or incorporated into the policies"

12   and in other "documentation available to CH2M and/or LMI at that time."  *Id.*  But "[b]y mutual

13   mistake or inequitable conduct of CH2M and LMI," the tables and figures in the policies "do not

14   include all known pollution conditions."  *Id.* ¶ 106.  Steadfast therefore claims the definition of

15   "Known Pollution Conditions" must be reformed to expressly allow references to "the Policy

16   application materials, including all documents describing the environmental conditions at Mare

17   Island (including Technical Summaries)."  *Id.* ¶ 107.

18          LMI and CCI argue this claim is barred by the applicable statute of limitations.

19                          b)      Statute of Limitations

20          The statute of limitations for a reformation claim is three years.  Cal. Civ. Proc.

21   Code § 338(d); *N. Star Reins. Corp. v. Super. Ct.*, 10 Cal. App. 4th 1815, 1818 (1992).  "The

22   cause of action . . . is not deemed to have accrued until the discovery, by the aggrieved party, of

23   the facts constituting the fraud or mistake."  *Id.*

24          Here, the ELI and RSL Policies were signed in 2001.  Am. Countercl. ¶¶ 11–12.

25   A person who signs a contract has a general duty to read it.  *Century Sur. Co.*, 2015 WL 1608874,

26   at *10 (citing, *inter alia*, *Jefferson v. Cal. Dept. of Youth Auth.*, 28 Cal. 4th 299, 303 (2002)).

27   This duty applies to insurance contracts.  *Id.* (citing, *inter alia*, *Madden v. Kaiser Found. Hosps.*,

28   17 Cal. 3d 699, 710 (1976)).  Steadfast therefore had notice of the alleged omissions in 2001:

                                            30

1    upon reading the terms of the policy, it would have discovered the mistake, whether unilateral or

2    mutual.  The reformation claim therefore accrued in 2001 unless the "facts constituting [a] fraud"

3    remained undiscovered until a later date.  Cal. Civ. Proc. Code § 338(d).

4         The amended counterclaim alleges LMI and CCI made misrepresentations and

5    withheld information when they submitted claims after 2001.  It also includes allegations that

6    after 2001, the parties behaved as though the definition of "Known Pollution Condition" was

7    written as Steadfast would have it reformed.  *See* Am. Countercl. ¶ 106.  But it includes no

8    allegations of fraud in the crafting of the definition of "Known Pollution Condition" or the tables

9    and figures in the endorsements.  Steadfast does not allege, for example, that LMI and CCI

10   actually were aware of several pollution events and conditions at the time they negotiated and

11   signed the policies, but did not disclose this knowledge to Steadfast.  Neither does Steadfast

12   allege, for example, that LMI and CCI knew or suspected Steadfast was mistaken but kept quiet.

13        Instead, in its opposition briefs, Steadfast argues "by mutual mistake or inequitable

14   conduct, LMI's and CCI's positions that the meaning of 'Known Pollution Condition' is limited

15   to only the Tables and Figures to the Scope of Work Endorsement did not become apparent until

16   the onset of this litigation."  Opp'n LMI Mot. at 19; Opp'n CCI Mot. at 16–17.  But Steadfast

17   alleges LMI's and CCI's intent in 2001 was consistent with Steadfast's current position.  *See* Am.

18   Countercl. ¶ 12.  LMI's and CCI's current positions on contract interpretation have no bearing on

19   the alleged defect in the written policy.  Whatever legal interpretation CCI and LMI have adopted

20   in recent years, the words of the written policies remain unchanged.

21        The reformation claim is dismissed; however, because the deficiency could be

22   cured by additional factual allegations of fraud or mistake, Steadfast is granted leave to amend if

23   possible within the confines of Rule 11.  *See, e.g.*, *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027,

24   1039 (9th Cir. 2002) ("[I]n the normal course district courts should freely grant leave to amend

25   when a viable case may be presented.").

26              4.    Fraud; Rule 9(b)

27        The court now turns to LMI's and CCI's arguments under Rule 9(b).  Each of

28   Steadfast's claims draws on the same foundational allegations, and these allegations include many

31

1   averments of fraud.  *See, e.g.*, Am. Countercl. ¶ 26 ("LMI and CH2M also mischaracterized

2   contamination events . . . ."); *id.* ¶ 27 ("LMI never disclosed this second contractor's opinion to

3   Steadfast."); *id.* ¶ 28 ("LMI failed to disclose to Steadfast that its original intent was to demolish

4   Building 84."); *id.* ¶ 35 ("CH2M . . . mischaracterized the work being performed, without

5   Steadfast's knowledge."); *id.* ¶ 37 ("CH2M employed accounting practices designed to prevent

6   Steadfast from understanding the true nature of the bills CH2M presented to Steadfast for

7   payment."); *id.* ¶ 42 ("CH2M . . . repeatedly hid investigation and/or remediation expenses

8   . . . ."); *id.* ¶ 43 ("LMI and CH2M represented to Steadfast that the government was requiring

9   certain investigation and cleanup.  In truth, such 'governmental authority' came only after CH2M

10  and/or LMI proactively asked government agencies to require them to undertake certain activities.

