1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LENNAR MARE ISLAND, LLC,                    No.  2:12-cv-02182-KJM-KJN

12                    Plaintiff,

13        v.                                      ORDER

14   STEADFAST INSURANCE COMPANY,

15                    Defendant.

16   _____

17   AND RELATED COUNTERCLAIMS

18

19             The matter is before the court on the motions by Lennar Mare Island, LLC (LMI),

20   and CH2M Hill Constructors, Inc. (CCI) to dismiss Steadfast Insurance Company's Second

21   Amended Counterclaim (SACC).  The court granted the parties' stipulated request for an

22   expedited briefing schedule and the matter was submitted for decision without a hearing.  As

23   explained below, the motions are granted in part without leave to amend.

24   I.        BACKGROUND

25             The court has summarized the factual and procedural background of this case in

26   previous orders.  *See, e.g.*, Order Oct. 16, 2015, at 1–7, ECF No. 306.[1]  Because much of the

_____

[1] For ease of reference, this order is reported at *Lennar Mare Island, LLC v. Steadfast Ins.
Co.*, ___ F. Supp. 3d ___, 2015 WL 6123730 (E.D. Cal. Oct. 16, 2015).

1

1    SACC parallels its previous iteration, no detailed review is necessary.  In summary, Steadfast

2    alleges it issued two insurance policies covering LMI's and CCI's environmental cleanup efforts

3    at the former Mare Island Naval Shipyard in Vallejo California: (1) the Remedial Stop Loss

4    (RSL) Policy, now expired, which was meant to insure against cleanup costs incurred in the

5    cleanup of certain known pollution conditions; and (2) the Environmental Liability Insurance

6    (ELI) policy, which remains in effect and is meant to insure against cleanup costs incurred in the

7    cleanup of previously unknown pollution conditions.  *See* SACC ¶¶ 9–12.

8            In 2012, LMI filed a complaint in state court alleging Steadfast had not paid

9    certain claims under the ELI Policy.  *See* Not. Rem. Ex. A, ECF No. 1.  Steadfast removed the

10   case to this court and filed a counterclaim against both LMI and CCI.  *See id.*; Countercl., ECF

11   No. 5.  At that time, Steadfast requested only a declaration of its rights under the RSL policy.  *See*

12   Countercl. at 5.  In late 2014, Steadfast received discovery responses from CCI, which Steadfast

13   believed proved CCI and LMI had committed fraud.  *See generally* Mot. Am. Countercl., ECF

14   No. 162.  Steadfast requested leave to file an amended counterclaim, and the court granted the

15   request several months later.  *See* Order, ECF No. 290.  LMI and CCI then moved to dismiss the

16   amended counterclaim.  *See* ECF Nos. 294, 297-1.

17           The court granted the motions to dismiss but allowed Steadfast leave to file the

18   SACC so as to bring its pleading into compliance with the heightened requirements of Federal

19   Rule of Civil Procedure 9(b).  *See* Order Oct. 16, at 37.  The court also allowed Steadfast to

20   advance a claim for breach of the implied covenant of good faith and fair dealing.  *See id.*  The

21   SACC alleges seven claims: (1) equitable accounting; (2) breach of the implied covenant of good

22   faith and fair dealing; (3) restitution; (4) unjust enrichment; (5) negligent misrepresentation; (6)

23   intentional misrepresentation; and (7) declaratory relief.  Steadfast requests relief in the form of

24   an accounting, restitution, cancellation of the ELI Policy, compensatory damages, punitive

25   damages, a declaration of its rights under the RSL and ELI policies, and other appropriate relief.

26   SACC at 38.  Steadfast attaches copies of the RSL and ELI policies to its pleading.  *See id.* App.

27   A (RSL Policy); *id.* App. B (ELI Policy).

28   /////

2

1    II.      LEGAL STANDARD

2              The court summarized the applicable legal standard in its previous order:

3              "A defendant's counterclaims are held to the same pleading
       standard as a plaintiff's complaint." *First Serv. Networks, Inc. v.*
4      *First Serv. Maint. Grp., Inc.*, No. 11-01897, 2012 WL 5878837, at
       *1 (D. Ariz. Nov. 21, 2012) (citing *Starr v. Baca*, 652 F.3d 1202,
5      1216 (9th Cir. 2011)).  A party may move to dismiss a counterclaim
       for "failure to state a claim upon which relief can be granted."  Fed.
6      R. Civ. P. 12(b)(6).   The motion may be granted only if the
       counterclaim lacks a "cognizable legal theory" or if its factual
7      allegations do not support a cognizable legal theory.  *Hartmann v.*
       *Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013).
8      The court assumes the counterclaim's factual allegations are true
       and draws reasonable inferences from them.  *Ashcroft v. Iqbal*, 556
9      U.S. 662, 678 (2009).

10             A counterclaim need contain only a "short and plain statement of
       the claim showing that the pleader is entitled to relief," Fed. R. Civ.
11     P. 8(a)(2), not "detailed factual allegations," *Bell Atl. Corp. v.*
       *Twombly*, 550 U.S. 544, 555 (2007).  But this rule demands more
12     than unadorned accusations; "sufficient factual matter" must make
       the claim at least plausible.  *Iqbal*, 556 U.S. at 678.  In the same
13     vein, conclusory or formulaic recitations of elements do not alone
       suffice.  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Evaluation under
14     Rule 12(b)(6) is a context-specific task drawing on "judicial
       experience and common sense." *Id.* at 679.  And aside from the
15     counterclaim, district courts have discretion to examine documents
       incorporated by reference, *Davis v. HSBC Bank Nevada, N.A.*,
16     691 F.3d 1152, 1160 (9th Cir. 2012); affirmative defenses based on
       the complaint's allegations, *Sams v. Yahoo! Inc.*, 713 F.3d 1175,
17     1179 (9th Cir. 2013); and proper subjects of judicial notice, *W.*
       *Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 976 (9th Cir. 2012).
18
               Federal Rule of Civil Procedure 9(b) imposes a heightened pleading
19     standard on fraud allegations: "In alleging fraud or mistake, a party
       must state with particularity the circumstances constituting fraud or
20     mistake.   Malice, intent, knowledge, and other conditions of a
       person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).
21     "Fraud can be averred by specifically alleging fraud, or by alleging
       facts that necessarily constitute fraud (even if the word 'fraud' is
22     not used)." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105
       (9th Cir. 2003).   Although state law governs the substantive
23     adequacy of the pleading here, Rule 9(b) nonetheless applies to any
       claims or allegations of fraud.  *Id.* at 1103.  If fraud is not an
24     essential element of a particular claim, "only those allegations . . .
       which aver fraud are subject to Rule 9(b)'s heightened pleading
25     standard." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th
       Cir. 2009).  If an allegation does not meet the heightened pleading
26     standard, it is disregarded.  *Id.*  Non-fraud allegations need satisfy
       only the standard of Rule 8.  *Id.*
27
               To meet the Rule 9(b) standard, a pleading must "'be specific
28     enough to give defendants notice of the particular misconduct . . .

