1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LENNAR MARE ISLAND, LLC,              No.  2:12-cv-02182-KJM-KJN

12              Plaintiff,

13        v.                                ORDER

14   STEADFAST INSURANCE COMPANY,

15              Defendant.

16   ─────────────────────────────

17   AND RELATED COUNTERCLAIMS

18   ─────────────────────────────

19          Lennar Mare Island, LLC (LMI), CH2M Hill Constructors, Inc. (CCI), and

20   Steadfast Insurance Company dispute their obligations with respect to the clean-up of Mare

21   Island, a former U.S. Navy shipyard.  This order addresses LMI's motions for partial summary

22   judgment of the definitions of "Government Authority" and "Known Pollution Conditions."  ECF

23   Nos. 160, 186.  The court held a hearing on August 7, 2015.  Ryan Werner appeared for LMI,

24   Deborah Ballati and Amanda Hairston appeared for CCI[1], and Dale Oliver and John Purcell

25

26   ──────────────────

27          [1] At the same hearing the parties offered arguments on Steadfast's motion to amend its
     counterclaim.  CCI appeared in opposition to that motion, but took no position on LMI's current
28   motions for summary judgment.

                                           1

1    appeared for Steadfast.  The court allowed post-hearing briefing, now on file.  The motions are

2    GRANTED IN PART as set forth in this order.

3    I.        UNDISPUTED FACTS

4                The parties do not dispute this case's general history, which the court has

5    summarized in previous orders.  *See* Order Feb. 28, 2014, at 6–9, ECF No. 95; Order May 15,

6    2014, at 2–4, ECF No. 111;[2] Order Apr. 7, 2015, at 2–3, ECF No. 264.[3]  The claims here stem

7    from environmental clean-up work LMI and CCI have undertaken at the former U.S. Navy

8    shipyard on Mare Island in Vallejo, California.  LMI agreed to clean up the former base and

9    contracted with CCI, who would investigate and remediate pollution.  LMI is also a party to a

10   consent agreement with the City of Vallejo and the California Department of Toxic Substances

11   Control (DTSC).  Steadfast Resp. Stmt. Undisputed Material Fact re Gov't Auth. (Auth. UMF)

12   no. 7, ECF No. 170.  In short, this consent agreement governs LMI's clean-up efforts at Mare

13   Island.  *See id.* nos. 8-15.

14               At about the time LMI and CCI agreed to undertake efforts to clean up the base,

15   Steadfast issued two insurance policies to LMI and CCI: (1) the Remediation Stop Loss or RSL

16   policy, now expired, which provided coverage to CCI should the cost of the cleanup of "Known

17   Pollution Conditions" exceed a specific amount; and (2) the Environmental Liability Insurance or

18   ELI policy, which among other things provides coverage to LMI for the cost of remediating

19   pollution other than the Known Pollution Conditions.  Among other limitations, the ELI policy

20   covers clean-up costs only if (1) "required by Governmental Authority," Auth. UMF no. 3,[4] and

21

22          [2] *See Lennar Mare Island, LLC v. Steadfast Ins. Co.*, No. 12-02182, 2014 WL 813140

23   (E.D. Cal. Feb. 28, 2014), *recons. denied*, 2014 WL 2002204 (E.D. Cal. May 15, 2014).

          [3] *See Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 105 F. Supp. 3d 1100 (E.D. Cal.

24   2015).

25          [4] The ELI policy reads in relevant part as follows:

26   1. [Steadfast] will pay to [LMI] any Cleanup Costs in excess of the applicable Self
     Insured Retention required by Governmental Authority as a result of a Pollution
27   Event on, at or under a Covered Location that is not a Known Pollution Condition
     and that is first discovered by an Insured during the Policy Period;

28   . . .

2

1    (2) costs are not expended on the remediation of "Known Pollution Conditions."  Auth. Evid.

2    Ex. 1, at SJCE 167596.

3              LMI alleges Steadfast caused it several million dollars in damages by refusing to

4    pay or delaying payments for claims under the ELI policy.  First Am. Compl., ECF No. 22.  The

5    complaint describes seven environmental clean-up sites in particular.  *See id.* ¶ 34.  LMI also

6    seeks declaratory judgment that Steadfast must pay specific claims.  *See id.* ¶¶ 34–35.  CCI

7    alleges similarly that Steadfast wrongfully withheld payments under the RSL policy and seeks

8    damages and declaratory relief.  Answer & Countercl., ECF No. 12.  Steadfast denies these

9    allegations and asserts counterclaims against both LMI and CCI.  After a series of dismissals and

10   amendments, Steadfast now proceeds on contract claims and seeks a declaration of its rights

11   under both policies.  *See generally* Order Mar. 3, 2016, ECF No. 351;[5] Steadfast's Second Am.

12   Countercl., ECF No. 315.

13             This order addresses two motions for summary judgment LMI filed in December

14   2014 and January 2015.  The first motion seeks an order that the DTSC consent agreement is

15   "Government Authority" and requires LMI to clean up any and all contamination it discovers at

16   the seven Mare Island sites.  Mem. P. & A. Summ. J. Gov't Authority (Auth. Mem.) 8, ECF

17   No. 160-1.  In its reply, LMI tempers this request and asks only for an order specifying the DTSC

18   agreement "constitutes Governmental Authority" and "if LMI incurs a cost in complying with the

19   Consent Agreement, it is a cost required by Governmental Authority within the meaning of the

20   ELI Policy."  Reply Gov't Auth. 3, 8, ECF No. 226.

21

22

---

23             provided that . . . the Claim is reported to the Company during the Policy Period,
             or any applicable extended reporting period.  Coverage for Cleanup Costs due to
24           changes in Governmental Authority during any applicable extended reporting
             period is set out [below in another section].
25
     LMI Evid. in Support of Mot. Summ. J. Re Gov't Auth. (Auth. Evid.), Ex. 1, at SJCE 167596
26   (bold typeface omitted); *see also id.* at SJCE 167554, 167599, 167600 (defining "First Named
     Insured" and "The Company").
27
             [5] *See Lennar Mare Island, LLC v. Steadfast Ins. Co.*, No. 12-02182, 2016 WL 829210
28   (E.D. Cal. Mar. 3, 2016).

1        In its second motion, LMI seeks an order defining "Known Pollution Conditions"

2   to be only those conditions listed in certain tables and figures attached to the RSL policy.  Mem.

3   P.&A. Summ. J. Pollution (Poll. Mem.) 2, ECF No. 187.  The terms for which LMI seeks

4   definitions are found in the ELI and RSL policies and in the endorsements and other materials

5   attached to those policies.  The parties agree those documents govern their dispute.  *See* Auth.

6   UMF nos. 1, 3, 6–15; Resp. Statement Undisputed Material Facts re Known Pollution Condition

7   (Poll. UMF) nos. 1, 2, 4–9, ECF No. 195.

8        Steadfast opposes both motions.  Auth. Opp'n, ECF No. 169; Poll. Opp'n, ECF

9   No. 193.  In general, it contends the ELI policy terms are not susceptible to the definitions LMI

10   proposes, and in any event, if they are, Steadfast argues the terms must be interpreted with the

11   benefit of extrinsic evidence.  CCI takes no position on these definitions or LMI's pending

12   motions for summary judgment.

13        After the parties presented their arguments at hearing, the court granted Steadfast

14   and LMI leave to file supplemental briefing addressing two specific questions: (1) "Under

15   California law, is an ambiguous contract term a prerequisite to admission of extrinsic evidence of

16   the contracting parties' course of performance?"; and (2) "Where in the briefing on file, if at all,

17   has Steadfast cited to portions of the record to show there is a genuine dispute of material fact

18   whether the parties' course of performance explained or supplemented the ELI policy's definition

19   of 'Known Pollution Condition'?"  Order Aug. 14, 2015, ECF No. 289.  Both parties submitted

20   responsive supplemental briefs.  Suppl. Opp'n, ECF No. 292; Suppl. Reply, ECF No. 299.

21   II.      LEGAL STANDARD

22        A court must grant a motion for summary judgment "if the movant shows that

23   there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

24   matter of law."  Fed. R. Civ. P. 56(a).  A motion for summary judgment calls for a "threshold

25   inquiry" into whether a trial is necessary at all, that is, whether "any genuine factual issues . . .

26   properly can be resolved only by a finder of fact because they may reasonably be resolved in

27   favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The court does

28   not weigh evidence or assess the credibility of witnesses; rather, it determines which facts the

1    parties do not dispute, then draws all inferences and views all evidence in the light most favorable

2    to the nonmoving party.  *See id.* at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

3    475 U.S. 574, 587–88 (1986).  "Where the record taken as a whole could not lead a rational trier

4    of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475

5    U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

6           The moving party bears the initial burden of "informing the district court of the

7    basis for its motion, and identifying those portions of the [record] which it believes demonstrate

8    the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

9    (1986).  If the party opposing summary judgment bears the burden of proof at trial, the moving

10   party need only illustrate the "absence of evidence to support the non-moving party's case."  *In re*

11   *Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  The burden then shifts to the non-

12   moving party to "go beyond the pleadings" and "designate specific facts" in the record to show a

13   trial is necessary to resolve genuine disputes of material fact.  *Celotex*, 477 U.S. at 324 (quotation

14   marks omitted).  "Only disputes over facts that might affect the outcome of the suit under the

15   governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S.

16   at 248.

17          The same standard applies to motions for partial summary judgment.  *See* Fed. R.

18   Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or

19   the part of each claim or defense—on which summary judgment is sought . . . .");  *accord*

20   *Barsamian v. City of Kingsburg*, 597 F. Supp. 2d 1054, 1061 (E.D. Cal. 2009).

21          The court turns first to the definition of "Governmental Authority" and then

22   considers the definition of "Known Pollution Conditions."