11  In other instances, 'governmental authority' was entirely absent."); *id.* ¶ 48 ("LMI represented to

12  Steadfast that the soil was from LMI property near Building 637 . . . .  In fact, the soil came from

13  property belonging to the Navy . . . ."); *id.* ¶ 53 ("LMI misrepresented to Steadfast that its

14  contractor had performed the over-excavation accidentally.").

15          Steadfast also alleges fraud in defining all of the counterclaims that the court has

16  not dismissed with prejudice.  *See, e.g.*, Am. Countercl. ¶ 72 (Accounting: "CH2M and LMI

17  submitted false, misleading and/or inflated claims and information under the RSL and ELI

18  Policies . . . ."); *id.* ¶ 77 (Breach of Contract: "CH2M and LMI . . . have concealed information

19  from Steadfast, have misrepresented the facts of the claims submitted, have refused to allow

20  Steadfast to hire proper consultants, and have otherwise withheld information from both Steadfast

21  and each other."); *id.* ¶ 85 (Restitution: "CH2M and LMI have both . . . submitt[ed] false,

22  misleading and/or inflated claims under the RSL and ELI Policies . . . ."); *id.* ¶ 89 (Unjust

23  Enrichment: "CH2M and LMI submitted false, misleading and/or inflated claims under the RSL

24  and ELI Policies."; *id.* ¶ 99 (Negligent Misrepresentation: "CH2M and LMI made material

25  misrepresentations as to past or existing facts . . . ."); *id.* ¶ 101 (Intentional Misrepresentation:

26  "CH2M and LMI made material misrepresentations as to past or existing facts . . . ."); *id.* ¶¶ 108–

27  109 (Declaratory Relief: incorporating all previous allegations and noting Steadfast's right to

28  cancel the ELI policy "as set forth under Section VIII.D of that policy," which provides for

1    cancellation in the event Steadfast "discovers material misrepresentation or fraud by an Insured").

2    The court therefore finds that each of these claims either includes fraud as a necessary element or

3    rests chiefly on allegations of fraud.

4            As noted above, the counterclaim must "be specific enough to give [LMI and CCI]

5    notice of the particular misconduct . . . so that they can defend against the charge and not just

6    deny that they have done anything wrong." *Sanford*, 625 F.3d at 558 (citation and quotation

7    marks omitted).  The counterclaim must "specify such facts as the times, dates, places, benefits

8    received, and other details of the alleged fraudulent activity." *Neubronner v. Milken*, 6 F.3d 666,

9    672 (9th Cir. 1993).  The Ninth Circuit has repeated this requirement in many opinions. *See, e.g.*,

10   *Cafasso*, 637 F.3d at 1055; *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir.

11   2010); *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (per curiam); *Edwards*, 356 F.3d

12   at 1066; *Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1401 (9th

13   Cir. 1986); *Misc. Serv. Workers Local # 427 v. Philco-Ford Corp.*, 661 F.2d 776, 782 (9th Cir.

14   1981).  In addition, when fraud is alleged against a corporation, federal courts often have required

15   that a pleading "allege the names of the employees or agents who purportedly made the

16   fraudulent representations or omissions, or at a minimum identify them by their titles and/or job

17   responsibilities." *UMG Recordings, Inc. v. Global Eagle Entm't, Inc.*, ___ F. Supp. 3d ___, No.

18   14-3466, 2015 WL 4606077, at *9 (C.D. Cal. June 22, 2015) (citing, *inter alia*, *United States ex

19   rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051 (9th Cir. 2001)).

20           Here, the counterclaim's allegations generally do not clear this high bar.  In none

21   of its allegations does Steadfast clarify who at LMI or CCI made a particular fraudulent

22   statement, on what date or dates a false statement or omission was made, or to whom the false

23   statement was made.  Steadfast also omits details about how false statements were communicated,

24   for example by in-person conversation, phone, fax, email or letter.  In many instances where the

25   counterclaim does provide specific details, it does so in terms of examples, hinting at additional

26   instances of fraud excluded from the pleading without explanation.  And in several instances,

27   Steadfast simply lumps LMI and CCI together, without distinguishing and clarifying their

28   respective roles.  "Rule 9(b) does not allow a complaint to merely lump multiple defendants

1    together but requires plaintiffs to differentiate their allegations when suing more than one

2    defendant and inform each defendant separately of the allegations surrounding his alleged

3    participation in the fraud." *Swartz*, 476 F.3d at 764 (citations, quotation marks, and alterations

4    omitted).