                                                 3

1
2
3
4
5

> so that they can defend against the charge and not just deny that they have done anything wrong.'" *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) (quoting *Kearns*, 567 F.3d at 1124) (alteration in original).   Normally this standard requires allegations of "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Id.* (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)) (quotation marks and alterations omitted).

6   Order Oct. 16, 2015, at 18–20.

7   III.   DISCUSSION

8   The court first addresses LMI's and CCI's general argument that the SACC must

9   be dismissed because Steadfast requested leave to amend in bad faith.   Then the court turns to

10   each of Steadfast's claims.

11   A.   LMI's and CCI's Allegations of Bad Faith Amendment

12   In the court's order granting Steadfast leave to amend its counterclaim, the court

13   "question[ed] Steadfast's early-case practice" and found "Steadfast should have been more

14   diligent" in discovering the facts that supported its First Amended Counterclaim.   Order Aug. 17,

15   2015, at 12, ECF No. 290.   These facts, Steadfast argued, it had discovered first in late 2014 upon

16   CCI's production of several million new pages of documents; before then Steadfast claimed to

17   have harbored only suspicions and hunches.   Despite Steadfast's questionable diligence, the court

18   found "denial of Steadfast's motion would not satisfy the court's duty to ensure fundamental

19   fairness in the litigation before it." *Id.*   Steadfast was allowed leave to file an amended

20   counterclaim.   LMI's and CCI's current motions request the court revisit its decision.   They argue

21   Steadfast's bad faith is laid bare in the SACC, whose allegations in their view could not stem

22   from any late-2014 production.

23   Federal district courts enjoy discretion in managing their dockets. *See Chambers*

24   *v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *Hamilton Copper & Steel Corp. v. Primary Steel, Inc.*,

25   898 F.2d 1428, 1429 (9th Cir. 1990).   Within this discretion is the inherent power to dismiss

26   claims, but dismissal is a harsh remedy reserved for only "extreme circumstances." *Hamilton*,

27   898 F.2d at 1429 (citation and quotation marks omitted).   The circumstances of this case are not

28   /////

4

1    so extreme as to warrant dismissal of the SACC on grounds of bad faith, and dismissal would not

2    serve fundamental fairness.

3           B.      Accounting

4                   An accounting claim is equitable in nature, designed to prevent unjust enrichment.

5    *Civic W. Corp. v. Zila Indus., Inc.*, 66 Cal. App. 3d 1, 14 (1977).  It is a proceeding in equity

6    meant to obtain a judicial settlement of accounts; the court adjudicates the amount due,

7    administers full relief and renders complete justice.  *Flores v. EMC Mortgage Co.*, 997 F. Supp.

8    2d 1088, 1119–20 (E.D. Cal. 2014).  To state a claim, Steadfast must allege (1) a relationship

9    exists between itself, LMI, and CCI that requires an accounting; (2) LMI and CCI engaged in

10   some misconduct; and (3) some balance of money is due to Steadfast that can only be ascertained

11   by an accounting.  *See Teselle v. McLoughlin*, 173 Cal. App. 4th 156, 179 (2009).

12                  In addition, "[a] suit for an accounting will not lie where it appears from the

13   complaint that none is necessary or that there is an adequate remedy at law."  *Civic W. Corp.*,

14   66 Cal. App. 3d at 14 (internal quotation marks omitted); *see also Union Bank v. Super Ct.*,

15   31 Cal. App. 4th 573, 594 (1995) ("There is no right to an accounting where none is necessary.").

16   If an accounting claim may be "folded into the fraud and breach of contract causes of action,"

17   then an accounting is unnecessary.  *See Fleet v. Bank of Am. N.A.*, 229 Cal. App. 4th 1403, 1414

18   (2014) ("If the [plaintiffs] are maintaining that they overpaid [the defendant] . . . because of the

19   fraudulent promise . . . the overpayment will constitute an element of their damages.").

20                  Here, the counterclaim alleges in only conclusory terms that an accounting is

21   necessary.  *See* SACC ¶ 81 ("The only means to determine the amount by which Steadfast

22   overpaid the true value of the policy benefits under the RSL and ELI Policies is by way of an

23   accounting.").  Moreover, the remedy Steadfast seeks is recoverable under its other claims at law.

24   The claim for an accounting is therefore dismissed.  In light of the late stage of this litigation,

25   further leave to amend is denied.  *See Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160

26   (9th Cir. 1989) ("The district court's discretion to deny leave to amend is particularly broad

27   where [the claimant] has previously amended the [pleading].").

28   /////

1

      C.      <u>Restitution and Unjust Enrichment</u>

2

      The court construes Steadfast's claims for restitution and unjust enrichment as a

3 single claim for restitution. *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir.

4 2015) ("When a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a

5 quasi-contract claim seeking restitution.'" (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*,

6 223 Cal. App. 4th 221 (2014))).

7

      "Unjust enrichment and restitution are based on quasi-contract." *Grebow v.*

8 *Mercury Ins. Co.*, 241 Cal. App. 4th 564, 580 (2015). "As a matter of law, an unjust enrichment

9 claim does not lie where the parties have an enforceable express contract." *Durell v. Sharp*

10 *Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010). Therefore, to state a quasi-contract claim for

11 restitution or unjust enrichment, Steadfast must plausibly allege the absence of any applicable and

12 enforceable contract provisions, even if in the alternative. *See, e.g.*, *Longest v. Green Tree*

13 *Servicing LLC*, 74 F. Supp. 3d 1289, 1302 (C.D. Cal. 2015). A review of the SACC reveals no

14 allegation that the RSL and ELI policies are unenforceable or void, and no factual allegations

15 support a theory of their unenforceability or voidness. Although Steadfast's opposition argues

16 these claims are pleaded in the alternative, it identifies no allegations to support an alternative

17 theory that no contractual remedy is available. *See* Opp'n CCI Mot. at 4; Opp'n LMI Mot.