23   III.   UNDERLINE GOVERNMENTAL AUTHORITY

24          California contract law applies to interpret the policies here.  *See Bell Lavalin, Inc.*

25   *v. Simcoe & Erie Gen. Ins. Co.*, 61 F.3d 742, 745 (9th Cir. 1995).  Contract interpretation is

26   ordinarily a question of law.  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995); *WYDA*

27   *Assocs. v. Merner*, 42 Cal. App. 4th 1702, 1710 (1996).  "A contract must be so interpreted as to

28   give effect to the mutual intention of the parties as it existed at the time of contracting, so far as

5

1  the same is ascertainable and lawful." Cal. Civ. Code § 1636. A court looks first and foremost to

2  the contract's language, which controls if "clear and explicit," provided it "does not involve an

3  absurdity." *Id.* § 1638. "When a contract is reduced to writing, the intention of the parties is to

4  be ascertained from the writing alone, if possible . . . ." *Id.* § 1639.

5          The ordinary rules of contract interpretation apply just as well to insurance

6  policies. *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992). Unless the parties

7  intended to use words in a technical or special sense, a court reads a contract's language to

8  understand its plain meaning as a layperson ordinarily would. *Waller*, 11 Cal. 4th at 18 (citing

9  Cal Civ. Code § 1638). The policy must also "be read as a whole." *Hartford Accident & Indem.*

10 *Co. v. Sequoia Ins. Co.*, 211 Cal. App. 3d 1285, 1298 (1989); *see also* Cal. Civ. Code § 1641

11 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably

12 practicable, each clause helping to interpret the other."). Contract interpretations that deprive

13 words of meaning are to be avoided. *See United States v. 1.377 Acres of Land*, 352 F.3d 1259,

14 1265 (9th Cir. 2003) (citing *Appalachian Ins. Co. v. McDonnell Douglas Corp.*, 214 Cal. App. 3d

15 1, 12 (1989)).

16         Here, LMI requests summary judgment that "the Governmental Authority element

17 of the ELI Policy is satisfied as to all contamination LMI discovers." Auth. Mem. at 2.

18 "Governmental Authority" is defined in relevant part as follows:

19             Government Authority means applicable federal, state, or local
               statutes and regulations, orders or ordinances, including remedial
20             action plans required by law . . . . For the purpose of this policy,
               the "Consent Agreement between Lennar Mare Island, the City of
21             Vallejo and the State of California, California Environmental
               Protection Agency, Department of Toxic Substances Control
22             Concerning Mare Island Naval Shipyard, Vallejo, CA", dated April
               16, 2001 and any amendments thereto . . . are recognized as the
23             equivalent of an "order."

24 Auth. Evid. Ex. 1, at SJCE 167594 (bold typeface omitted[6]). This language clearly explains the

25 parties' intent: the DTSC agreement is an order and "Government Authority." Both LMI and

26

----

27         [6] In their arguments the parties do not attribute meaning to bold typeface, which appears
   to indicate that a term is defined elsewhere in the policy. *See* Poll. Mem. at 6 n.4. The court's
28 decision here does not turn on typeface, bold or otherwise.

1   Steadfast seem to agree.  *See* Auth. Mem. 5; Auth. Opp'n at 1.  The parties also agree on the

2   document that is the DTSC agreement.  *See* Auth. UMF nos. 8–15; Auth. Evid. Ex. 5, ECF No.

3   160-3.  Therefore, LMI's first motion for summary judgment is granted to the extent it seeks an

4   order that the DTSC agreement is Governmental Authority.

5           LMI has not carried its burden, however, to show "the Governmental Authority

6   element of the ELI Policy is satisfied as to all contamination LMI discovers."  Auth. Mem. at 2.

7   The DTSC agreement includes twenty-four substantive pages of single-spaced provisions divided

8   into five parts: an introduction; findings of fact (describing Mare Island's history and the nature

9   and extent of the contamination); a description of the "Response Actions Process" (essentially the

10  tasks to be completed); general provisions (for example on notice and severability); and penalties

11  for noncompliance.  *See generally* Auth. Evid. Ex. 5.  It defines its purposes as follows:

12          The purposes of this Agreement are to bind the Owner [LMI[7]] to
            enter into environmental restrictions on the Site[8] prior to selection
13          of the remedy, as necessary to protect human health and the
            environment, and to establish the process and timetable for the
14          completion by [LMI] of the response and corrective actions at the
            Site in a manner that is consistent with [federal and state laws and
15          regulations].

16  Auth. Evid. Ex. 5, ¶ 1.3.

17          In the DTSC agreement, LMI agreed to conduct certain "response activities" in

18  eight "Investigation Areas."  *See id.* ¶¶ 3.3–3.16.  For example, the DTSC agreement obligates

19  LMI to

20      •   Identify portions of Investigation Areas "where no removal or remedial action or

21          institutional control is recommended," *id.* ¶ 3.3;

22      •   Submit a draft and final report on Remedial Investigations for each Investigation

23          Area for DTSC's review and approval, *id.* ¶ 3.4;

24      •   Prepare and submit draft Feasibility Studies and Feasibility Study Reports for each

25          Investigation Area, *id.* ¶ 3.5.2;

26  _____

27      [7] *See* Auth. Evid. Ex. 5, ¶ 1.1.
        [8] "Site" is a defined term and generally refers to Mare Island.  *See* Auth. Evid. Ex. 5,
28  ¶ 1.2.

7

1      •     Prepare and submit draft and final long-term monitoring plans for each

2            Investigation Area, *id.* ¶ 3.5.3;

3      •     Provide any information DTSC requires to comply with the California

4            Environmental Quality Act, *id.* ¶ 3.5.4;

5      •     Prepare and submit draft and final Remedial Action Plans or Removal Action

6            Workplans for each Investigation Area, *id.* ¶ 3.6;

7      •     Submit Remedial Designs for each Investigation Area, *id.* ¶ 3.7;

8      •     Comply with provisions on how the land may be used before LMI fulfills its

9            obligations, *id.* ¶ 3.8;

10      •     Implement a Remedial Action Plan or Removal Action Workplan for each

11            Investigation Area, *id.* ¶ 3.9; and

12      •     "[T]ake all appropriate action to prevent, abate, or minimize" emergency releases

13            of hazardous substances, *id.* ¶ 3.16.

14         It is undisputed these provisions apply to LMI's clean-up efforts. *See* Auth. Mem.

15 at 5–7; Auth. Opp'n at 7–8; Auth. Reply at 1. But LMI has not shown it is undisputed its

16 remedial efforts were proposed, reviewed, modified, approved, and executed in line with the

17 DTSC agreement. To the extent this was its goal, the motion is denied. *See* Auth. Mem. at 8

18 ("[T]he Governmental Authority element of the ELI Policy coverage grant is satisfied as to any

19 contamination LMI discovers . . . ."). LMI has not satisfied its initial burden to "inform[] the

20 district court of the basis for its motion," *Celotex*, 477 U.S. at 323.

21 IV.     <u>KNOWN POLLUTION CONDITIONS</u>

22     A.     <u>The Parties' Positions</u>

23         LMI's second motion presents a more complicated question. A more detailed

24 statement of the parties' positions is necessary as a starting point. LMI requests summary

25 judgment that Known Pollution Conditions "are the conditions specifically identified in the Scope

26 of Work Endorsement to the RSL Policy." Poll. Mem. at 8. It advocates the following

27 interpretation:

28

The RSL Policy covered only conditions that are listed in the Scope of Work. The ELI Policy covers only conditions that are not listed in the Scope of Work. On the face of both policies a straightforward, objective mechanism exists for determining which policy may apply to a given condition: look on the Scope of Work. No further inquiry is appropriate.

*Id.* at 7 (emphasis and record citations omitted). LMI acknowledges these general statements are subject to "the [ELI] policy's definitions, conditions and exclusions." *Id.* at 2 n.2.

Steadfast agrees in its opposition brief that the tables and figures listed in the Scope of Work Endorsement "are the beginning of the inquiry," Poll. Opp'n at 3, and it agrees the definition of Known Pollution Conditions is unambiguous, *see id.* at 8–9 & n.6. But it believes the list of pollution conditions in those tables is "not the sole arbiter" of whether a condition is a Known Pollution Condition. *Id.* at 1. It argues the ELI policy makes several exceptions within its definition of Known Pollution Conditions, and these exceptions show documents other than the Scope of Work Endorsement may influence whether a particular condition is "known." *See id.* at 7–10. To show this interpretation is correct, Steadfast cites evidence that LMI, CCI, and Steadfast have referred to "environmental studies" and other documents that were not part of the Scope of Work Endorsement. *See id.* at 11–18.

Steadfast also argues a pollution condition may be a Known Pollution Condition if it was actually known before the ELI policy took effect, regardless of whether the condition appears in the Scope of Work Endorsement. *See id.* at 11 (arguing the parties understood they could "resort to environmental studies during the underwriting and during the claims adjusting process . . . to determine whether a pollution condition was 'known' or 'unknown'"); *id.* at 3 ("[T]he issues in this case are not simply whether a condition is listed in a table, but rather whether the actual pollution . . . was known."). Steadfast does not cite any particular policy provision in support of this position; rather, it cites the parties' correspondence after the policy took effect.