5          Federal courts have on occasion applied a more lenient standard to fraud claims

6    under Rule 9(b).  For example, when a claimant "cannot be expected to have personal knowledge

7    of the relevant facts," the particularity requirement may be relaxed.  *Sanford*, 625 F.3d at 558

8    (quoting *Neubronner*, 6 F.3d at 672).  This may be the case for "matters within the opposing

9    party's knowledge." *Neubronner*, 6 F.3d at 672; *cf., e.g.*, *Moore v. Kayport Package Exp., Inc.*,

10   885 F.2d 531, 540 (9th Cir. 1989) ("Instances of corporate fraud may also make it difficult to

11   attribute particular fraudulent conduct to each defendant as an individual.  To overcome such

12   difficulties in cases of corporate fraud, the allegations should include the misrepresentations

13   themselves with particularity and, where possible, the roles of the individual defendants in the

14   misrepresentations.").  Here, however, it is reasonable to expect Steadfast, the insurer, to have

15   meaningful information about the insurance claims it received from LMI and CCI.

16         In some cases courts have also applied a less stringent test if the plaintiff alleges

17   fraudulent omissions.  *UMG Recordings*, 2015 WL 4606077, at *8; *accord*, *e.g.*, *In re Apple &*

18   *AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1310 (N.D. Cal. 2008).  But here, Steadfast's

19   claims are based on more than just omissions, and many descriptions of claimed omissions lack

20   details Steadfast may reasonably be expected to provide.  For example, Steadfast alleges LMI and

21   CCI concealed their disputes "arising from LMI's efforts to convert numerous claims from RSL

22   Policy claims to ELI policy claims." Am. Countercl. ¶ 40.  After Steadfast learned of these

23   disputes, it requested information.  *Id.*  It alleges one particular omission: "With respect to

24   Building 206/208, LMI provided some technical documents but omitted documents covering an

25   18-month period from 2009 to 2010." *Id.*  Steadfast does not specify the subject matter of these

26   "technical documents," why these documents were related to disputes between LMI and CCI, and

27   why the omissions were material.

28

Courts have also sometimes adopted a much more lenient approach to complaints that allege a series of fraudulent transactions. *See, e.g.*, *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997).[10]  In *Cooper*, the complaint did not describe a particular fraudulent shipment in the same detail as others, but this shortcoming was "not fatal" in light of several other allegations of "who (eight . . . customers), what (four types of improper revenue recognition), when (last two quarters of 1993 and first quarter of 1994), and where (reported in financial statements)." *Id.*; *see also Lee*, 245 F.3d at 1051 ("Rule 9(b) may not require [the plaintiff] to allege, in detail, all facts supporting each and every instance of false testing over a multi-year period.").  District courts in this circuit and others also have held, "[w]here fraud allegedly occurred over a period of time . . . , Rule 9(b)'s requirement that the circumstances of fraud to be stated with particularity are less stringently applied." *United States v. Hempfling*, 431 F. Supp. 2d 1069, 1075 (E.D. Cal. 2006) (citing *Fujisawa Pharm. Co., Ltd. v. Kapoor*, 814 F. Supp. 720, 726 (N.D. Ill. 1993)); *U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am., Inc.*, 238 F. Supp. 258, 268 (D.D.C. 2002) ("[W]here a complaint covers a multi-year period, Rule 9(b) may not require a detailed allegation of all facts supporting each and every instance of submission of a false claim.").

The Third Circuit has allowed plaintiffs "to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).  In *Seville*, the plaintiff satisfied Rule 9(b) "by incorporating into the complaint a list identifying with great specificity the pieces of machinery that were the subject of the alleged fraud." *Id.*  He "divided this list into five 'exhibits' and identified which pieces of equipment were the subject of which alleged fraudulent transaction." *Id.*  The Eleventh Circuit also appears to consider an alternative approach permissible. S*ee United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 n.18 (11th Cir. 2002) ("challenged complaints—read together with other documents in the record—

---

[10] *Cooper* was a securities case decided before passage of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. §§ 78u-4(b)(1) & (2), and may therefore no longer accurately reflect the law of pleading in a securities context. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002).  Because Steadfast's counterclaim does not implicate the PSLRA, the court concludes *Cooper* and similar authorities continue to apply to Rule 9(b) pleading.