18 at 4–6.

19

      Contrary to Steadfast's argument in opposition, one who asserts a quasi-contract

20 claim may not circumvent the preclusive effect of an enforceable contract provision simply by

21 asserting the contract has expired. *See* Opp'n CCI Mot. at 3–4; Opp'n LMI Mot. at 3–4. Were

22 this true, then any contract claim could be recast as an equitable claim for unjust enrichment

23 immediately after its term, despite any relevant contract terms. Moreover, Steadfast has alerted

24 the court to no behavior that falls outside the bounds of the RSL and ELI policies. It has

25 described no unjustly conferred benefits it will be unable to obtain by a successful contract claim.

26 The case it cites in support of its position is also readily distinguishable. *See* Opp'n CCI Mot. at

27 3–4 (citing *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000)). In *Lectrodryer* "[t]he

28 focus of [the] case was on what happened to the proceeds of the sale . . . after the [contract]

1   expired." *Lectrodryer*, 77 Cal. App. 4th at 883.  Steadfast's counterclaim, by contrast, focuses on

2   the LMI's and CCI's actions during the policies' terms, not on CCI's unjust retention and use of

3   money after the policy expired.  Its claims unambiguously arise from alleged breaches of

4   contract.  *See also In re Checkmate Staffing, Inc.*, No. 04-01791, 2008 WL 8444825, at *7

5   (B.A.P. 9th Cir. Feb. 11, 2008) (distinguishing *Lectrodryer* because "it [was] significant that no

6   contract existed between the affected parties" in that case).

7          The motion to dismiss is therefore granted without leave to amend, again in light

8   of the litigation's late stage.

9          D.      Breach of Contract

10          Steadfast alleges LMI and CCI breached the implied covenant of good faith and

11   fair dealing.  California law recognizes this implied covenant in every contract, including

12   insurance policies.  *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 400 (2000).

13   More specifically, an insured's breach of the covenant of good faith and fair dealing is separately

14   actionable as a contract claim.  *Id.* at 408.

15          The covenant of good faith and fair dealing is a "supplement to the express

16   contractual covenants."  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 36 (1995).  Stated simply,

17   one contracting party may not unfairly deprive another of the benefit of their agreement, even

18   though his behavior technically complies with the contract's terms.  *Love v. Fire Ins. Exch.*,

19   221 Cal. App. 3d 1136, 1153 (1990).  But "the implied covenant does not trump an agreement's

20   express language."  *Steiner v. Thexton*, 48 Cal. 4th 411, 419 (2010) (emphasis omitted).  It

21   imposes no substantive duties beyond the contract's terms, *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th

22   317, 349–50 (2000), and does not vary express contract terms, *Carma Developers v. Marathon

23   Dev.*, 2 Cal. 4th 342, 374 (1992).  Therefore the parties to a contract may agree to allow conduct

24   that would otherwise have been forbidden by an implied covenant of good faith and fair dealing.

25   *Steiner*, 48 Cal. 4th at 419–20.

26          Here, Steadfast alleges LMI and CCI breached the implied covenant of good faith

27   and fair dealing by (1) intentionally submitting claims for unknown pollution events under the

28   RSL policy and known events under the ELI policy; (2) submitting claims that were unreasonable

7

1  in amount and kind; (3) submitting claims that they knew "did not arise out of governmental

2  authority"; (4) submitting claims for which they affirmatively sought governmental authority;

3  (5) prejudicing Steadfast's subrogation rights by releasing others from claims Steadfast could

4  otherwise have brought; and (6) prejudicing Steadfast's rights by amending two other agreements

5  related to the ELI and RSL policies and excluding Steadfast from negotiations about those

6  amendments.  *See* SACC ¶¶ 85–86.

7           These claims are in turn founded on Steadfast's more specific factual allegations.

8  First, Steadfast alleges LMI and CCI misrepresented that some pollution events were "known"

9  when they were actually "unknown," and vice versa, as part of their plan to secure additional

10  payments from Steadfast.  *See generally id.* ¶¶ 24–46.  Second, Steadfast alleges LMI and CCI

11  misrepresented that state and local authorities required them to undertake certain investigation

12  and cleanup efforts, when in truth no such requirements existed.  *See id.* ¶¶ 47–51.  Other times

13  LMI and CCI allegedly lobbied for the government to require certain efforts because the land

14  would become more valuable but did not tell Steadfast what they had done.  *See id.* ¶¶ 47, 48, 51.

15  Third, Steadfast alleges CCI inflated and obfuscated quarterly reports of its expenses in an effort

16  to secure payments Steadfast was not required to make under the RSL policy.  *See generally id.*

17  ¶¶ 58–63.  Similarly, it alleges CCI intentionally performed unreasonable and unnecessary work,

18  overstaffed its projects, withheld information, and frustrated Steadfast's auditing efforts.  *See*

19  *generally id.*  Fourth, Steadfast alleges LMI and CCI made "other material misrepresentations and

20  concealed critical information," essentially in an attempt to prevent Steadfast from discovering

21  their other misrepresentations.  *See generally id.* ¶¶ 53–57.

22           Finally, Steadfast alleges LMI and CCI prejudiced its contract rights by

23  negotiating two other agreements without informing Steadfast or obtaining its consent.  Steadfast

24  claims LMI and CCI entered a mutual release with the Navy and the City of Vallejo in which

25  LMI and CCI agreed to release one another, the Navy, and the City of Vallejo from any actions or

26  claims arising out of the Mare Island project.  *Id.* ¶¶ 70–74.  This they did, alleges Steadfast,

27  without Steadfast's knowledge or consent and in violation of their promises in the RSL and ELI

28  policies not to prejudice Steadfast's subrogation rights of recovery against third parties.  *See id.*

¶¶ 66–69.  Steadfast also alleges LMI and CCI reached an agreement with the Navy and the City

of Vallejo that (1) costs had surpassed a $114.3 million threshold, and therefore certain pollution

conditions became the Navy's responsibility, and (2) any pollution conditions other than those

identified on an agreed list were "unknown."  *See id.* ¶¶ 76–77.  Steadfast alleges it was excluded

from these negotiations intentionally.  *Id.* ¶ 77.  It also claims the agreement expands its potential

liability because it will be unable to recover reimbursements for costs that should have been paid

by the Navy and it will be forced to pay for the cleanup of the newly agreed "unknown"

conditions.  *Id.*

These allegations "allow[ ] the court to draw the reasonable inference" that LMI

and CCI are "liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  No RSL or ELI policy

terms prohibit or permit the actions LMI and CCI allegedly undertook, but Steadfast was

plausibly denied the benefits of the agreements it struck.  This is true despite both policies'

cancellation provisions, where the parties agreed Steadfast would be within its rights to cancel the

RSL or ELI policies if it discovered material misrepresentations or fraud by LMI or CCI.  *See*

SACC App. A, at 13–14; *id.* App. B, at 22.  As noted above, contracting parties may agree to

allow conduct that would otherwise breach the implied covenant.  *Steiner*, 48 Cal. 4th at 419–20.