In reply to Steadfast's opposition brief, LMI reiterates the broad interpretation it espoused in its original motion. *See* Poll. Reply at 1 ("To be a Known Pollution Condition a condition must appear in the Scope of Work . . . ."). It also fleshes out a more focused request:

9

1  that the court find Steadfast cannot "dispute coverage by . . . arguing that 'the actual pollution—

2  including, most importantly, its source—was known,'" *id.* at 2 (quoting Poll. Opp'n at 6).  In

3  other words, LMI seeks an order clarifying that actual knowledge of pollution on Mare Island

4  does not control whether a pollution condition is "known," but rather that the ELI policy and the

5  Scope of Work Endorsement alone control that decision.  The parties' supplemental briefing

6  confirms this understanding of LMI's motion.  *See, e.g.*, Suppl. Opp'n at 4 ("The Tables and

7  Figures to the Scope of Work Endorsement reflect the efforts of the parties to create a partial list

8  of what they knew at policy inception to be Known Pollution Conditions."); Suppl. Reply at 6

9  (arguing against the position that Steadfast may not "look in every other document" to discover

10  actual knowledge).  This dispute has been at the heart of this case for some time.  *See, e.g.*, Order

11  May 15, 2015, at 8, ECF No. 111 ("According to LMI, Steadfast seeks to rewrite the policy by

12  arguing there might be conditions that did not make the list of 'knowns' but which now qualify as

13  known.").

14       LMI's and Steadfast's conflicting interpretations are unsurprising in light of the

15  incentives they face.  Because the ELI policy provides no coverage for Known Pollution

16  Conditions, Steadfast may reduce its liability by adding to the list of Known Pollution Conditions.

17  LMI, on the other hand, can increase coverage by limiting the number of Known Pollution

18  Conditions.

19       In resolving LMI's motion, the court first briefly reviews the effects of its previous

20  order.  Second, the court provides a detailed description of the ELI policy's terms to explain its

21  decision here.  Third, the court reviews the substantive law applicable to LMI's motion, and

22  fourth, it applies that law to the definition of Known Pollution Conditions.

23       B.    The Effect of the Court's Previous Order

24       At hearing Steadfast suggested the court's previous orders establish the law of the

25  case and require the denial of LMI's current motion because the court has already rejected LMI's

26  proposed definition of "Known Pollution Conditions."[9]  This argument is unpersuasive.  The

27  
          [9] This argument was absent from Steadfast's briefing.  In most circumstances, a party
28  abandons an argument by omitting it from an opposition brief.  *See, e.g.*, *Stichting Pensioenfonds*

1   court's previous order expressly invited LMI's current motion.  *See* Order May 15, 2014, at 8,

2   ECF No. 111 ("According to LMI, Steadfast seeks to rewrite the policy by arguing there might be

3   conditions that did not make the list of 'knowns' but which now qualify as known. . . . As the

4   court denied the motion for summary judgment without prejudice, LMI will have a chance to

5   argue this in any renewed motion.").

6         C.      Summary of Policy Terms

7         The ELI policy's definition of "Known Pollution Conditions" includes more than

8   1,000 words.  *See* Evid. Supp. Mot. Summ. J. Known Pollution Conditions (Poll. Evid), Ex. 2, at

9   SJCP 002583–84,[10] ECF No. 192-2.  The definition is inelegant and difficult to parse, but a

10  complete reproduction of its text is necessary to explain the conclusions the court reaches in this

11  order.

12        1.      Foundational Definition

13        In its first two sentences, the policy lays a foundation:

14        Known Pollution Conditions means all conditions specifically

15  described in the Scope of Work Endorsement to the Remediation
      Stop Loss Policy No. ERC 5224884-00 ("Scope of Work
      Endorsement") and which require or may ultimately require any

16  form of remedial investigation or action, including solely
      administrative action or establishment of Institutional Controls, by

17  the Named Insured before a Governmental Authority will determine
      that no further remedial action is required.   Known Pollution

18  Conditions constitute all of the conditions that are deemed known
      to the Insureds for the purposes of this Policy. . . .

19

20        The definition's third and fourth sentences provide a more detailed, two-part

21  clarification.  First,

22        . . . Known Pollution Conditions are:

23        1.  those conditions specifically set forth in Tables 1-3 and Figures
          1 through 89 and Fuel Oil Line Removal Project Figures 1

24            through 11 to the Scope of Work Endorsement, which statement

25  _____

26  *ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011).  Nevertheless, in
its discretion, the court addresses the argument briefly.

27      [10] All citations to and quotations of that definition below are from this same page range.
Bold typeface is omitted, as it does not communicate a meaning other than that the bolded term is

28  defined.  *See supra* note 6.

of conditions is either (i) a designation of location, contamination, byproducts, breakdown products and source of such identified contamination at the time of policy inception, or (ii) a designation of location, contamination, byproducts, breakdown products and an expressly unidentified source of such identified contamination at the time of policy inception, . . .

In other words, entries in the tables and figures always include "a designation of location, contamination, byproducts, [and] breakdown products."  Some also include a "source of such identified contamination," and the others include "an expressly unidentified source."

The definition of Known Pollution Conditions continues:

. . . Known Pollution Conditions are:

1. . . . [reproduced above], and

2. any contaminants generally accepted in the relevant scientific community at the time of policy inception as a byproduct or breakdown product of the contaminant(s) referred to in 1) above, whether listed on the Scope of Work Endorsement or not.  Listing of a byproduct or breakdown product on the Scope of Work Endorsement shall constitute agreement by the Insureds and the Company that such general acceptance exists with respect to that byproduct or breakdown product.

The definition's structure suggests the parties' basic intent: the tables and figures are the center of any inquiry into whether a pollution condition is a Known Pollution Condition. The policy cites those tables and figures in strong terms: "Known Pollution Conditions are . . . those conditions specifically set forth in [the tables and figures]"; "Known Pollution Conditions constitute all of the conditions that are deemed known to the Insureds for the purposes of this Policy."  But as explained in the next paragraphs, the definition allows for exceptions to this general rule.

2.       Quantity and Geographic Extent

After laying this groundwork, the definition continues:

In the case of any Known Pollution Condition, the Known Pollution Condition shall be deemed to include the entire quantity and geographic extent of any contaminant which is ultimately determined to have been released as or to have constituted part of such Known Pollution Condition, . . .

12

1    This expansion squares with the definition's first sentences, which specify the tables and figures

2    include "a designation of location [and] contamination . . . ."  Notably, if Known Pollution

3    Conditions include "the entire quantity and geographic extent" of a Known Pollution Condition,

4    then the tables and figures in this sense do not exhaustively define Known Pollution Conditions.

5              The definition continues by clarifying that the exception described immediately

6    above applies

7              . . . without regard to:

8         1.   whether the contaminant or its byproduct or breakdown product
              was identified in Tables 1-3 and Figures 1 through 89 and Fuel
9             Oil Line Removal Project Figures 1 through 11 in quantities or
              concentration(s) requiring remedial action at the time it was
10            identified as part of such Known Pollution Condition, except
              that this subsection shall not apply to contaminants or their
11            respective byproducts or breakdown products at a particular
              location identified in the Scope of Work Endorsement Tables
12            and Figures only in amounts representing natural background
              concentrations;
13
          2.   whether the contaminant as identified in Tables 1-3 and Figures
14            1 through 89 and Fuel Oil Line Removal Project Figures 1
              through 11 or its byproduct or breakdown product is
15            subsequently determined to have migrated across or through
              one or more environmental media before or after identification
16            as part of a Known Pollution Condition or to have otherwise
              had a fate and transport or spatial extent different than that
17            understood as set forth in Tables 1-3 and Figures 1 through 89
              and Fuel Oil Line Removal Project Figures 1 through 11 or
18            described at the time the contaminant was identified as part of a
              Known Pollution Condition;
19
              . . .
20

21    These provisions anticipate and defuse counterarguments against expansion of the definition of

22    Known Pollution Conditions.  In other words, a Known Pollution Condition may expand to

23    encompass its "entire quantity and geographic extent," "without regard to," for example, the fact

24    a contaminant "migrated across or through one or more environmental media" or "otherwise had

25    a fate and transport or spatial extent" different from that described in the tables and figures.  But

26    because this structure is negative—the exception applies "without regard to" certain facts,

27    essentially depriving those facts of relevance—a party could not affirmatively cite migration

28    across "environmental media" or an unanticipated "fate and transport or spatial extent" to argue a

13

1    newly discovered pollution condition must necessarily be a Known Pollution Condition.  Rather,

2    if a contaminant is later determined to have been a part of a listed Known Pollution Condition's

3    entire extent, migration across environmental media, or an unexpected spatial extent are

4    irrelevant.

5                    3.      Additional Sources and Man-Made Objects

6                    The policy makes two more exceptions.  First:

7                         provided, that Known Pollution Conditions shall not include the
                          allocable portion of costs attributable to completing the Scope of
8                         Work with respect to any contaminant, regardless of whether it is
                          identified in the Scope of Work Tables 1-3 or Figures 1 through 89
9                         and Fuel Oil Line Removal Project Figures 1 through 11, to the
                          extent that the contaminant results from a source that is in addition
10                        to a source for that contaminant specified in the Scope of Work
                          endorsement . . .
11

12   This exception excludes certain costs from the definition of Known Pollution Conditions.  In the

13   context of the ELI policy, which covers costs incurred remediating only unknown pollution

14   conditions, the exception expands coverage.  But the exception has its own exceptions:

15                         . . . , but this proviso shall not apply to: 1) sources incorrectly
                          identified where such incorrect identification indicates a material
16                        misunderstanding by the Company and an Insured as to the actual
                          source of the contaminants designated on the Scope of Work Tables
17                        1-3 or Figures 1 through 89 and Fuel Oil Line Removal Project
                          Figures 1 through 11; and 2) contamination where the source of
18                        contamination identified on the Scope of Work endorsement is
                          originally designated as unidentified but is later identified; . . .
19

20   Put differently, "a material misunderstanding" that caused the parties to incorrectly identify "the

21   actual source" of pollution in the tables and figures can prevent the expansion of coverage under

22   this exception.  Similarly, if the Scope of Work endorsement originally defined a contaminant's

23   source as unidentified, but later the source was identified, coverage cannot be expanded under

24   this exception.