1  [may] be sufficient" in place of "allegations of date, time or place" to plead the circumstances of

2  fraud with particularity).  A pair of district court decisions from this circuit also cite *Seville* with

3  approval, *see David K. Lindemuth Co. v. Shannon Fin. Corp.*, 637 F. Supp. 991, 994 (N.D. Cal.

4  1986); *In re Nat'l Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig.*, 636 F. Supp.

5  1138, 1159 (C.D. Cal. 1986).  The Ninth Circuit appears not to have taken any position on such

6  an "alternative" standard.

7         Even assuming the court may apply a more lenient approach to Rule 9(b), the

8  current counterclaim does not provide the sort of detail necessary to apprise LMI and CCI of the

9  fraud claims against them.  It must contain at minimum sufficiently granular allegations of fraud

10 to serve as blueprints of the alleged scheme.  *See, e.g.*, *Clausen*, 290 F.3d at 1314 n.25.  Steadfast

11 argues LMI and CCI already know enough about this case to understand the basis of its claims for

12 fraud.  *See, e.g.*, Opp'n LMI Mot. at  8 ("The [amended counterclaim] is not a case-initiating

13 document.  It was not filed at the outset of a case before any discovery, before the opposing party

14 was familiar with the facts of the case, and before the court was even sure whether the case would

15 proceed.").  The court appreciates the advanced stage of this litigation, the highly technical nature

16 of the subject matter, the volume of discovery produced to date, and LMI's and CCI's familiarity

17 with Steadfast's claims.  But the court may not overlook the Federal Rules of Civil Procedure and

18 binding case law interpreting those rules.  Indeed, messy facts and voluminous discovery weigh

19 in favor of a faithful application of Rule 9(b).  Carefully crafted pleadings serve to narrow

20 disputes, avoid confusion, and prevent wasteful discovery.

21         As noted above, when a particular allegation of fraud does not meet the Rule 9(b)

22 standard, it is "stripped from the claim."  *Vess*, 317 F.3d at 1105.  Stripping the insufficiently

23 particular allegations of fraud from Steadfast's amended counterclaim deprives all but one of

24 Steadfast's claims of necessary support.  The claim for declaratory relief is premised on more

25 than fraud.  *See* Am. Countercl. ¶ 109 ("Steadfast hereby requests a judicial declaration of its

26 rights and duties [under the RSL and ELI policies]" as to the definitions of "Known Pollution

27 Condition," "Cleanup Costs," "Limited Further Investigation," "Loss," "Governmental

28 Authority," "allowable expense," and coverage under the policies for the claims asserted by LMI

1   and CCI).  The declaratory relief claim may therefore proceed, without amendment, to the extent

2   it does not sound in fraud and does not rely on allegations of fraud.

3            Given the circumstances of this case, and considering Rule 15's liberal policy on

4   amendments, the court grants Steadfast leave to amend to bring its counterclaim into compliance

5   with Rule 9(b).  The majority of Steadfast's claims were asserted for the first time in the amended

6   counterclaim, which was prepared hastily in late 2014 after Steadfast received large numbers of

7   documents from CCI.  Because discovery and motion deadlines rapidly approach, and because

8   Steadfast has argued it has ample documentation of LMI's and CCI's wrongdoing, *see* Mot. Am.

9   2, ECF No. 162, a second amended counterclaim must be filed within fourteen days.

10  IV.   <u>CONCLUSION</u>

11            LMI's and CCI's motions are GRANTED IN PART as follows:

12   (1)   LMI's motion to dismiss under Rule 12(b)(7) and CCI's motion to strike the

13         prayer under Rule 19 are denied;

14   (2)   Steadfast's counterclaim for breach of contract is dismissed with prejudice and

15         without leave to amend, but Steadfast is granted leave to amend to allege a claim

16         for breach of the implied covenant of good faith and fair dealing;

17   (3)   As stipulated, Steadfast's counterclaim for negligence is dismissed with prejudice

18         and without leave to amend;

19   (4)   Steadfast's counterclaim for intentional interference with contractual relations is

20         dismissed with prejudice and without leave to amend;

21   (5)   In all other respects, the counterclaim is dismissed with leave to amend.

22   (6)   Any second amended counterclaim must be filed within fourteen days of the date

23         this order is filed.

24  This order resolves ECF Nos. 293 and 297.

25            IT IS SO ORDERED.

26   DATED:  October 16, 2015.

27

28   _____
     UNITED STATES DISTRICT JUDGE