But the cancellation provisions do not allow LMI or CCI to shift unreasonable claims deceptively

from one policy to another, to fabricate governmental authority, or to negotiate away Steadfast's

contract rights.

Neither do the cancellation provisions conflict with imposition of the implied

duties Steadfast alleges.  At this stage, the court must construe the counterclaim's allegations and

draw inferences in the light most favorable to Steadfast.  *See, e.g.*, *Ass'n for L.A. Deputy Sheriffs

v. Cty. of L.A.*, 648 F.3d 986, 991 (9th Cir. 2011).  In that light, the cancellation provisions read

not as limitations but as reservations of Steadfast's rights.  *See, e.g.*, SACC App. A, at 13–14

(providing that the policy "may be canceled" if Steadfast discovers material misrepresentation or

fraud by an insured).

Finally, despite LMI's arguments in opposition, the SACC adequately alleges LMI

and CCI deprived Steadfast of subrogation rights under the RSL and ELI policies by releasing

1   claims against one another, the United States, and the City of Vallejo.  The SACC also describes

2   an intelligible claim that LMI and CCI deprived Steadfast of the benefit of its bargain by

3   expanding Steadfast's potential liability under the ELI policy because Steadfast will be unable to

4   recover reimbursements from the Navy and it will be forced to pay for cleanup of new

5   "unknown" conditions.  *Id.* ¶¶ 76–77.

6          The motions are denied as to Steadfast's claim for breach of contract.

7        E.     Negligent and Intentional Misrepresentation

8          An insurer may pursue fraud claims against an insured, including for the

9   submission of fraudulent insurance claims.  *See generally Agric. Ins. Co. v. Super. Ct.*, 70 Cal.

10   App. 4th 385 (1999).  But tort and contract are distinct areas of law.  *See Robinson Helicopter Co.*

11   *v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004).  Therefore "[a] person may not ordinarily recover in

12   tort for the breach of duties that merely restate contractual obligations."  *Aas v. Super. Ct.*, 24 Cal.

13   4th 627, 643 (2000), *superseded by statute on other grounds as stated in Rosen v. State Farm*

14   *Gen. Ins. Co.*, 30 Cal. 4th 1070, 1080 (2003).  Only if a defendant's actions "violate a social

15   policy that merits the imposition of tort remedies" will a tort claim be available.  *Id.* (citation and

16   quotation marks omitted).  The court must therefore first determine whether Steadfast's claims for

17   intentional and negligent misrepresentation "merely restate [LMI's and CCI's] contractual

18   obligations" under the RSL and ELI policies.  *Id.*

19          Steadfast alleges LMI and CCI "made material misrepresentations as to past or

20   existing facts when they submitted false, deceptive and/or inflated claims and false information to

21   Steadfast."  *Id.* ¶¶ 98, 100.  It alleges "[t]hese material misrepresentations include those

22   misrepresentations detailed in Paragraphs 24 to 64."  *Id.* ¶¶ 98, 100.  Although Steadfast alleges

23   LMI's and CCI's misrepresentations "include" those detailed in paragraphs 24 to 64 of the

24   SACC—that is, LMI and CCI submitted claims under the wrong policy, fabricated governmental

25   authority, submitted unreasonable claims, and prejudiced Steadfast's contract rights by

26   negotiating agreements with third parties, *see supra* section II.D,—it does not allege any

27   additional misrepresentations.  Thus, the misrepresentations and mischaracterizations Steadfast

28   relies on to allege fraud are the very same it relies on to support its contract claims.  But for its

1    request for punitive damages, Steadfast seeks the same monetary relief with respect to both

2    claims.  *Compare* SACC ¶¶ 82–88 (contract claims), *with id.* ¶¶ 98, 100–03 (fraud claims), *and*

3    *id.* at 38 (request for relief).  The fraud claims restate the contract claims.

4            In some instances, however, parallel contract and tort claims may proceed.  The

5    California Supreme Court has found a contract party may pursue both contract claims and tort

6    claims as long as the tort claims seek relief for "a defendant's affirmative misrepresentations on

7    which a plaintiff relies and which expose a plaintiff to liability for personal damages independent

8    of the plaintiff's economic loss."  *Robinson Helicopter*, 34 Cal. 4th at 991.[2]  But lest every

9    contract breach dissolve into a tort, the California Supreme Court has emphasized the importance

10   of a "cautious approach" that preserves the contracting parties' rights to limit their liability to the

11   value of the promise and any exceptions they agree to impose.  *Erlich*, 21 Cal. 4th at 553.

12           In *Robinson Helicopter*, the defendant (Dana) had agreed to sell the plaintiff

13   (Robinson) a helicopter "sprag clutch," which functioned primarily as a safety mechanism.

14   34 Cal. 4th at 985.  Dana was required to provide Robinson with certificates of the clutches'

15   conformity with specific design parameters.  *Id.*  Dana's contract and warranties affirmed the

16   clutches it shipped complied with those parameters.  *See id.* at 985-86, 988.  But this was not

17   always true: for a little more than a year, Dana shipped clutches manufactured with different

18   specifications, and these clutches failed at alarming rates.  *Id.* at 985-86.  Dana did not disclose to

19   Robinson that it had shipped faulty clutches.  *See id.*  Some evidence also suggested a Dana

20   employee had redacted documents to conceal the fact that the clutches did not comply with the

21   certificates.  *Id.* at 987 & n.4.  When Robinson eventually learned of the misrepresentations and

22   faulty shipments, it was forced to conduct costly investigations and replace the non-conforming

23   parts at its own expense.  *Id.* at 986–87.  It was hampered in these efforts by Dana's months-long

---

[2] Tort remedies may also be available in other circumstances not relevant to this case. *See, e.g.*, *Erlich v. Menezes*, 21 Cal. 4th 543, 553–54 (1999) (aside from allegations of fraud or conversion, as are at issue here, tort remedies may be available when an insurer breaches the covenant of good faith and fair dealing; when "the means used to breach the contract are tortious, involving deceit or undue coercion"; or when "one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages.").