25                    Second, the definition includes an exception for interactions with an "unknown

26   man-made subsurface structure or object":

27                         . . . provided further, however, that the allocable portion of costs
                          attributable to completing the Scope of Work shall not be a Known
28                        Pollution Condition where an increase in extent, concentration or

                                             14

quantity of a contaminant over that identified in the Scope of Work Tables 1 -3 and Figures 1 through 89 and Fuel Oil Line Removal Project Figures 1 through 11 is the direct result of contaminant interaction with an "unknown man-made subsurface structure or object" (but this shall not include costs attributable to the need to excavate into or remove portions of any unknown man-made subsurface structure or object to remediate contamination unless such excavation or removal is required as part of a remedial plan and would otherwise constitute Cleanup Costs).

The policy defines "unknown man-made subsurface structure or object" in the negative:

. . . For purposes of this definition, the term "unknown man-made subsurface structure or object" shall not include the following:[11]

1. any man-made subsurface structure or object known to any Insured's principal, partner, director, officer or employee with responsibility for environmental affairs, legal affairs or risk management to exist or have existed at a specific location at the Insured Project.

2. any and all soil, sediment, debris, fill and dredge spoils placed or disposed at the Insured Project, whether lawfully or otherwise;

3. man-made subsurface structures or objects identified in the Scope of Work Endorsement;

4. any portion of the sanitary sewer, industrial water treatment system, storm sewer, fuel distribution system, potable water supply system, or gas distribution system.

5. any foundation or portion thereof which is part of a building or former building known to any Insured's principal, partner, director, officer or employee with responsibility for environmental affairs, legal affairs or risk management to exist or have existed at a specific location at the Insured Project.

With this, the ELI policy's definition of "Known Pollution Conditions" concludes.

4.      The Scope of Work Endorsement

As described above, the policy defines Known Pollution Conditions by referring to the Scope of Work Endorsement.  The Scope of Work Endorsement provides, "The conditions and activities identified in Tables 1, 2 and 3 and listed below represent the Scope of Work of the Insured Project and are Known Pollution Conditions or actions with respect to such Known Pollution Conditions authorized under the Scope of Work . . . ."  Poll. Evid. Ex. 4, at SJCP

[11] The list in the policy is separated by both periods and semicolons, as reproduced above. This punctuation scheme, although perhaps an error, is not material to the court's decision here.

15

029073.  It cautions, "The figures illustrate the general locations of contaminants for each site,

but do not represent the total extent or maximum concentrations of such contaminant." *Id.*

In addition to the tables and figures attached, the endorsement lists several

"sections," which, it provides, "are part of and incorporated into Tables 1 through 3 of this

Endorsement, and the contamination conditions and remedial activities identified in these sections

shall constitute Known Pollution Conditions for the purposes of this Policy and the

Environmental Liability Policy . . . ." *Id.* at SJCP 029074–75.  Section six is titled "Planned

Remedial Actions for PCB Sites." *Id.* at SJCP 029076.  It provides,

> The planned remedial actions, unless Government Authority requires additional or different remedial actions, for the sites listed on Table 3 and shown on Figures 84 through 88 are as follows and in all events shall be consistent with [a specific consent agreement], and any amendments thereto:

> . . .

> 3. Perform PCB characterization as required by Governmental Authority at 84 additional sites, not including the specific sites listed in Items 1 and 2 above.

> 4. Perform PCB abatement as required by Governmental Authority of 42 additional sites, not including the specific sites listed in Items 1 and 2 above.

> . . .

*Id.*  The section includes no other description of these 84 and 42 "additional sites."

D.      California Rules Regarding Extrinsic Evidence in Contract Cases

The court now turns to the law applicable to the interpretation of the ELI policy.

As noted above, California law governs the policy's interpretation.  *See Bell Lavalin*, 61 F.3d

at 745.

Steadfast rests much of its argument on evidence external to the contract.

California law imposes specific limits on evidence other than a contract's written terms.  The

court first reviews these rules.

1.      The Parol Evidence Rule

Normally a contract's written terms alone control its interpretation: "when parties

enter an integrated written agreement, extrinsic evidence may not be relied upon to alter or add to

16

1    the terms of the writing." *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*,

2    55 Cal. 4th 1169, 1174 (2013) (citing Cal. Code Civ. Proc. § 1856 and Cal. Civ. Code § 1625).

3    This rule, commonly called the parol evidence rule, is a rule of substantive law, not of procedure.

4    *Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 343 (2004).  "It is founded on the principle that

5    when the parties put all the terms of their agreement in writing, the writing itself becomes the

6    agreement." *Riverisland*, 55 Cal. 4th at 1174.  Because a contract's "written terms supersede

7    statements made during the negotiations," evidence other than those written terms is "irrelevant,

8    and cannot be relied upon." *Id.* (emphasis omitted).

9            The parol evidence rule applies only to "an integrated written agreement." *Id.*  A

10    written agreement is "integrated" or is an "integration" if it is "a complete and final embodiment

11    of the terms of an agreement," *Masterson v. Sine*, 68 Cal. 2d 222, 225 (1968); *Alling v. Universal*

12    *Mfg. Corp.*, 5 Cal. App. 4th 1412, 1434 (1992), or in other words, if it is "intended by the parties

13    as a final expression of their agreement," Cal. Code Civ. Proc. § 1856(a).  Whether a written

14    contract is an integration is a question of law.  *Id.* § 1856(d); *Alling*, 5 Cal. App. 4th at 1434.  A

15    court considers several factors when determining whether an agreement is an integration: (1) the

16    presence of an integration clause; (2) the contract's language and apparent completeness or

17    incompleteness; (3) if a party argues another contract exists, whether that agreement's terms

18    contradict those of the written contract; (4) whether the alleged additional agreement would

19    naturally be made as a separate agreement; and (5) whether extrinsic evidence might confuse the

20    jury.  *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859 (9th Cir. 1995) (citing *McLain v. Great Am. Ins.*

21    *Cos.*, 208 Cal. App. 3d 1476, 1484 (1989)); *Alling*, 5 Cal. App. 4th at 1434.

22            Here, with respect to the definition of Known Pollution Conditions, the ELI policy

23    is an integrated writing.  It is comprehensive, refers expressly to other policies when necessary,

24    and includes the following provision:

25            This policy is a separate, independent agreement between the
                  Company and the Insureds.  Notwithstanding any other provision of

26            this Policy, no contract or agreement, other than the [RSL policy]
                  shall  be  used  to  interpret  this  Policy  . . . ;  provided,  that  the

27            [Environmental Services Cooperative Agreement] may be used to
                  interpret [certain specific portions] of this Policy.  Each Named

28            Insured and each Additional Insured expressly agrees as a condition

1                 of coverage under this policy that in the event there is any
2                 inconsistency between the terms of this policy and the terms or
obligations of any other contract or agreement between any Named
Insured or any Additional Insured or any other person, the terms of
3                 this Policy shall nevertheless wholly and exclusively govern the
obligations of the Company and the Insured toward each other.
4

5    Miller Decl. Ex. 1, at 25–26, ECF No. 172-1 (bold typeface omitted).  At hearing, the parties

6    confirmed they agree the ELI policy is an integrated agreement, but Steadfast argues extrinsic

7    evidence is nonetheless admissible under exceptions to the parol evidence rule.  The court next

8    considers those exceptions

9                    2.      Extrinsic Evidence to Establish and Resolve Ambiguity

10                   Contract law allows admission of extrinsic evidence "to resolve an ambiguity,"

11   even when the contract is an integrated agreement.  *WYDA*, 42 Cal. App. 4th at 1710; *see also*

12   Cal. Code Civ. Proc § 1856(g); *Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1992).  Extrinsic

13   evidence may be offered both to explain an obviously ambiguous term and to reveal a latent

14   ambiguity.  *Pac. Gas & E. Co. v. G.W. Thomas Drayage etc. Co.*, 69 Cal. 2d 33, 37 (1968);

15   *Emp'rs Reinsurance Co. v. Superior Court*, 161 Cal. App. 4th 906, 920 (2008).

16                   "An agreement is not ambiguous merely because the parties (or judges) disagree

17   about its meaning."  *Abers v. Rounsavell*, 189 Cal. App. 4th 348, 356 (2010).  Rather, the

18   determination of ambiguity involves two steps.  "First, the court provisionally receives (without

19   actually admitting) all credible evidence concerning the parties' intentions to determine

20   'ambiguity,' *i.e.*, whether the language is 'reasonably susceptible' to the interpretation urged by a

21   party."  *Winet*, 4 Cal. App. 4th at 1165.  If the contract is not "'reasonably susceptible' to the

22   interpretation urged," then "the case is over."  *S. Cal. Edison Co. v. Superior Court*, 37 Cal.

23   App.4th 839, 847–48 (1995).  But "[i]f in light of the extrinsic evidence the court decides the

24   language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then

25   admitted to aid in the second step—interpreting the contract."  *Winet*, 4 Cal. App. 4th at 1165.

26                   Because extrinsic evidence must be "relevant to prove a meaning to which the

27   language of the contract is reasonably susceptible," any extrinsic evidence must be tethered to

28   specific contract language.  *Alameda Cnty. Flood Control v. Dep't of Water Res.*, 213 Cal. App.

1    4th 1163, 1188–89 (2013) (quoting *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006))

2    (emphasis omitted).  Whether a contract is ambiguous is a question of law, but if the contract is

3    ambiguous, the conflict is ordinarily a genuine dispute of material fact inappropriate for

4    resolution on summary judgment.  *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*,

5    132 F.3d 1303, 1307 (9th Cir. 1997); *WYDA*, 42 Cal. App. 4th at 1710.

6                          3.   Evidence of a Course of Performance

7                     One form of extrinsic evidence is the contracting parties' "course of

8    performance."[12]  *See* Cal. Civ. Proc. Code § 1856(c); *Epic Commc'ns, Inc. v. Richwave Tech.,*

9    *Inc.*, 237 Cal. App. 4th 1342, 1355 (2015); *Emp'rs Reinsurance*, 161 Cal. App. 4th at 920.