1    refusal to provide serial numbers for the non-conforming parts.  *Id.*  Dana also refused to

2    compensate Robinson for the clutches' failures.  *Id.* at 987.

3              In the ensuing litigation, Robinson alleged breaches of contract, breaches of

4    warranty, and negligent and intentional misrepresentations.  *Id.*  After trial, the jury found the

5    defendant had breached its contract, had breached its warranty obligations, and had made

6    intentional misrepresentations.  *Id.*  It awarded both compensatory and punitive damages.  *Id.*

7              On appeal, Dana argued the economic loss rule barred Robinson's claims for

8    intentional misrepresentation and disallowed any punitive damages award.  *Id.* at 988.  The court

9    of appeal agreed, finding Robinson had suffered only economic losses, but the California

10   Supreme Court reversed.  *Id.*  It found the economic loss rule did not preclude a tort claim for

11   fraud or intentional misrepresentation because the defendant's conduct was intentional,

12   independent of the contract, and could have led to a helicopter crash and concomitant personal

13   liability.  *Id.* at 989–90.  It emphasized the non-contract liability Robinson faced as a result of

14   Dana's actions: "Dana's provision of faulty clutches exposed Robinson to liability for personal

15   damages if a helicopter crashed and to disciplinary action by the FAA.  Thus, Dana's fraud is a

16   tort independent of the breach."  *Id.* at 991.

17             Here, unlike in *Robinson Helicopter*, the court is not confronted with a defective

18   product.  No party has identified any potential for personal liability.[3]  The SACC includes no hint

19   of non-economic damages; other than punitive damages, Steadfast's tort claims seek the same

20   compensatory remedies as its contract claim: the value of claims paid, the costs of claims

21   adjusting, and the cost of unnecessary investigations.  *See* SACC ¶¶ 82–88, 98, 100–03.  The

22   court has not been apprised of any public safety concern relevant to Steadfast's misrepresentation

23   claims.  The *Robinson Helicopter* court expressly limited its decision in this respect.  *Id.* at 993

24   ("Our holding today is narrow in scope and limited to a defendant's affirmative

25   misrepresentations on which a plaintiff relies and which expose a plaintiff to liability for personal

26   _____

27        [3] Although this case involves toxic contaminants, Steadfast does not allege LMI's and
     CCI's conduct exposed the public to these contaminants or increased the risk of exposure; rather,
     as summarized above, Steadfast alleges LMI and CCI remediated pollution to a greater extent
28   than necessary.

1   damages independent of the plaintiff's economic loss."); *see also id.* at 991 n.7 (distinguishing

2   previous cases in which a defendant's actions had not "put people at risk"); *id.* at 988 (restating

3   the rule that tort claims are unavailable unless the plaintiff alleges "harm above and beyond a

4   broken contractual promise.").  Similarly, a California appellate court has interpreted *Robinson*

5   *Helicopter* to allow parallel fraud and contract claims only if the defendant's conduct was both

6   intentional and "exposed the plaintiff to liability."  *Cnty. of Santa Clara v. Atl. Richfield Co.*,

7   137 Cal. App. 4th 292, 328 (2006).  Steadfast has identified no "liability" it faces as a result of

8   CCI's and LMI's conduct other than this lawsuit.  Moreover, as in *Robinson Helicopter* and

9   unlike here, *County of Santa Clara* involved a threat to public safety.  *See id.* 310 (the plaintiffs

10  alleged the defendants knew "about the dangers of lead for nearly a century but had engaged in a

11  concerted effort to hide the dangers of Lead from the government and the public").

12          Federal courts have similarly expressed hesitation at expanding the rule of

13  *Robinson Helicopter* when a plaintiff alleges only economic losses, when no personal liability

14  could arise, and when no products liability claims are alleged.  *See, e.g.*, *Nada Pac. Corp. v.*

15  *Power Eng'g & Mfg., Ltd.*, 73 F. Supp. 3d 1206, 1224–25 (N.D. Cal. 2014) (dismissing tort

16  claims and noting the economic nature of any losses); *JMP Sec. LLP v. Altair Nanotechnologies*

17  *Inc.*, 880 F. Supp. 2d 1029, 1043 (N.D. Cal. 2012) (expressing doubt *Robinson Helicopter* has

18  any application outside products liability; noting the absence of independent personal liability);

19  *United Guar. Mortgage Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1182–83

20  (C.D. Cal. 2009) (same); *Multifamily Captive Grp., LLC v. Assurance Risk Managers, Inc.*,

21  629 F. Supp. 2d 1135, 1146 (E.D. Cal. 2009) ("[T]he damages plaintiffs seek are the same

22  economic losses arising from the alleged breach of contract."); *In re Enron Corp.*, 367 B.R. 384,

23  405 (Bankr. S.D.N.Y. 2007) (only economic losses); *cf., e.g.*, *NuCal Foods, Inc. v. Quality Egg*

24  *LLC*, 918 F. Supp. 2d 1023, 1032 (E.D. Cal. 2013) (the defendants' misrepresentations allegedly

25  exposed the plaintiffs to personal liability "for some of the 62,000 people who were sickened as a

26  result of this [*salmonella enteritidis*] outbreak and to potential disciplinary action by government

27  authorities . . . .").

28

The RSL and ELI policies' cancellation provisions create a further factual incongruity between this case and *Robinson Helicopter*.  As noted above, both policies include provisions that suggest Steadfast considered the risk of fraud and misrepresentations by CCI and LMI.  *See* SACC App. A, at 13–14; *id.* App. B, at 22.  The *Robinson Helicopter* court, by contrast, reached its decision to allow parallel fraud and contract claims because although commercial entities could reasonably anticipate negligent product design or manufacture, they could not reasonably be expected to anticipate fraud in the sales themselves.  *See* 34 Cal. 4th at 992–93.  The court relied heavily on a law review article discussing fraud in the context of the Uniform Commercial Code.  *See id.* at 993 (citing Steven C. Tourek, et al., *Bucking the "Trend": The Uniform Commercial Code, the Economic Loss Doctrine, and Common Law Causes of Action for Fraud and Misrepresentation*, 84 Iowa L. Rev. 875, 894 (1999)).  Its reasoning therefore appears unlikely to apply equally to an insurance contract.  *See Elrad v. United Life & Acc. Ins. Co.*, 624 F. Supp. 742, 744 (N.D. Ill. 1985) (an insurance contract is not a contract for the sale of "goods" to which the U.C.C. applies); *N. Am. Chem. Co. v. Super. Ct.*, 59 Cal. App. 4th 764, 780–81 (1997) (the U.C.C. and attendant exceptions to the economic loss doctrine have no application to contracts for the sale of services).  Here, by contrast, the parties appear to have had fraud and misrepresentation in mind when they negotiated the RSL and ELI policies.  *See also United Guar.*, 660 F. Supp. 2d at 1185 (dismissing a parallel tort claim because the parties were sophisticated entities who could and did negotiate remedies to handle misrepresentation and fraud).