10   Section 1303 of the California Commercial Code defines the term "course of performance" for

11   purposes of an insurance policy dispute like this one.  *See* Cal. Civ. Proc. Code § 1856(c) cmt. to

12   1978 am.; *Emp'rs Reinsurance*, 161 Cal. App. 4th at 920 (noting a renumbering of the relevant

13   code sections).  "A 'course of performance' is a sequence of conduct between the parties to a

14   particular transaction . . . ."  Cal. Com. Code § 1303(a).  It exists if both (1) the parties' agreement

15   "involves repeated occasions for performance" by one of them and (2) the other has "knowledge

16   of the nature of the performance and opportunity for objection to it" but "accepts the performance

17   or acquiesces in it without objection."  *Id.*

18                     "The rationale for the admission of course of performance evidence is a practical

19   one."  *Emp'rs Reinsurance*, 161 Cal. App. 4th at 921.  When interpreting a contract, the court's

20   duty is to give effect to the parties' intentions at the time they entered the contract.  Cal. Civ.

21   Code § 1636.  And "the most reliable evidence of the parties' intentions" is their behavior after

22   the contract is signed and before any controversy has arisen.  *Kennecott Corp. v. Union Oil Co.*

23   196 Cal. App. 3d 1179, 1189 (1987).

24

25   _____

26         [12] Another form is a "course of dealing."  Cal. Civ. Proc. Code § 1856(c).  Course-of-
     dealing evidence and course-of-performance evidence are distinct.  "'Course of dealing,' . . . is
27   restricted, literally, to a sequence of conduct between the parties previous to the agreement.  A
     sequence of conduct after or under the agreement, however, is a 'course of performance.'"  Cal.
28   Com. Code § 1303 U.C.C. cmt. 2.

                                                     19

In federal court, "[a]n inference of the parties' common knowledge or understanding that is based upon a prior course of dealing is a question of fact." *In re CFLC, Inc.*, 166 F.3d 1012, 1017 (9th Cir. 1999). In light of the Ninth Circuit's reasoning in *In re CFLC*, the same may likely be said of the parties' course of performance. *See id.* (citing *New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24, 31 (2d Cir. 1997) (discussing the factfinder's role in drawing inferences from the contracting parties' actions)). A genuine dispute surrounding the parties' course of performance may therefore preclude summary judgment.

### 4.     The Role of Ambiguity

Recent decisions in California appellate courts contradict one another on the role of ambiguity in the admissibility of course of performance evidence. In *Employers Reinsurance Co. v. Superior Court*, the California Court of Appeal explained the parties' course of performance will be adopted and enforced only when it is a reasonable interpretation of the contract's terms. 161 Cal. App. 4th at 921. Later the court repeated this rule, explaining a course of performance could be admitted "regardless of the actual language of the contract, as long as the parties' interpretation is reasonable." *Id.* at 922 (emphasis omitted). In the same paragraph, however, the court summarized that "course of performance evidence can supplement, qualify, or modify contrary terms in the contract." *Id.* This holding seems to refer to California Commercial Code section 1303(f), which the state appellate court had quoted earlier in its decision: evidence of a course of performance is relevant to "show a waiver or modification of any term inconsistent with the course of performance." *Id.* at 920–21 (quoting Cal. Com. Code § 1303(f)).

It is difficult to understand how a course of performance could be both a reasonable interpretation of a contract and "inconsistent with" the contract's written terms. These citations are also difficult to square with the same court's description of course of performance evidence as a type of extrinsic evidence, which it emphasized "is admissible when relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Id.* at 920 (citation and quotation marks omitted). In a later decision, a different panel of the same Court of Appeal suggested the *Employers* court's citation to section 1303(f) was dicta, only "a passing

1    reference." *Lonely Maiden Prods., LLC v. GoldenTree Asset Mgmt., LP*, 201 Cal. App. 4th 368,

2    378 (2011).

3         In 2010, another Court of Appeal quoted *Employers* and confirmed course of

4    performance evidence, like any extrinsic evidence, "is admissible when relevant to prove a

5    meaning to which the language of the instrument is reasonably susceptible." *In re Tobacco*

6    *Cases I*, 186 Cal. App. 4th 42, 52 (2010) (quoting 161 Cal. App. 4th at 920). In *Tobacco Cases I*,

7    the court rejected evidence of the parties' course of performance offered to explain the word

8    "cartoon" because the agreement's written terms were not susceptible to the interpretation the

9    course of performance would have supported. *Id.*

10        Like *Employers*, however, *Tobacco Cases I* also has come under criticism in later

11   opinions, albeit in dicta. In *Epic Communications, Inc. v. Richwave Technology, Inc.*, the court

12   concluded a settlement agreement's release clause was "patently ambiguous." 237 Cal. App. 4th

13   at 1354. Therefore the court found it proper to consider the parties' course of performance as

14   evidence of their intent. *Id.* at 1354–55. Although the court had already concluded the contract

15   terms in question were patently ambiguous, it quoted the Law Revision Committee's comments

16   to section 1856(c): "Subdivision (c) [of California Code of Civil Procedure § 1856] definitely

17   rejects . . . the requirement that a condition precedent to the admissibility of the type of evidence

18   specified in the subdivision is an original determination that the language used is ambiguous." *Id.*

19   at 1355 (citing Cal. Civ. Proc. Code § 1856, cmts. to 1978 am.) (ellipses in *Epic*). In a footnote,

20   the *Epic* court then rejected the "more stringent rule" of *Tobacco Cases I*, which "appear[ed] to

21   rest on the premise that course-of-performance evidence is admissible only if the contract is first

22   found to be ambiguous, or at least latently ambiguous." *Id.* at 1355 n.13.

23        In the presence of these competing authorities, this court must anticipate how the

24   California Supreme Court would resolve the issue. *See, e.g.*, *Kairy v. SuperShuttle Int'l*, 660 F.3d

25   1146, 1150 (9th Cir. 2011). California Code of Civil Procedure section 1856 is the common

26   thread in the cases cited above. The court therefore looks first to that section. Subdivision (a)

27   provides, "Terms set forth in a writing intended by the parties as a final expression of their

28   agreement with respect to the terms included therein may not be contradicted by evidence of a

1    prior agreement of or a contemporaneous oral agreement."  Cal. Civ. Proc. Code § 1856(a).

2    Subdivision (c) allows "[t]he terms set forth in a writing described in subdivision (a) [to] be

3    explained or supplemented . . . by course of performance."  *Id.* § 1856(c).

4              The words "explained" and "supplemented" are not synonyms of "contradicted."

5    Moreover, California Commercial Code section 2202, which the Law Revision Commission

6    Comments describe as "comparable to" Code of Civil Procedure section 1856, also uses the

7    words "explained or supplemented" to describe permissible uses of course of performance

8    evidence and "contradicted" to describe impermissible uses of extrinsic evidence.  Cal. Com.

9    Code § 2202.  *See also Apex LLC v. Sharing World, Inc.*, 206 Cal. App. 4th 999, 1014 (2012)

10   ("[Under section 2202,] to the extent the writing incorporates terms the parties agreed on, then the

11   writing controls as to those terms and anything contradictory or inconsistent is of no force or

12   effect." (citation and quotation marks omitted)).  This is also the general rule of the Uniform

13   Commercial Code.  *See* 2A Anderson U.C.C. § 2-208:5 (3d. ed. updated 2015) ("Evidence of a

14   course of performance is admissible if it does not directly contradict the terms of a written

15   agreement, but merely explains or supplements them.").  And courts outside California also

16   regularly interpret analogous state law similarly.  *See, e.g.*, *Ellicott Mach. Corp. Int'l v. Jesco*

17   *Const. Corp.*, 199 F. Supp. 2d 290, 295 (D. Md. 2002); *Craig Sessions, M.D., P.A. v. TH*

18   *Healthcare, Ltd.*, 412 S.W.3d 738, 745–46 (Tex. App. 2013); *Noble Roman's, Inc. v. Pizza Boxes,*

19   *Inc.*, 835 N.E.2d 1094, 1099 (Ind. Ct. App. 2005); *J A & A Mech., Inc. v. Thermal Equip. Sales,*

20   *Inc.*, 998 S.W.2d 505, 510 (Ky. Ct. App. 1999); *R. Waymire Co. v. Antares Corp.*, 975 S.W.2d

21   243, 247 (Mo. Ct. App. 1998); *KN Energy, Inc. v. Great W. Sugar Co.*, 698 P.2d 769, 779 (Colo.

22   1985).

23             This court concludes section 1856(c) makes course of performance evidence

24   admissible to explain or supplement but not to contradict the terms of an integrated agreement,

25   even when the agreement's written terms are unambiguous.  The distinction between evidence

26   that explains and evidence that contradicts is familiar in California jurisprudence.  *See, e.g.*,

27   *Hervey v. Mercury Cas. Co.*, 185 Cal. App. 4th 954, 961 (2010) ("Although parol evidence may

28   be admissible to determine whether the terms of a contract are ambiguous, it is not admissible if it

22

1    contradicts a clear and explicit policy provision." (citation omitted)); *Winet*, 4 Cal. App. 4th at

2    1167 ("[P]arol evidence is admissible only to prove a meaning to which the language is

3    'reasonably susceptible,' not to flatly contradict the express terms of the agreement." (citation

4    omitted)).  Moreover, section 1856(c) "codifies prior law."  Cal. Civ. Proc. Code § 1856 cmt. to

5    1978 am.  California courts have long held parol evidence may not contradict the terms of an

6    integrated agreement.  *See, e.g.*, *Masterson*, 68 Cal. 2d at 225–26 (parol evidence cannot "vary"

7    the terms of a written agreement); *Universal Sales Corp. v. California Press Mfg. Co.*, 20 Cal. 2d

8    751 (1942) (evidence of the parties' "practical construction" of a contract is not admissible when

9    it would only support an interpretation "wholly at variance with the correct legal interpretation"

10   of the contract's terms).