The Ninth Circuit's memorandum disposition in *Kallitta Air, LLC v. Central Texas Airborne Systems, Inc.* is not to the contrary.  *See* 315 F. App'x 603, 607 (9th Cir. 2008).  In that case, the circuit court referred only briefly to *Robinson Helicopter* to support its conclusion that under California law, economic losses may be recoverable for negligent misrepresentation.  *See id.* (citing *Robinson Helicopter*, 34 Cal. 4th at 991 & n.7).  It expressed no broader interpretation of that case.  For similar reasons, the Northern District court's decision in *Rejects Skate Magazine, Inc. v. Acutrack, Inc.* is unpersuasive.  *See* No. 06-2590, 2006 WL 2458759, at *5 (N.D. Cal. Aug. 22, 2006) (dismissing a tort claim that "merely restate[d]" the plaintiffs' breach

1   of contract claim but allowing claims for personal injury, damage to other property, and

2   emotional distress to proceed).

3           In sum, although Steadfast alleges LMI and CCI made affirmative

4   misrepresentations, its theory of their tort liability is the same theory of their contract liability:

5   (1)  LMI and CCI had a duty not to falsely represent that unknown conditions were known or vice

6   versa; (2) LMI and CCI had a duty not to misrepresent that their claims were required by

7   governmental authority; (3) LMI and CCI had a duty not to misrepresent the nature of their

8   claims so as to conceal their unreasonableness.

9           The claims for negligent and intentional misrepresentation are dismissed without

10  leave to amend in light of the late stage of this litigation and Steadfast's previous amendments.

11          F.      Declaratory Relief

12          Steadfast requests a declaration of its rights under the RSL and ELI policies.  *See*

13  SACC ¶¶ 104–06.  Specifically, it requests a declaration whether (1) the insurance claims LMI

14  and CCI assert in their pleadings are covered by the RSL and ELI policies; and (2) Steadfast is

15  within its right to cancel the ELI policy under section VIII.D of that policy.  *Id.* ¶ 105; *see also id.*

16  App. B, at 22–23 (ELI policy section VIII.D, providing for cancellation among other reasons

17  upon Steadfast's discovery of fraud or material misstatements by an insured).

18          LMI and CCI advance two arguments in favor of dismissing this claim.  First, they

19  argue Steadfast must not be allowed to amend this claim because it could have alleged similar

20  claims in 2012 but did not.  *See* LMI Mem. at 2; CCI Mem. at 6.  As noted above, the court

21  declines to impose this sanction.

22          Second, LMI argues the claim for declaratory relief "is based on the same fraud

23  allegations that [Steadfast] still fails to plead adequately . . . ."  *See* LMI Mem. at 2.  The policy

24  provides for cancellation upon Steadfast's discovery of "material misrepresentation or fraud."

25  SACC App. B, at 22.  Because the policy allows cancelation upon discovery of

26  misrepresentations "or" fraud, the court infers the parties intended to allow cancellation in the

27  face of both misrepresentations and full-fledged fraud in all its elements.  *Iqbal*, 556 U.S. at 678

28  (inferences are to be drawn in favor of the non-moving party); *see also, e.g.*, *United States v.*

15

1    *1.377 Acres of Land*, 352 F.3d 1259, 1265 (9th Cir. 2003) (contract interpretations that deprive

2    words of meaning are to be avoided) (citing *Appalachian Ins. Co. v. McDonnell Douglas Corp.*,

3    214 Cal. App. 3d 1, 12 (1989)).

4            For the declaratory relief claim to survive, then, Steadfast need only allege LMI

5    and CCI made some misrepresentation.  For this reason the court does not reach LMI's arguments

6    that Steadfast inadequately pleads its reliance and damages.  *See* LMI Mem. at 16–17.  In

7    assuring itself the SACC adequately alleges at least one misrepresentation, the court considers

8    many but not all of LMI's specific arguments below.

9                    1.      Building 688 Pits

10           LMI represented that costs incurred remediating pollution in "all ten pits" in

11   Building 688 were eligible for coverage under the ELI Policy because the pollution conditions in

12   question were unknown.  *See* SACC ¶¶ 27–28.  However, total petroleum hydrocarbon (TPH)

13   contamination in those pits was listed as a "known pollution condition" in the RSL policy, and

14   CCI had already conducted substantial work under the RSL policy at that site to remove TPH

15   contamination with LMI's knowledge and approval.  *Id.*  To mask the discrepancy and to obtain

16   additional coverage under the ELI policy, LMI "improperly" claimed the pits were contaminated

17   with another pollutant, polychlorinated biphenyl (PCB).  *See id.* ¶ 28.  LMI also misrepresented

18   that CCI had remediated previous pollution in the pits "for free."  *Id.*

19           A misrepresentation is "a false representation, concealment, or nondisclosure."

20   *Agric. Ins. Co.*, 70 Cal. App. 4th at 402 (citation and quotation marks omitted).  California Civil

21   Code section 1572 lists several acts that may establish a misrepresentation:

22                    1. The suggestion, as a fact, of that which is not true, by one who
                     does not believe it to be true;
23

24                    2. The positive assertion, in a manner not warranted by the
                     information of the person making it, of that which is not true,
                     though he believes it to be true;
25

26                    3. The suppression of that which is true, by one having knowledge
                     or belief of the fact;

27                    4. A promise made without any intention of performing it; or,

28   /////

16

1                    5. Any other act fitted to deceive.

2 Cal. Civ. Code § 1572.  In addition, a plaintiff may ordinarily succeed in alleging fraud only by

3 alleging the defendant misrepresented a fact, not an opinion.  *Agric. Ins. Co.*, 70 Cal. App. 4th at

4 402.  "A representation is one of opinion if it expresses only (a) the belief of the maker, without

5 certainty, as to the existence of a fact; or (b) his judgment as to quality, value, authenticity, or

6 other matters of judgment."  *Id.* (citation and quotation marks omitted).