11          This reading of section 1856(c) is consistent with *Epic Communications*,

12   *Employers*, and *Tobacco Cases I*.  According to section 1856's comments, an ambiguity is not a

13   prerequisite to admission under section 1856(c) if the evidence will explain and supplement a

14   contract.  *See Epic Commc'ns*, 237 Cal. App. 4th at 1355 n.13.  And according to the *Employers*

15   and *Tobacco Cases I* courts, parol evidence may not flatly contradict the written contract or

16   support an unreasonable interpretation of it.  *See* 186 Cal. App. 4th at 52 (quoting 161 Cal. App.

17   4th at 920).

18          Here, as a practical matter, the court concludes evidence of the parties' course of

19   performance is admissible even if Steadfast makes no effort to show the contract is ambiguous

20   and even if the court makes no finding to that effect.  The Law Review Commission's meticulous

21   phrasing suggests this interpretation.  *See* Cal. Civ. Proc. Code § 1856 cmt. to 1987 am. (rejecting

22   "the requirement that a condition precedent to the admissibility of [course of performance

23   evidence] is an original determination that the language used is ambiguous.").  Nevertheless, LMI

24   may challenge the evidence by arguing it could support no reasonable interpretation of the ELI

25   Policy or flatly contradicts the policy.  If evidence does flatly contradict the policy, the question

26   would presumably be whether the contract was modified, an issue the parties have not raised or

27   briefed, and one the court does not consider here.  *See, e.g.*, Cal. Civ. Code § 1698; *Wagner v.*

28   *Glendale Adventist Med. Ctr.*, 216 Cal. App. 3d 1379, 1388 (1989).

1      E.      Discussion

2              The law described above leaves the court with three questions: (1) whether the ELI

3      Policy's written terms support the interpretation LMI proposes; (2) whether Steadfast's extrinsic

4      evidence is admissible to resolve an ambiguity in the policy; and (3) whether Steadfast's extrinsic

5      evidence is admissible to establish a course of performance consistent with Steadfast's

6      interpretation of the policy.

7              1.      The ELI Policy's Written Terms

8              To decide whether a condition is a Known Pollution Condition, the policy refers

9      twice to the conditions "specifically described" or "specifically set forth" in the Scope of Work

10     Endorsement.  Not only does the policy refer repeatedly to the Scope of Work endorsement, it

11     often repeats the lengthy reference to "Tables 1-3 and Figures 1 through 89 and Fuel Oil Line

12     Removal Project Figures l through 11 to the Scope of Work Endorsement."  Even when the policy

13     makes exceptions it refers to the same tables and figures.  This choice of language suggests the

14     parties intended to cabin any discussion of known and unknown conditions to the Scope of Work

15     endorsement.

16             But the policy is more complex.  The definition of Known Pollution Conditions

17     includes the "entire quantity and geographic extent" of a contaminant later determined to have

18     been part of a Known Pollution Condition—regardless of "whether the contaminant . . . was

19     identified in [the tables and figures] in quantities or concentration(s) requiring remedial action at

20     the time it was identified" and regardless of whether it "had a fate and transport or spatial extent

21     different than that understood as set forth in" the tables and figures.  In this light, the Scope of

22     Work endorsement and the tables and figures do not exhaustively define Known Pollution

23     Conditions.  Otherwise it would be impossible to "ultimately determine[]" a contaminant,

24     although not originally listed, was actually part of the "entire quantity and geographic extent" of a

25     Known Pollution Condition and therefore "deemed" a Known Pollution Condition.

26             Similarly, the exceptions for additional sources and any "unknown man-made

27     subsurface structure or object" reach beyond the Scope of Work Endorsement and attached tables

28     and figures.  Otherwise it would be impossible to determine (1) whether an "incorrect

24

1   identification indicates a material misunderstanding by the Company and an Insured as to the

2   actual source of the contaminants" listed in the tables and figures, or (2) if "an increase in extent,

3   concentration or quantity of a contaminant over that identified in the" tables and figures was "the

4   direct result of contaminant interaction with an 'unknown man-made subsurface structure or

5   object.'"

6          The court also notes the parties' apparent agreement that the tables and figures in

7   the Scope of Work endorsement "are often meaningless without reference to the source

8   documents" and that the parties may need to "resort . . . to contemporaneous technical

9   documents" and "historic environmental documents . . . to determine what was meant by

10  reference to a given 'location,' 'contaminant' and 'source.'"  Poll. Opp'n at 3; Poll. Reply at 1

11  ("[D]ocuments external to the policy may be relevant to explain an unclear entry on the tables

12  . . . .").  After all, evidence extrinsic to the contract is generally admissible to explain its meaning

13  if the written terms are reasonably susceptible to that meaning.  *Casa Herrera*, 32 Cal. 4th at 343.

14         In sum, the court cannot agree with LMI that to determine whether a pollution

15  condition is known or unknown, one need only "look on the Scope of Work" and that "[n]o

16  further inquiry is appropriate."  Poll. Mem. at 7.  The policy's definition is not so simple.

17         On the other hand, the ELI Policy's written definition of Known Pollution

18  Conditions does support LMI's more focused contention that a pollution condition cannot be

19  "known" simply because Steadfast can demonstrate historical knowledge of it.  Were the opposite

20  true, then the following terms would be meaningless:

21  •    "Known Pollution Conditions means all conditions specifically described in the

22       Scope of Work Endorsement . . . ."

23  •    "Known Pollution Conditions are: [¶] 1. those conditions specifically set forth in

24       Tables 1-3 and Figures 1 through 89 and Fuel Oil Line Removal Project Figures 1

25       through 11 to the Scope of Work Endorsement . . . ."

26  •    "Known Pollution Conditions constitute all of the conditions that are deemed

27       known to the Insureds for the purposes of this Policy."

28

25

1    The painstakingly detailed exceptions that follow these sentences reinforce this conclusion.  Had

2    the parties intended actual knowledge to control rather than the Scope of Work Endorsement, a

3    much shorter definition saying as much would be expected.  And although Steadfast points out

4    several exceptions within the definition of Known Pollution Conditions, none allows the

5    conclusion that actual knowledge controls.  Each exception refers to the Scope of Work

6    Endorsement.

7            In Steadfast's supplemental brief, it argues this interpretation would deprive the

8    ELI Policy's Coverage A provision of meaning.  *See* Supp. Opp'n at 4.  As noted above, *see*

9    *supra* note 4, the ELI Policy provides coverage only for pollution conditions "first discovered by

10   an Insured during the Policy Period."  Steadfast did not raise this argument in its opposition brief,

11   despite the court's previous order expressly reserving consideration of that provision for this

12   motion.  *See* Order May 15, 2014, at 8–9 ("Steadfast argues the omission does not matter because

13   the court said this 'deemed known' provision would render the 'first discovered' provision

14   surplusage. . . . LMI argues the 'first discovered language,' when read in conjunction with the

15   'deemed known' provision, operates to limit the coverage to contamination discovered before the

16   end of the policy period. . . . Whatever the ultimate meaning of this provision, it is better resolved

17   on a renewed motion for summary judgment.").  By raising this argument only belatedly now,

18   Steadfast signaled the court did not need to raise it with the parties at hearing, and LMI was left

19   only its supplemental reply brief for a rebuttal.  *See* Supp. Reply at 5 n.3.  Problems like this

20   motivate Local Rule 230, which establishes a briefing and hearing schedule for all motions.  *See*

21   E.D. Cal. L.R. 230(a)–(d).

22           Nevertheless, because the court does not accept Steadfast's argument, considering

23   it here will not prejudice LMI.  In short, Steadfast's interpretation of Coverage A would render

24   the definition of Known Pollution Conditions superfluous.  The parties would have had no reason

25   to construct an intricate, thousand-word definition if discovery of any pollution condition before

26   the policy period automatically excluded coverage.  It is also possible to interpret the provisions

27   of Coverage A to avoid a conflict.  *See* Cal. Civ. Code § 1652 ("Repugnancy in a contract must

28   be reconciled, if possible, by such an interpretation as will give some effect to the repugnant

26

1    clauses, subordinate to the general intent and purpose of the whole contract."); *id.* § 1653

2    ("Words in a contract which are wholly inconsistent with its nature, or with the main intention of

3    the parties, are to be rejected.").  Requiring conditions be discovered "during the Policy Period,"

4    rather than after the Policy Period, is unsurprising in light of the ELI Policy's extended reporting

5    periods, which the Coverage A provision expressly cites.[13]

6         In summary, first, LMI's motion is denied to the extent it argues one need only

7    "look on the Scope of Work" and "[n]o further inquiry is appropriate."  Poll. Mem. at 7.  The

8    definition of Known Pollution Conditions includes exceptions that may require documentary

9    investigation beyond the Scope of Work Endorsement.  Documents external to the policy may

10   also be necessary to shed light on the meaning of an item in the Scope of Work Endorsement or

11   entries in tables and figures.  Second, Steadfast cites no policy term showing a pollution condition

12   may become a Known Pollution Condition on the basis of actual knowledge only.  The court

13   therefore turns to evidence extrinsic to the ELI Policy, but only with respect to this second

14   question.

15              2.    Extrinsic Evidence

16        The court first summarizes Steadfast's proposed extrinsic evidence, then considers

17   whether that evidence is admissible to resolve an ambiguity or to establish the parties' course of

18   performance.

19              a)    Proposed Evidence

20        Steadfast divides its parol evidence into five categories.  First, it offers excerpts

21   from the deposition testimony of Karen Lubovinsky, the person Steadfast designated as its

22   representative under Federal Rule of Civil Procedure 30(b)(6).  Poll. Opp'n at 11–12.  Ms.