7              The court must view the SACC in the light most favorable to Steadfast.  Because

8 the SACC may reasonably be read to allege LMI misled Steadfast about the nature of

9 contamination in the Building 688 pits, these allegations suffice to describe a misrepresentation

10 for purposes of the declaratory relief claim.

11              LMI also argues these allegations are demonstrably false on the face of the ELI

12 and RSL policies, which Steadfast attached to the SACC.  *See* LMI Mem. at 19.  The court need

13 not assume an allegation is true if it is contradicted by documents attached to or cited in the

14 SACC.  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010); *Paulsen v. CNF*

15 *Inc.*, 559 F.3d 1061, 1071 (9th Cir. 2009).  But the Ninth Circuit repeatedly phrases this rule

16 using permissive language: the court is not "required" to assume contradicted allegations are true.

17 *Daniels-Hall*, 629 F.3d at 998; *Paulsen*, 559 F.3d at 1071.

18              Here, LMI argues Steadfast falsely alleges "[t]he TPH contamination at the

19 Building 688 Pits was listed as a 'known pollution condition' and scheduled under the RSL

20 Policy."  LMI Mem. at 19 (citing SACC ¶ 27).  LMI cites the tables attached to the RSL policy's

21 Scope of Work Endorsement, which are in turn attached as Appendix A to the SACC.  *Id.*

22 According to LMI, these tables reference Building 688 twice, but say nothing about the pits inside

23 Building 688.  *See id.* (citing SACC App. A, at 71, 78).  Steadfast does not contradict this reading

24 in its opposition brief.  *See* Opp'n LMI Mot. at 16–18.  But this motion and order are an

25 inappropriate means for resolving this matter.  The nature, location, sources, and extent of

26 pollution conditions, along with whether those conditions are "known" or "unknown," are not

27 simple matters, as the briefing on LMI's separately pending motion for partial summary judgment

28

1    illustrates.  *See generally* Mem. P. & A. Partial Summ. J., ECF No. 187; Opp'n, ECF No. 193;

2    Reply, ECF No. 228; Suppl. Opp'n, ECF No. 292; Suppl. Reply, ECF No. 299.

3           Finally, LMI argues it cannot be held responsible because the SACC alleges LMI

4    merely passed along CCI's statements, rather than making its own.  LMI Mem. at 16.  The court

5    disagrees.  Viewed in the light most favorable to Steadfast, the SACC alleges LMI knew of and

6    approved CCI's previous investigation, characterization, and remediation work for the Building

7    688 Pits under the RSL policy.  SACC ¶ 28.  It may reasonably be inferred from the SACC that

8    LMI and CCI had similar interests and incentives, communicated regularly, and cooperated to

9    make misleading statements.  The SACC also alleges LMI made misleading statements about the

10   nature of pollution in those pits.  *See id.* ¶¶ 27–28.

11          Steadfast may proceed on this theory of misstatement.

12                 2.      Contamination at DOM 6

13          LMI submitted a "Confirmed Unknown" notice about TPH pollution at a location

14   referred to as "DOM 6."  SACC ¶ 29.  But when LMI submitted this notice, it knew the TPH

15   contamination resulted from known historical releases from fuel oil pipelines (FOPLs) and were

16   therefore properly covered under the RSL policy.  *Id.*  LMI had also received confirmation from

17   both CCI and a third-party contractor that the TPH contamination came from these FOPLs.  *Id.*

18   Nevertheless, LMI hired another contractor to prepare a report that the TPH could have come

19   from some other source so it could claim the TPH was an unknown pollution condition.  *Id.*  To

20   secure the payment of claims under the ELI policy, LMI prevented Steadfast from speaking to the

21   first contractor in LMI's absence.  *Id.*  As a result, Steadfast mistakenly paid a claim under the

22   ELI policy and incurred expenses investigating whether the pollution at DOM 6 was known or

23   unknown.  *Id.*

24          Steadfast also alleges LMI has taken opportunistic and inconsistent positions about

25   the pollution at DOM 6.  *See id.* ¶¶ 30–31.  LMI and CCI have investigated and reported on

26   contamination at DOM 6 for more than a decade, both in shallow and deep soil.  *Id.* ¶ 31.  But in

27   late 2014, the San Francisco Bay Regional Water Quality Control Board (RWQCB) issued a "No

28   Further Action" (NFA) letter about contamination at DOM 6.  *Id.* ¶ 30.  LMI did not disclose the

18

1    NFA letter to Steadfast, and when Steadfast learned about the letter in early 2015, LMI argued the

2    RWQCB meant to address only shallow and not "deep TPH contamination at DOM 6." *Id.* But

3    LMI had previously submitted claims for both shallow and deep contamination. *Id.* ¶ 31.

4           In response LMI argues these alleged misstatements are no more than assertions of

5    its opinions about coverage and that it cannot be held responsible for the statements CCI and

6    third-party contractors made. *See* LMI Mem. at 14–16. Again the court finds that in the light

7    most favorable to Steadfast, the statements in question may reasonably be inferred to be LMI's

8    own.

9           LMI also argues the allegations about the NFA letter are false and presents the

10   court with the letter and the parties' correspondence about it. *See id.* at 19–20 (citing Werner

11   Decl. Ex. 11, ECF No. 321-11 (NFA letter) and *id.* Ex. 12, ECF No. 321-12 (correspondence

12   from Steadfast to LMI discussing the NFA letter)). LMI argues the NFA letter does not concern

13   DOM 6, but rather three segments of fuel oil pipelines.[4] *See id.* at 20; LMI Reply at 10; Werner

14   Decl. Ex. 11, at 12. Steadfast responds that the pipelines are adjacent to DOM 6. Opp'n LMI

15   Mot. at 17. LMI replies that "adjacent to" does not mean "the same as." LMI Reply at 10. When

16   read in Steadfast's favor and with the benefit of reasonable inferences, the SACC does not

17   necessarily contradict the NFA letter. Pipelines can leak and contaminate adjacent territory.