23   Lubovinksy testified that in her experience, CCI "looked at historic Navy documents" and "all of

24   [the] historic record becomes part of the evaluation of what [CCI] is doing and why they're doing

25   it."  Lubovinsky Dep. 207–08, ECF No. 212-1.

26        [13] In a previous order, the court signaled its suspicion this question may be resolved in
     Steadfast's favor.  *See* Order May 15, 2014, at 8–9.  But as explained in the text above, after
27   further review of the ELI policy and the definition of Known Pollution Conditions, the court now
     reaches the opposite conclusion.
28

1          Second, Steadfast offers evidence that LMI and CCI have referred to documents

2    other than the Scope of Work endorsement to decide whether a pollution condition was a Known

3    Pollution Condition.  Poll. Opp'n at 12–15.  For example, Steadfast presents evidence in the form

4    of a letter from LMI to Steadfast that in January 2010, LMI understood a pollution condition was

5    a Known Pollution Condition in part because it "was known to exist at the time of policy

6    inception," *id.* at 12, and in May 2009, LMI referred to its "records from the time of policy

7    underwriting," *id.* at 15 (emphasis omitted).

8          Third, Steadfast offers evidence LMI and CCI have disagreed whether the tables

9    and figures in the policy were exhaustive.  *Id.* at 16–17.  For example, Steadfast cites evidence

10   that CCI was concerned about its dispute with LMI over "what constitutes an Unknown," *id.*

11   at 16, and in past disputes with CCI, LMI had concurred with Steadfast that a pollution condition

12   could be unknown as provided in various "underwriting materials," *id.* at 16.

13         Fourth, Steadfast offers evidence LMI understands the difficulty of determining

14   whether a pollution condition is a Known Pollution Condition.  Poll. Opp'n at 17–18.  For

15   example, Steadfast cites evidence LMI acknowledged in 2011 that some pollution conditions did

16   not "fall[] neatly into known or unknown categories," and that pollution conditions can be

17   "partially known and partially unknown."  *Id.* at 18 (emphasis omitted).

18         Fifth, Steadfast argues section six of the Scope of Work endorsement is

19   ambiguous.  Poll. Opp'n at 9–10.  As summarized above, the section describes five "planned

20   remedial actions," including "PCB characterization . . . at 84 additional sites" and "PCB

21   abatement . . . at 42 additional sites."  Poll. Evid. Ex. 4, at SJCP 029076.  The section includes no

22   other description or identification of these 126 "additional sites."  Steadfast relies on evidence

23   "the parties met in 2005 to reach agreement on exactly what those 'known' sites included, taking

24   into consideration the Site Summary Forms and other historic documents."  Poll. Opp'n at 10.

25                              b)      Ambiguity

26         The court first "provisionally receives (without actually admitting) all credible

27   evidence concerning the parties' intentions to determine 'ambiguity,' *i.e.*, whether the language is

28   'reasonably susceptible' to the interpretation urged by a party."  *Winet*, 4 Cal. App. 4th at 1165.

1    If the ELI policy is not "reasonably susceptible" to the interpretation Steadfast urges, then the

2    evidence cannot be admitted.  *S. Cal. Edison Co.*, 37 Cal. App. 4th at 847–48.

3               Steadfast must tie its evidence "to particular language" of the written agreement;

4    this is "essential."  *Alameda Cnty. Flood Control*, 213 Cal. App. 4th at 1188 (emphasis omitted);

5    *cf., e.g.*, *Dore*, 39 Cal. 4th at 392 (considering whether the phrase "at will" was ambiguous); *Am.*

6    *Alt. Ins. Corp. v. Superior Court*, 135 Cal. App. 4th 1239, 1247 (2006) (considering whether the

7    phrases "physical damage" and "damaged property" were ambiguous); *Pac. Gas & Elec.*, 69 Cal.

8    2d at 39 & n.6 (considering whether an indemnity clause was ambiguous and citing cases where

9    the court had considered whether the words "United Kingdom," "ton," "stubble," and "north"

10   were ambiguous); *Epic Commc'ns*, 237 Cal. App. 4th at 1348–54 (considering conflicting

11   sentences); *Tobacco Cases I*, 186 Cal. App. 4th at 50–52 (considering whether the word

12   "cartoon" was ambiguous); *In re Black's Estate*, 211 Cal. App. 2d 75, 85 (1962) (considering

13   whether the phrase "To The University of Southern California known as The U.C.L.A" was

14   ambiguous).

15              Apart from the fifth category of parol evidence, Steadfast does not tie its evidence

16   to any specific term, phrase, or clause.  Neither does Steadfast address the ELI Policy's directives

17   that (1) "Known Pollution Conditions means all conditions specifically described in the Scope of

18   Work Endorsement to the Remediation Stop Loss Policy;" and (2) "Known Pollution Conditions

19   constitute all of the conditions that are deemed known to the Insureds for the purposes of this

20   Policy."  Rather, Steadfast simply argues these phrases cannot mean what they say.  *See, e.g.*,

21   Poll. Opp'n at 3 ("[T]he issues in this case are not simply whether a condition is listed in a table,

22   but rather whether the actual pollution . . . was known.").  But parol evidence is not admissible to

23   "flatly contradict the express terms of the agreement."  *Winet*, 4 Cal. app. 4th at 1167 (citing

24   *Stevenson v. Oceanic Bank*, 223 Cal. App. 3d 306, 317–18 (1990)).  The court therefore cannot

25   consider evidence from the first four categories to "explain or otherwise shed light on the parties'

26   intent."  *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC*, 185 Cal. App. 4th 1050, 1061

27   (2010).

28

1          As to the fifth category, Steadfast argues section six of the Scope of Work

2    endorsement is ambiguous because its text refers to 126 "additional sites" without identifying

3    them.  Poll. Opp'n at 10.  Steadfast relies on a declaration submitted by Ms. Lubovinsky.  *See*

4    Statement Disputed Facts no. 19, ECF No. 194 (citing Lubovinsky Decl. ¶ 5, ECF No. 197).

5    Ms. Lubovinsky recounts a March 14, 2005 meeting with about twenty representatives from CCI,

6    LMI, and Steadfast.  Lubovinsky Decl. ¶ 5.  The purpose of the meeting was to "come to

7    agreement on whether more than one hundred PCB claims involved 'known' or 'unknown'

8    contamination."  *Id.*  At the meeting, the parties considered "certain Navy Technical Memoranda

9    and Environmental Documents and other pre-policy documentation."  *Id.*  The parties decided

10   some of these "PCB claims" were "known," some were "unknown," and reached no conclusion

11   as to others.  *Id.*  "[B]oth CCI and LMI made clear during that meeting that these documents were

12   critical to the resolution."  *Id.*  CCI sent Ms. Lubovinksy an email before the meeting, which

13   attached "additional information made available by the Navy" about "115 sites so as to enable

14   Zurich to make a determination as to whether they were known or unknown."  *Id.* Ex. B, at SZC

15   101531.  Therefore, Steadfast reasons, the court must refer to "the historic environmental

16   documents."  *Id.*

17          First, Steadfast has not explained how a finder of fact could conclude the 115 sites

18   Ms. Lubovinsky refers to in her declaration are the same sites as the 126 sites mentioned in

19   section six of the Scope of Work Endorsement.  Without this explanation, its evidence lacks

20   foundation and cannot support Steadfast's position.

21          Second, assuming for sake of argument this numerical discrepancy could be

22   resolved, to show the Scope of Work endorsement is ambiguous, Steadfast must present evidence

23   that the Scope of Work endorsement is reasonably susceptible to multiple interpretations.  For

24   example, Steadfast could present evidence that section six could be interpreted to refer to multiple

25   physical locations.  It could show the additional sites may or may not be among those listed in the

26   tables and figures.  Or if the additional sites are among those listed in the tables and figures,

27   Steadfast could show it is unclear on what page and in which row.  The evidence about the 2005

28   meeting establishes no ambiguity about section six's language.  Rather, Steadfast presents the

1    March 2005 meeting as evidence that the parties at one time considered actual knowledge

2    sufficient to create a Known Pollution Condition. For the reasons described above, parol

3    evidence of this type is not admissible here.

4              Third, this evidence sheds no persuasive light on the text in question. In relevant

5    part, section six provides as follows: "The planned remedial actions . . . for the sites listed on

6    Table 3 and shown on Figures 84 through 88 are as follows . . . 3. Perform PCB characterization

7    as required by Governmental Authority at 84 additional sites . . . . 4. Perform PCB abatement as

8    required by Governmental Authority of 42 additional sites . . . ." Poll. Evid. Ex. 4, at SJCP

9    029076. Items three and four are among the "planned remedial actions . . . for the sites listed on

10   Table 3 and shown on Figures 84 through 88." *Id.* That is, the 84 and 42 "additional sites" are

11   among those listed in the tables and figures, whether or not the parties considered other

12   documentation at a March 2005 meeting, and the text is not ambiguous. *See Alameda Cnty.*

13   *Flood Control*, 213 Cal. App. 4th at 1189 ("[W]ritten agreements whose language appears clear

14   in the context of the parties' dispute are not open to claims of 'latent' ambiguity." (citations and

15   internal quotation marks omitted)).

16             Steadfast has not shown any particular policy language is reasonably susceptible to

17   more than one interpretation. Its parol evidence is therefore inadmissible to explain any

18   ambiguity.