18   These allegations are therefore not "false," and may support Steadfast's case.

19           Steadfast may proceed on this theory of misstatement.

20           3.     Building 84

21           LMI intended to demolish Building 84 but concealed this intent from Steadfast to

22   obtain coverage for its cleanup efforts in the meantime. SACC ¶¶ 32–35. It may reasonably be

23   inferred from the SACC that if Building 84 were demolished, LMI would not have been required

24   to clean up pollution in that building. *See id.* ¶ 35. LMI also refused to give Steadfast

25

26           [4] LMI also argues it could not have concealed the NFA letter from Steadfast because the
     NFA letter is publicly available. *See* LMI Mem. at 19–20. This argument does not show
27   Steadfast's allegation is false; Steadfast alleges it obtained the letter by a request made under the
     Freedom of Information Act. SACC ¶ 30.
28

1  information about its efforts to obtain offsets from the City of Vallejo if Building 84 were closed.

2  *Id.* ¶¶ 32–33.

3      LMI argues the SACC does not explain how any of LMI's alleged statements were

4  false or misleading.  *See* LMI Mem. at 15.  Its arguments are better understood as disagreements

5  with Steadfast's allegations and requests for details unnecessary at the pleading stage.  *See id.*

6  (arguing remediation of Building 84 was necessary regardless of whether it was demolished and

7  arguing Steadfast does not adequately explain why obtaining coverage for remediation of

8  pollution in Building 84 before demolition resulted in "coverage for the demolition under the ELI

9  Policy").

10      Steadfast may proceed on this theory of misstatement.

11      4.    Contamination Events at Building 680

12      Steadfast alleges LMI and CCI knew PCB contamination in Building 680 "was so

13  widespread that any surface or area was known to be contaminated," such that coverage under

14  only the RSL policy was available.  SACC ¶¶ 36–37.  Yet both CCI and LMI requested coverage

15  under the ELI policy and told Steadfast the contamination in Building 680 was unknown.  *Id.*

16      LMI argues these statements were not misstatements of fact, but merely coverage

17  positions.  LMI Mem. at 16.  Again, when read in Steadfast's favor, the SACC adequately alleges

18  LMI knew pollution conditions in Building 680 were part of a "known" condition but represented

19  to Steadfast they were not.

20      Steadfast may proceed under this theory of misstatement.

21      5.    Building 386

22      Steadfast alleges CCI misled Steadfast about contamination in Building 386 by

23  falsely describing old maps and figures as new, that is, by claiming it had only recently

24  discovered certain pollution conditions when in fact those conditions were long understood to

25  exist.  *Id.* ¶¶ 38–39.  Steadfast also alleges CCI submitted claims for tests of soil performed at

26  depths between zero and five feet at this site, but in fact more than five feet of soil had already

27  been removed from the site.  *Id.* ¶ 39.  Steadfast alleges CCI made these misrepresentations "with

28  the knowledge and approval of LMI," as was LMI's "standard procedure."  *Id.* ¶ 38.  To evidence

1   LMI's knowledge and approval, Steadfast cites correspondence in which CCI told Steadfast that

2   LMI would provide Steadfast with information about the purportedly unknown pollution

3   condition after LMI received that information from CCI.  *Id.*

4          LMI argues these allegations cannot suffice to make LMI responsible for CCI's

5   alleged misrepresentations.  LMI Mem. at 16.  The court disagrees.  At this stage, Steadfast's

6   allegations are sufficient to allow LMI to defend against this claimed misrepresentation.  And as

7   the court has found above, a reasonable inference may be drawn that LMI and CCI worked in

8   concert.

9          Steadfast may proceed on this theory of misrepresentation.

10                6.      Building 46

11         Steadfast alleges LMI submitted a claim for pollution spilled from an underground

12   oil pipe at Building 46.  SACC ¶¶ 40–41.  LMI claimed the condition was unknown because the

13   pipe was not associated with nearby underground storage tanks.  *Id.* ¶ 40.  But LMI knew the pipe

14   in question was in fact connected to the tanks.  *Id.*  LMI prevented Steadfast from discovering this

15   fact by filling in and covering the hole it had used to find the pollution.  *Id.*  Steadfast discovered

16   the misstatement when the San Francisco Bay RWQCB issued the NFA letter disclosing both that

17   the pipe was connected to the tanks and that LMI's contractor had punctured the pipe and caused

18   contamination to spill into the surrounding soil.  *Id.* ¶ 41.

19         LMI argues the NFA letter Steadfast cites has since been corrected to reflect that

20   the pollution conditions at Building 46 are not attributable to the underground tanks.  *See* LMI

21   Mem. at 20 (citing Werner Decl. Ex. 14, ECF No. 321-14).  LMI cites another NFA letter about

22   the underground tanks in question that finds "[n]o associated piping or contaminated soil" are

23   associated with those tanks.  *See id.* (citing Werner Decl. Ex. 13, ECF No. 321-13).  LMI requests

24   the court take judicial notice of the corrected and additional NFA letters.  *See* Req. Judicial Not.,

25   ECF No. 320.  Publicly available documents published on government websites may be subject to

26   judicial notice.  *See, e.g.*, *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062, 1079 n.17

27   (N.D. Cal. 2013).  But judicial notice does not establish the accuracy of a document's contents

28   without further assurance those contents are subject to no reasonable dispute.  *See, e.g.*, *Cactus*

1   *Corner, LLC v. U.S. Dep't of Agric.*, 346 F. Supp. 2d 1075, 1099 (E.D. Cal. 2004), *aff'd*,

2   450 F.3d 428 (9th Cir. 2006).  The court declines to attribute persuasive force to the NFA letters

3   LMI cites, particularly at this pleading stage.

4            Steadfast may proceed on this theory of misstatement.

5   IV.   CONCLUSION

6            The motions to dismiss are GRANTED IN PART as follows:

7            (1) The claim for an accounting is DISMISSED without leave to amend;

8            (2) The claims for unjust enrichment and restitution are construed as a single claim

9   for restitution and are DISMISSED without leave to amend;

10           (3) The claims of negligent and intentional misrepresentation are DISMISSED

11  without leave to amend; and

12           (4) The motion is denied in all other respects.

13  This order resolves ECF Nos. 318, 322.

14           By previous order, discovery was stayed pending resolution of this motion.  *See*

15  Order Dec. 29, 2015, at 3, ECF No. 341.  On the court's own motion and in the interest of the

16  efficient resolution of this action, discovery remains stayed pending a forthcoming order on

17  LMI's motions for partial summary judgment.  The schedule for the remainder of this case will be

18  set in that order.

19           SO ORDERED.

20  DATED:  March 2, 2016.

21

22  _____
    UNITED STATES DISTRICT JUDGE
23

24

25

26

27

28