19                      c)      Course of Performance

20             As the court has concluded above, section 1856(c) of the California Code of Civil

21   Procedure allows Steadfast to present evidence of the parties' course of performance even without

22   showing a contract term is ambiguous. As described above, "course of performance," is defined

23   in particular as follows:

24             A "course of performance" is a sequence of conduct between the
                 parties to a particular transaction that exists if:

25

26             (1) the agreement of the parties with respect to the transaction
                 involves repeated occasions for performance by a party; and

27   /////

28   /////

1

2

(2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

3   Cal. Com. Code § 1303(a); *accord Epic Commc'ns*, 237 Cal. App. 4th at 1355. In other opinions,

4   California courts have expressed more concretely that course of performance evidence "applies

5   only to acts performed under the contract before any dispute has arisen." *Warner Constr. Corp.*

6   *v. City of L.A.*, 2 Cal. 3d 285, 297 (1970). In other words, actions undertaken after the parties

7   reach "a stage of clear disagreement" are not admissible under this rule. *Id.*

8          Steadfast must therefore make four preliminary showings before its evidence is

9   admissible. First, the ELI Policy must contemplate a series of repeated performance by a

10  particular person or entity. Second, that person or entity must be shown to have acted in

11  accordance with Steadfast's current interpretation of the ELI Policy. Third, Steadfast must show

12  LMI knew about these actions and had an opportunity to object, but did not. And fourth, all this

13  must have occurred after the ELI Policy was executed and before the parties to the ELI Policy

14  reached "a stage of clear disagreement." Overarching this test is the general rule that evidence of

15  the parties' course of performance is not admissible to flatly contradict the written policy. *See*

16  *Universal Sales*, 20 Cal. 2d at 761–62; *Tobacco Cases I*, 186 Cal. App. 4th at 52; *Emp'rs*

17  *Reinsurance*, 161 Cal. App. 4th at 921.

18         Steadfast has not cited the record to show any genuine disputes of material fact

19  prevent summary judgment in LMI's favor as to actual knowledge. As a preliminary matter,

20  much of Steadfast's evidence simply does not speak to a possible course of performance. Several

21  of Steadfast's citations speak only to CCI's or Steadfast's knowledge, actions, or positions, rather

22  than LMI's. *See* Miller Decl. Ex. E, at 14, ECF No. 202-5 (describing a dispute between CCI and

23  Steadfast); *id.* Ex. H, at 1, ECF No. 202-8 (reporting CCI's position); *id.* Ex. J, at 2, ECF

24  No. 202-10 (reporting CCI's position); *id.* Ex. L, at 1, ECF No. 202-12 (describing CCI's

25  actions); *id.* Ex. N, at 1[14] (describing CCI's actions); *id.* Ex. O, at 1, ECF No. 202-14 (CCI states

26  its understanding); *id.* Ex. U, at 1–2, ECF No. 208-2 (LMI states its belief Steadfast will likely

27

28         [14] This exhibit appears not to have been filed on the CM/ECF system, but was included in the courtesy copies sent to the court by mail. A copy is filed concurrently with this order.

1   consider a condition known on the basis of documentation outside the Scope of Work

2   Endorsement); *id.* Ex. Y, at 3, ECF No. 208-6 (LMI states its understanding of a conflict between

3   CCI and Zurich and founds its own position on the basis of contracts other than the ELI Policy);

4   *id.* Ex. II, at 2–3, ECF No. 211-1 (CCI categorizes unknown PCB sites); *id.* Ex. JJ, at 187–88,

5   ECF No. 212-1 (CCI relied on documents other than the Scope of Work Endorsement).

6           Other citations are simply irrelevant.  *See id.* Ex. W, at 1, ECF No. 208-4 (LMI

7   pillories CCI for relying on arguments based on the parties' intent rather than contract

8   provisions); *id.* Ex. X, at 5, ECF No. 208-5 (CCI reports its belief that disputes with LMI "as to

9   what constitutes an Unknown" are a risk management issue); *id.* Ex. AA, at 1, ECF No. 209-1

10  (LMI argues CCI faced conflicts of interest that drove CCI to mischaracterize pollution

11  conditions as unknown).

12          Several of Steadfast's citations suggest other documentation may help interpret the

13  Scope of Work Endorsement, but do not suggest actual knowledge controls the definition of

14  Known Pollution Conditions.  *See id.* Ex. F, ECF No. 202-6 (LMI relied on the Scope of Work

15  Endorsement to conclude a condition is unknown and supported this conclusion with other

16  documentation); *id.* Ex. G, at 1–2, ECF No. 202-7 (LMI relates its understanding of why a

17  condition was included in the Scope of Work endorsement); *id.* Ex. V, at 1–2, ECF No. 208-3

18  (LMI states its belief that a condition is known based both on its listing in the Scope of Work

19  Endorsement and historical documentation).

20          And several of Steadfast's citations suggest costs may be allocated between

21  Known Pollution Conditions and unknown conditions.  *See id.* Ex. CC, at 1, ECF No. 209-3 (LMI

22  writes that distinction between known and unknown pollution conditions is murky); *id.* Ex. DD,

23  at 1, ECF No. 209-4 (LMI writes some sites do not fall "neatly into known or unknown

24  categories"); *id.* Ex. EE, at 1, ECF No. 209-5 (LMI describes "co-located Known and Unknown

25  contamination"); *id.* Ex. FF, at 1, ECF No. 209-6 (CCI writes "costs must be properly

26  apportioned between the RSL and ELI policies"); *id.* Ex. GG, at 1, ECF No. 209-7 (LMI writes it

27  is "trying to come up with a way of allocating the costs of known/unknown conditions between

28  the RSL/ELI policies").  But this conclusion is consistent with the ELI Policy's definition, which

1    provides that "Known Pollution Conditions shall not include the allocable portion of costs

2    attributable to completing the Scope of Work with respect to any contaminant . . . , to the extent

3    that the contaminant results from a source that is in addition to a source for that contaminant

4    specified in the Scope of Work endorsement."  Poll. Evid. at SJCP 002584.

5                    Finally, the remaining citations could be relevant to establish LMI's knowledge

6    that other contract parties valued actual knowledge over a listing in the Scope of Work

7    Endorsement.  *See* Miller Decl. Ex. M, at 3, ECF No. 202-13 (CCI summarizes its understanding

8    to this effect in correspondence to LMI); *id.* Ex. P, at 2, ECF No. 202-15 (same); *id.* Ex. Q, at 2,

9    ECF No. 202-16 (same); *id.* Ex. S, at 2, ECF No. 210-1 (same); *id.* Ex. BB, at 2, 4, ECF No. 209-

10   2 (same).  Alternatively, some evidence suggests LMI acquiesced in that understanding.  *See id.*

11   Ex. E, at 16 (CCI reports its understanding of LMI's position that "Zurich determines

12   Knowns/Unknowns"); *id.* Ex. R, at 1, ECF No. 202-17 ("LMI claims Known [Fuel Oil Pipeline

13   or] FOPL segments are those shown on Figures in [another agreement, the Environmental

14   Services Cooperative Agreement or] ESCA . . . CH2M HILL claims only those segments shown

15   on Table 2 of the RSL Policy define the list of Known FOPL segments.  LMI using ESCA to

16   define Known FOPL segments . . .CH2M HILL using the RSL Policy to define Known FOPL

17   segments."); Lubovinksy Decl. ¶ 6, ECF No. 197 (reporting "LMI has often agreed that resolution

18   of whether given pollution was 'known' or 'unknown' necessarily turns upon what the parties

19   knew prior to the policies' inception, regardless of whether a given pollution condition is

20   expressly listed in the tables appended to the policies").

21                   But fundamentally, Steadfast has cited no portion of the record to show its

22   evidence depicts relevant performance before any controversy arose.  It makes no attempt to

23   delineate a time period in which the parties "harmoniously performed the contract."  *Emp'rs*

24   *Reinsurance*, 161 Cal. App. 4th at 922.  Rather, Steadfast's citations are replete with references to

25   disputes about the meaning of Known Pollution Conditions.  *See, e.g.*, Miller Decl. Ex. U, at 1–2;

26   *id.* Ex. W, at 1; *id.* Ex. X, at 5; *id.* Ex. Y, at 3; *id.* Ex. AA, at 1; Lubovinsky Decl. ¶ 5 (describing

27

28

1 | 2005 meeting meant to resolve disagreements about definition of Known Pollution Conditions).

2 | Its course of performance evidence is therefore inadmissible.[15]

3 |        Furthermore, as the court concluded above, Steadfast's fundamental position flatly

4 | contradicts the terms of the ELI Policy.  Steadfast argues "the issues in this case are not simply

5 | whether a condition is listed in a table, but rather whether the actual pollution . . . was known."

6 | Poll. Opp'n at 3.  It argues the Scope of Work Endorsement is only "a partial list of what [the

7 | parties] knew at policy inception to be Known Pollution Conditions."  Suppl. Opp'n at 4.  But the

8 | ELI Policy defines Known Pollution Conditions to be "all conditions specifically described in the

9 | Scope of Work Endorsement," and it provides that "Known Pollution Conditions constitute all of

10 | the conditions that are deemed known to the Insureds for the purposes of this Policy."

11 |        Steadfast has not borne its burden to show the parties' course of performance

12 | modified the terms of the ELI Policy.

13 | V.    CONCLUSION

14 |        LMI's motions for summary judgment are GRANTED IN PART as follows:

15 |        (1) The "Consent Agreement between Lennar Mare Island, the City of Vallejo and

16 | the State of California, California Environmental Protection Agency, Department of Toxic

17 | Substances Control Concerning Mare Island Naval Shipyard, Vallejo, CA," dated April 16, 2001,

18 | constitutes "Governmental Authority";

19 |        (2) For purposes of the ELI Policy, a person's or entity's actual knowledge of a

20 | pollution condition is insufficient to establish that condition is a Known Pollution Condition; and

21 |        (3) In all other respects, the motions are DENIED.

22 |        This order resolves ECF Nos. 160 and 186.

23 |        IT IS SO ORDERED.

24 | DATED:  March 31, 2016.

25 |

26 | UNITED STATES DISTRICT JUDGE

27 |

28 | [15] Because the court concludes substantive California law precludes admission of
Steadfast's evidence, it does not reach LMI's objections under the Federal Rules of Evidence.

35